UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

LOCAL 100, TRANSPORT WORKERS　　　：
UNION, AFL-CIO; ROGER TOUSSAINT, as：
President of Local 100, Transport Workers　：
Union, AFL-CIO, and WAYNE BRYAN,　　：

               Plaintiffs,　　　　：　　Civ. No.:  06 Civ. 4787 (RPP)

                   ：

          - against -　　　　：　　**AFFIDAVIT OF SCOTT A. GOLD**

BERNARD ROSEN, MARGARET　　　：
CONNOR, MARK PAGE, MARGE　　　：
HENNING and SUSAN KUPFERMAN, as　：
Employer Trustees of the T.W.U.-New York　：
City Private Bus Lines Pension Trust,　　：

            Defendants.　　　：

-------------------------------------------------------X

STATE OF NEW YORK　　　)
                : ss.:
COUNTY OF NEW YORK　　)

      Scott A. Gold, being duly sworn, deposes and says:

      1.     I am an attorney associated with the law firm of Schulte Roth & Zabel

LLP ("SRZ"), counsel to the Employer Trustees of the Transport Workers Union-New York City

Private Bus Lines Health Pension Trust (the "Fund").  SRZ also was counsel to the three former

contributing employers to the Fund, Queens Surface Corp. ("QSC"), Triboro Coach Corp.

("Triboro") and Jamaica Buses, Inc. ("Jamaica").  I am familiar with the facts and circumstances

in this action.  I submit this affidavit in support of the Employer Trustees' Memorandum of Law

in Opposition to Plaintiffs' Order To Show Cause For Preliminary Injunction And Temporary

Restraining Order.

      2.     The Fund is a jointly-administered trust fund, which sponsors employee

benefit plans that provide pension and other benefits to participants and beneficiaries affiliated

with Local 100, Transport Workers Union of America (the "Union").  The Fund is administered

in accordance with its Second Restated Trust Agreement (the "Trust Agreement") and Section

302(c)(5) of the Labor Management Relations Act ("Taft-Hartley"). A copy of the Trust

Agreement is attached and marked Exhibit A.

   3.  Pursuant to Section 3.1 of the Trust Agreement and Taft-Hartley, five of

the ten Trustees of the Fund are designated by the Union (5 Trustees) (the "Union Trustees") and

the other five Trustees are designated by the three employers that had collective bargaining

agreements with the Union.

   4.  The Trust Agreement was executed on September 28, 1999, by four Union

Trustees and four Employer Trustees.

   5.  Section 3.7(3) requires all decisions to be made by a majority vote by both

the Union Trustees and Employer Trustees. Section 3.7(5) further provides "[i]n the event of a

deadlock upon any question coming before the Trustees for decision or resolution, then on the

written request of any two (2) Trustees, the matter or dispute shall be submitted for decision to

the Impartial Chairman of the Local Private Transit Industry in New York City. Said Impartial

Chairman shall, for the purpose of deciding the matter or dispute, be vested with full voting

powers of a Trustee."

   6.  Section 1.2 of the Trust Agreement provides "[t]he sole purpose of the

Fund, the Pension Plan and the Savings Plan is to provide benefits permitted by law to

employees and their beneficiaries to the extent that the Trustees determine feasible and to defray

the expenses of doing so." Section 4.4 further provides "[t]he Trustees shall have the exclusive

power from time to time to determine what benefits the Fund is able feasibly to provide under

the Plan and generally, to determine the eligibility requirements, to determine the rules and

procedures for obtaining and administering such benefits, and to amend, modify or repeal any of the foregoing in accordance with applicable law."

7.    Sections 4.8(1) and 4.8(9) of the Trust Agreement authorize the Trustees to, inter alia, "construe this Trust Agreement, the Plans, and their rules and regulations" and to "do all other acts that they consider necessary or appropriate to effectuate the purposes of the Fund and the Plans, subject always to the provisions of applicable law, this Trust Agreement and the Plans."

8.    Section 11.1 of the Trust Agreement provides "[t]he provisions of this Trust Agreement may be amended at any time by an instrument in writing executed by the Trustees, provided, that in no event shall the Fund and the Plans be used for any purpose other than the purposes herein set forth."

9.    Section 10.1 of the Trust Agreement provides "[t]his Trust Agreement shall continue for such time as may be necessary to accomplish the purpose for which it was created but may be terminated at any time by the Trustees."

10.    The Pension Plan of the Fund is attached and marked as Exhibit B. Section 14.15 of the Pension Plan provides "[t]he Plan may be merged or consolidated with, or its assets or liabilities transferred in whole or in part to, another plan which meets the requirements of Code Sections 401(a) and 501(a) only if each Participant would, if either the Plan or the other plan terminated immediately after the merger, consolidation or transfer, then receive a benefit which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer if the Plan then terminated."

11.    On April 19, 2004, New York City Mayor Michael Bloomberg and New York State Governor George Pataki announced that the Metropolitan Transportation Authority

(the "MTA"), a public authority, would assume responsibility for bus routes then operated by seven private bus companies in New York City, including QSC, Triboro and Jamaica. A copy of the Press Release is attached and marked Exhibit C.

12.    Beginning in or about August 2004, the Trustees of the Fund have discussed the possibility of merging the Fund into a government pension plan.

13.    QSC, Jamaica and Triboro also engaged in negotiations with the Union about merging the Fund into the MTA Defined Benefit Pension Plan (the "MTA Plan").

14.    On February, 27, 2005, New York City purchased the assets of QSC, Following the purchase of QSC's assets, QSC terminated all employees and, pursuant to the Employee Retirement Income Security Act ("ERISA"), withdrew from the Fund. The MTA created a new article of the MTA Plan which provided the same plan of benefits as provided in the Pension Plan to former QSC employees.

15.    On January 30, 2006, New York City acquired the assets of Jamaica, and on February 20, 2006, the City acquired Triboro's assets. Upon the respective acquisitions, both Triboro and Jamaica terminated all employees and withdrew from the Fund. Former Triboro and Jamaica employees also became covered under the same article of the MTA Plan covering former QSC employees that mirrored the benefits from the Fund.

16.    The three private bus companies no longer contribute to the Plan pursuant to Section 4041A of ERISA, 29 U.S.C. § 1341a. By letter dated March 16, 2006, SRZ notified the Pension Benefit Guaranty Corporation ("PBGC") of the mass withdrawal of all employers and the resulting termination of the Plan. A copy of the March 16 letter (without its attachments) is attached and marked Exhibit D.

4

17.    Under Section 4041A(c) of ERISA, 29 U.S.C. § 1341a, upon a mass withdrawal, only "nonforfeitable" benefits can continue to be paid following the date of termination.  See PBGC letter dated April 21, 2006 attached and marked Exhibit E.  Thus, the Fund is no longer authorized to pay disability and certain death benefits to participants and beneficiaries under the Plan.

18.    On March 2, 2006, at a Board of Trustees meeting, the Employer Trustees made a motion to effectuate the merger of the Fund into the MTA Plan (the "Merger").  The Resolutions circulated by the Employer Trustees provided for taking all action necessary to effectuate the Merger, including adoption of the amendments to the Trust Agreement and the Pension Plan first proposed in August 2004 to explicitly authorize a merger of the Fund into a government plan.  The Resolutions also provided for transfer of all of the Fund's assets and liabilities to the MTA Plan, as well as that the MTA Plan provide the same benefits to the former employees of QSC, Jamaica and Triboro as to which they previously were eligible to receive from the Fund.  The Union Trustees moved to table the motion, but the Employer Trustees opposed tabling the motion.  The Employer Trustees all voted for the Merger and the Union Trustees all voted to oppose the Merger.

19.    Invoking the deadlock rules of the Trust Agreement, the Union Trustees demanded arbitration to resolve the deadlock with respect to the motion to table the Employer Trustees' motion.  The Employer Trustees also demanded arbitration, seeking to resolve the deadlock as to whether to approve the Merger proposal.  The Trustees agreed to consolidate the two demands for arbitration and submitted the deadlock motions to Arbitrator Jacqueline Drucker.  A copy of SRZ's letter to Arbitrator Drucker dated March 3, 2006, with its enclosures, is attached and marked Exhibit F.

20.    On March 2, 2006, the Trustees also signed Resolutions terminating the Transport Workers Union-New York City Private Bus Lines 401(k) Plan. Moreover, the Board of Trustees of the Transport Workers Union-New York City Private Bus Lines Health Benefit Trust signed Resolutions terminating the health plan. The Trustees' authority to terminate those plans has not been challenged. Copies of the respective Resolutions are attached and marked Exhibit G and H.

21.    Two days of arbitration hearings have already transpired, the first on May 15, 2006, and the second, on June 23, 2006. A third day of hearings is currently scheduled for August 2, 2006.

_____
Scott A. Gold (SG 3024)

Sworn to before me this
27th day of June 2006.

Notary Public
MEREDITH B. KRELL
Notary Public, State of New York
No. 02KR6133598
Qualified in New York County
Commission Expires September 19, 2009

6

# **EXHIBIT A**

## T.W.U. - NEW YORK CITY PRIVATE
## BUS LINES PENSION TRUST

SECOND RESTATED TRUST AGREEMENT made effective the 1st day of January, 1999, by and among the undersigned Union Trustees and Employer Trustees.

### WITNESSETH

WHEREAS: (1)    Local 100, Transport Workers Union of America AFL-CIO (the "Union") has entered into, and expects to continue to enter into, collective bargaining agreements which, among other things, require employer payments (the "Employer Contributions") to the T.W.U. - New York City Private Bus Lines Pension Trust;

(2)    The T.W.U. - New York City Private Bus Lines Pension Trust was established by an Agreement and Declaration of Trust (the "Trust Declaration"), dated as of November 23, 1963, and from time to time later amended by various instruments of amendment, under which a trust fund was established (the "Fund");

(3)    Said Trust Declaration has heretofore been amended and restated as the Restated Trust Agreement (the "Restated Trust Agreement"), effective as of January 1, 1976;

(4)    Pursuant to Section 4.3 of the Restated Trust Agreement, the Trustees may adopt a Plan of Benefits which shall state the level of benefits and the rules of eligibility thereof;

(5)    The Trustees adopted the T.W.U.- New York City Private Bus Lines Pension Trust (the "Pension Plan"), a defined benefit plan, amended and restated effective as of January 1, 1989;

(6)    The Trustees adopted the T.W.U.- NYC Private Bus Lines 401(k) Savings Plan (the "Savings Plan"), a defined contribution plan, effective as of February 1, 1999;

(7)    Article 11, Section 11.1 of the Restated Trust Agreement provides that the Restated Trust Agreement may be amended at any time in writing, executed by the Trustees;

(8)    It is the desire of the Trustees that the Second Restated Agreement and Declaration of Trust (the "Second Restated Trust Agreement") conform at all times with the applicable requirements of the Labor Management Relations Act of 1947, as amended; qualify as a "qualified trust" and as an "exempt trust" pursuant to the Internal Revenue Code of 1986, as amended (the "Code") and the Employee Retirement Income Security Act of 1974, as amended; ("ERISA");

(9)    It is the desire of the Trustees that this Second Restated Trust Agreement shall govern the Pension Plan and the Savings Plan; and

(10)    The Trust Declaration empowers the undersigned, as the original parties or the duly designated successors to all of the original parties to make and execute this Second Restated Trust Agreement.

NOW, THEREFORE, the parties agree:

1.0    Name, Nature and Purpose, Definitions.

1.1    The trust fund heretofore established by the Trust Declaration and continued by the Restated Trust Agreement and this Second Restated Trust Agreement shall be known as the Transport Workers Union - New York City Private Bus Lines Pension Trust, (the "Fund").

1.2    The sole purpose of the Fund, the Pension Plan and the Savings Plan is to provide benefits permitted by law to employees and their beneficiaries to the extent that the Trustees determine feasible and to defray the expenses of doing so. The assets of the Fund attributable to the Pension Plan shall only be used for the purposes of the Pension Plan and the assets of the Fund attributable to the Savings Plan shall only be used for the purposes of the Savings Plan.

1.3    It is intended that each Plan of Benefits promulgated pursuant hereto shall be a "multi-employer plan" and that the Trustees, collectively, shall be the "administrators" of the Fund and each Plan within the meaning of ERISA.

1.4    Unless the context clearly requires otherwise, whenever the following terms are used in this Second Restated Trust Agreement, they shall mean only as follows:

(1)    "Agreement" means a collective bargaining agreement between the Union and any Employer which requires Employer Contributions to the Fund.

(2)    "Code" means the Internal Revenue Code of 1986, as now in effect or hereafter amended and all regulations thereunder.

-2-

(3)    "Employee" means a person who is employed in a bargaining unit covered by an Agreement or who is employed by the Union or by a multi-employer fund to which the Union is party, and for whom the Union or such fund has agreed to pay and the Trustees have agreed to accept contributions on the same conditions that apply to other Employees.

(4)    "Employer" means Queens Surface Corp., Triboro Coach Corp., and Jamaica Buses, Inc. The Union, the Fund and any affiliated fund (that is, a fund sharing the same premises and general operating expenses and with substantially the same Employers) shall also be considered Employers under this Trust Agreement solely and exclusively for the purpose of permitting each of them to contribute to the Fund on behalf of their full-time employees, and to permit their said employees to participate in the Plans. Except for their right to make such contributions to the Fund, the Union, the Fund and any affiliated fund shall have no rights, privileges or powers as an Employer under this Trust Agreement or the Plans. If any situation should arise in which the rules of the Plans are not applicable to the Union or the Fund or any affiliated fund and its employees, the Trustees shall have the power to make appropriate rules and regulations with respect to the Union or the Fund or any affiliated fund and its employees.

(5)    "Employer Contributions" mean the payments which an Employer is required to make to the Fund pursuant to an Agreement or pursuant to the provisions of each of the Plans.

(6)    "ERISA" means the Employee Retirement Income Security Act of 1974, as now in effect or hereafter amended and all regulations thereunder.

(7)    "Fund" means the trust fund heretofore established by the Trust Declaration and continued by the Restated Trust Agreement and this Trust Agreement, known as the Transport Workers Union - New York City Private Bus Lines Pension Trust.

(8)    "Participant" means an employee or former employee who is eligible to participate in the benefits provided by the Plans under the criteria established by each Plan.

(9)    "Participant Contributions" mean the contributions made to a Plan by a Participant.

(10)    "Pension Plan" means the T.W.U. - New York City Private Bus Lines Pension Trust, amended and restated effective as of January 1, 1989.

(11)    "Plan" or "Plan of Benefits" are used interchangeably to mean the plan of benefits and the rules and regulations pertaining thereto, as promulgated and from time to time amended by the Trustees.

(12)    "Savings Plan" means the T.W.U. - New York City Private Bus Lines 401(k) Savings Plan, effective as of February 1, 1999.

(13)    "Trust Agreement" means this instrument, including amendments made pursuant hereto.

-3-

SR2WY\477321v9

(14)    "Trustees" mean the parties so designated herein and includes their successors.  "Employer Trustees" and "Union Trustees" mean trustees designated pursuant to Section 3.1 hereof.

(15)    "Union means Local 100, Transport Workers Union of America AFL-CIO.

2.0    The Fund.

2.1    The Employer Contributions and/or Participant Contributions, heretofore and hereafter made in accordance with the provisions of the Pension Plan, as well as their proceeds, increments and earnings, shall constitute the assets of the Pension Plan.

2.2    Employer Contributions and/or Participant Contributions heretofore and hereafter made in accordance with the provisions of the Savings Plan, as well as their proceeds, increments and earnings shall constitute the assets of the Savings Plan.

2.3    The Union assigns to the Trustees the sole right to receive the Employer Contributions and Participant Contributions, but without prejudice to the Union's rights under any Agreement to enforce payment of the Employer Contributions to the Trustees.

2.4    Neither the Union, a Trustee, nor an Employer shall have any liability to pay or provide any benefits under each Plan of Benefits or have any other liability for obligations of the Plans and only the assets of each Plan shall be available for the provision of such benefits and for the other purposes of this Trust Agreement, and the liability of each Plan shall be limited to its assets.  At no time and under no circumstances shall any part of the assets of the Plans revert to or be recoverable by an Employer or be used for or diverted to any purpose other than for the exclusive benefit of persons entitled to benefits under this Trust Agreement or each Plan.

-4-

The foregoing shall not prohibit the return of payments of contributions made by mistake of fact within one (1) year after any such payment.

2.5    Neither an Employer, Employee, nor any party hereto, nor any person claiming in the right of any of them, shall have any right, title, or interest in the assets of the Plans except only that Participants entitled to benefits under each Plan of Benefits shall be entitled to such benefits in the amount provided therein and subject to the conditions thereof. An Employee shall not have the right to any part of the Employer Contributions in place of such benefits.

2.6    Except with respect to a qualified domestic relations order as defined in Section 414(p) of the Code, no Employee, Participant, or beneficiary of a Plan of Benefits may waive any right to benefits or assign, transfer, pledge, encumber, anticipate, or in any way impair her or his right to any benefits. Neither the Fund, the Plans nor any of the Plan's assets shall be liable for the debts of an Employee, Participant or beneficiary nor shall benefits be subject to garnishee, attachment, or execution, except that the Fund may offset overpayments made by the Fund to an Employee, Participant or beneficiary against later benefits payable by the Fund pursuant to the provisions of the Plans.. The Trustees shall not pay a benefit to anyone other than the Employee, Participant or beneficiary personally or to her or his representative or distributees as provided in each Plan of Benefits.

3.0    The Trustees.

3.1    The Fund shall be administered by ten (10) Trustees, of whom five (5) shall be designated by the Union (the "Union Trustees") and two (2) shall be designated by Queens Surface Corp., two (2) shall be designated by Triboro Coach Corp., and one (1) shall be

-5-

designated by Jamaica Buses, Inc. (the "Employer Trustees"). At all times the number of Union

Trustees shall be equal to the number of Employer Trustees. The Trustees are vested with all

right, title, and interest in and to the Fund.

3.2    The Trustees shall serve without compensation but shall be reimbursed for

all reasonable and necessary expenses incurred in performing their duties. The Fund shall save

them harmless from any costs, counsel fees, or other expenses growing out of their office or

involving the Fund and shall provide liability and other insurance permitted by law.

3.3    By their subscriptions hereto, each of the undersigned Trustees accepts the

Fund and the Trust Agreement hereby created, consents to act as Trustee hereunder, and agrees

to administer the Fund and the Plans as herein provided. A successor Trustee may not serve until

he files a similar acceptance with the Fund. Upon so doing, such successor shall be vested with

all the rights and powers of the predecessor Trustee.

3.4    A Trustee shall serve at the pleasure of the party which designated him

and shall cease to serve when the Union or the designating Employer, as the case may be,

notifies the Fund in writing that it is duly designating a successor and such successor files with

the Fund a written acceptance of the duties of the office.

3.5    A Trustee may resign upon ten (10) days notice by an instrument in

writing addressed to the remaining Trustees and delivered to the Fund Secretary (as described in

Section 4.11 hereof) for transmittal to them. Such resignation shall become effective upon the

date stated in the notice unless a successor is qualified sooner.

3.6    A vacancy in the office of Trustee shall be promptly and duly filled by the party which designated the Trustee whose office has become vacant. Should a vacancy or vacancies exist among the Trustees for a period of thirty (30) days, a successor Trustee shall be designated by the balance of the Employer Trustees or the Union Trustees, as the case may be. A vacancy or vacancies in the office of Trustee shall not impair the power of the remaining Trustees to administer the Fund or the Plans.

3.7    The Trustees shall be governed by the following procedures:

(1)    The Trustees shall select from among themselves a Chairman and a Treasurer who shall serve until removed by a majority vote of the Trustees present and voting at a meeting of the Trustees. The Trustees shall set forth by formal resolutions, the persons, by name or title, who shall have authority to act as signators on drafts, checks or other withdrawal of the Fund;

(2)    The vote of the Trustees may be cast in person by the Trustees at a meeting or any Trustee may empower, by signed writing (e.g., by proxy), any other Trustee or Trustees to act on his or her behalf at any meeting of the Trustees;

(3)    A quorum for the transaction of business shall consist of at least six (6) Trustees. A majority of a quorum at a meeting shall be the act of the Trustees provided that such majority shall include at least two (2) Union Trustees and two (2) Employer Trustees. Actions of the Trustees may also be taken upon the written consent of all of them without a meeting.

(4)    The Trustees shall meet at least annually and upon the call of the Chairman, or upon the call of any three (3) Trustees upon at least five (5) days notice of the time and place of the meeting. Notices of meetings shall be in writing and shall be given to each Trustee. A meeting may also be held at any time without notice if all of the Trustees consent to such a meeting;

(5)    In the event of a deadlock upon any question coming before the Trustees for decision or resolution, then on the written request of any two (2) Trustees, the matter or dispute shall be submitted for decision to the Impartial Chairman of the Local Private Transit Industry in New York City. Said Impartial Chairman shall, for the purpose of deciding the matter or dispute, be vested with full voting powers of a Trustee; and

(6)    The Trustees shall cause written minutes of the business transacted at their meetings to be kept, including the matters voted upon and the votes of each Trustee, and copies to be furnished with reasonable promptness to each Trustee. They shall also keep accurate records of their transactions, and their books of account shall be audited at least

-7-

annually by a certified public accountant, copies of which shall be furnished to each Trustee.  A copy of each audit report shall be kept available for inspection by interested parties at the Fund office.

    4.0    <u>Administration of the Fund.</u>

    4.1    The Trustees shall use and apply the property of the Fund attributable to the Pension Plan only:

    (1)    To pay the expenses which they determine to be reasonable and necessary to administer the Pension Plan; and

    (2)    To provide for the benefits intended by the Pension Plan, and for no other purpose.

    4.2    The Trustees shall use and apply the property of the Fund attributable to the Savings Plan only:

    (1)    To pay the expenses which they determine to be reasonable and necessary to administer the Savings Plan; and

    (2)    To provide for the benefits intended by the Savings Plan and for not other purpose;

    4.3    The Trustees may, from time to time, promulgate other Plans which shall state the provisions for benefits and the rules of eligibility thereof.  Further, the Trustees have the authority to amend all Plans, either retroactively or prospectively, as they deem necessary or desirable, provided that:

    (1)    No amendment may provide for the payment of any benefits which will result in a loss of the tax-exempt status of the Fund or Plans, or an impairment of the tax deductibility of the Employer Contributions to the Plans;

    (2)    Divert any part of the Plans to any other purpose or revest any part of the Plans in any Employer; or

SR2NY1477321v9

(3)    Alter, change, modify, or amend any provisions of an Agreement.

4.4    The Trustees shall have the exclusive power from time to time to determine what benefits the Fund is able feasibly to provide under the Pension Plan and generally, under the Plans, to determine the eligibility requirements, to determine the rules and procedures for obtaining and administering such benefits, and to amend, modify or repeal any of the foregoing in accordance with applicable law.

4.5    The Trustees shall have the exclusive power to verify claims for the payment of benefits and to determine whether the conditions for the payment of benefits have been fulfilled.

4.6    Each Plan shall provide for a written explanation to a person whose claim for benefits has been denied of the specific reason for the denial with adequate notice or a reasonable opportunity for a full and fair review of such decision by the Trustees, a committee of the Trustees, or a third party, as the Trustees may arrange.

4.7    The Trustees shall not be required to submit any provisions of the Plans to the arbitration and grievance procedures of an Agreement.

4.8    The Trustees shall also have power:

(1)    To construe this Trust Agreement, the Plans, and their rules and regulations. Any construction or determination adopted by the Trustees in good faith shall be binding upon all parties, Participants, and beneficiaries;

(2)    To enforce by appropriate action in their discretion, the payment of contributions by Employers to the Plans. If any Employer defaults in the making of such payments there shall be added to the obligation of the Employer who is in default reasonable attorney's fees of twenty percent (20%), interest at the rate of two percent (2%) over the prime rate and all other expenses incurred by the Trustees in connection with the default;

-9-

(3)    In their own names, or in the name of the Fund or Plans, to demand, collect, and receive Employer Contributions, to sue and institute or take any actions in law, equity, bankruptcy, arbitration, or otherwise to enforce or vindicate any right of the Fund, and to settle, adjust, or compromise any claim as they deem necessary or desirable;

(4)    To enter into arrangements with other funds or with the Union to share office space, service and facilities and to pay a reasonable consideration therefor;

(5)    To enter into contracts, to conduct affairs of the Fund in corporate or other form, to keep property and securities registered in the name of the Fund or in the name of a bank or other fiduciary or agents or nominees of a fiduciary of the Fund, and to buy, sell, lease, convey, mortgage, or dispose of any property upon such terms as they deem proper, and to execute and deliver appropriate instruments in connection therewith;

(6)    To establish and maintain reserves and/or a funding policy;

(7)    To pay taxes, assessments, levies, and other charges imposed by law;

(8)    To delegate any of their ministerial or administrative powers or duties to agents, employees, or others, including the Union or a Trustee, except that the Trustees may not authorize any Employer, or the Union, or any representative of them, to make any representation to a Participant or prospective participant regarding eligibility for the right to benefits from the Fund. Such representations may be made only in writing and only by an authorized representative of the Fund and in their names; and

(9)    To do all other acts that they consider necessary or appropriate to effectuate the purposes of the Fund and the Plans, subject always to the provisions of applicable law, this Trust Agreement and the Plans.

4.9    The Trustees shall have the power, in their discretion:

(1)    To invest and reinvest assets of the Plans as they determine are not necessary for current expenditures or liquid reserves without distinction between principal and income in such investments as are lawful for the investment of such employee trust funds, and to sell, exchange, or otherwise dispose of such investments at any time and from time to time, including, but not limited to the investment or reinvestment of all or any part of the Fund in a common commingled, or separately managed trust fund or funds which has been established in order to provide diversified investments only for qualified pension and profit sharing trusts which meet the requirements of Section 501(a) and 401(a) of the Code, provided that such common commingled or separately managed trust fund or funds shall constitute an integral part of a Plan and this Trust Agreement;

(2)    By resolution, to delegate to a committee of the Trustees such investment duties and responsibilities with respect to such assets of the Plans as the Trustees shall specify in such delegation;

-10-

(3)    By resolution, to appoint one or more investment managers (as defined in Section 3(38) of ERISA) to be responsible for the management, acquisition, disposition, investing, and reinvesting of such assets of the Plans as the Trustees shall specify. Any such delegations shall be terminable by the Trustees upon not more than thirty (30) days written notice. The fees and charges of such investment manager shall be paid from the assets of the Plan for which such investment manager has served.

(4)    To allow, in accordance with Section 404(c) of ERISA, that each Savings Plan Participant shall have the exclusive right, in accordance with the provisions of the Savings Plan, to direct the investment by the Trustees of all amounts allocated to the separate accounts of such Savings Plan Participants among any one or more of the investment funds under the Savings Plan. Investment directions by Savings Plan Participants with respect to all contributions made under the Savings Plan shall be furnished to the Trustees or an agent of the Trustees by the Participants. In making any investment of the assets of the Savings Plan, the Trustees shall be fully entitled to rely on such directions furnished by the Participants with respect to the investment of contributions under the Savings Plan and shall be under no duty to make any inquiry or investigation with respect thereto. If the Trustees receive any contribution under the Savings Plan that is not accompanied by written instructions directing its investment, the Trustees may, in their discretion, hold or return all or a portion of the contribution uninvested without liability for loss of income or appreciation pending receipt of proper investment directions. Notwithstanding anything to the contrary herein, it is specifically intended under the Savings Plan and this Trust Agreement that the Trustees shall have no discretionary authority to determine the investment of the assets of the Savings Plan; and

(5)    To employ such administrative, professional expert or clerical assistance as they deem necessary or desirable in the performance of their duties.

4.10    The Trustees may, by resolution or by-law or by provisions of this Trust Agreement, delegate other fiduciary and administrative duties such as, but not limited to, those related to eligibility, audits, collections, administrative budgets and expenses, to committees of the Trustees consisting of an equal number of Employer and Union Trustees, or to other individuals as they may deem appropriate or necessary.

4.11    The Trustees shall employ a Fund Secretary for the Fund who shall, under the direction of the Trustees or an appropriate committee of the Trustees, administer the Fund offices, coordinate and administer the record-keeping and clerical services, provide for the coordination of actuarial services, prepare (in cooperation, where appropriate, with the consulting

-11-

actuary and independent auditor) all required reports and other documents to be filed or disseminated by the Fund, supervise the collection of Employer Contributions and Participant Contributions, and furnish Participants with information concerning their rights to benefits and assist them in preparing applications for benefits, review such applications, supervise the payment of such benefits, and perform such other duties and furnish such other services as the Trustees may assign. The Fund Secretary shall be the custodian, on behalf of the Trustees, of the documents and records of the Fund. The Fund Secretary shall serve at the pleasure of the Trustees.

4.12   The Trustees shall keep uninvested funds in such banks or similar depositories that they may designate, to be subject to withdrawal upon the signatures of those persons designated by the Trustees pursuant to the provisions of Section 3.7(1) of this Trust Agreement. They shall also provide for fidelity and surety bonds in at least the amounts required by law, the premium costs of which shall be paid from the assets of the applicable Plan. At the cost of the applicable Plan, and to the extent permitted by law, they may also provide for such errors and omissions and liability insurance for the Fund as such, themselves, and employees or agents of the Fund while engaged in the business of the Fund or in activities in its behalf as they deem desirable, provided that an insurance policy paid for by the Plans shall provide such recourse by the insurer against a Trustee as may be required by law.

4.13   Employers shall be required to furnish to the Fund regular written reports containing the names, addresses, social security numbers, hours worked, earnings and other information concerning their Employees, in the form and at the times that the Trustees may reasonably require, and Employer records which the Trustees' auditors deem relevant to an examination, including, without limitation, payroll books and records, cash books, ledgers,

-12-

contracts, tax returns and reports, which shall be subject to audit and copying by the representative of the Trustees at the Employer's place of business during regular business hours when the Trustees deem such examination and audit advisable.

4.14    To whatever extent permitted by law, the Trustees and each individual Trustee shall not be liable for any error or judgment, or for any loss arising out of any act or omission in the execution of this Trust Agreement, including any loss resulting from the investment and reinvestment of the corpus of the Fund (assets of the Plans), so long as they act in good faith, nor shall any Trustee, in the absence of his own bad faith, be personally liable for the acts or omissions (whether performed at the request of the Trustees or not) of any other Trustee, or of any employee, agent or attorney selected or appointed by or acting for the Trustee.

5.0    <u>Third Parties.</u>

5.1    A third party dealing with the Fund or the Plans shall not be required to satisfy himself that any money he pays or property he transfers to the Fund on behalf of the Plans is properly applied to its purposes or be obliged to inquire into the necessity or desirability of any action of the Trustees.

5.2    Every instrument executed by the Trustees, or by the Chairman, shall be conclusively presumed in favor of any party relying thereon that, at the time of execution of said instrument: (1) the Trust Agreement hereby created was in full effect, (2) the execution of the instrument was authorized by this Trust Agreement, and (3) the Trustees or the said Chairman were duly authorized and empowered to execute the instrument.

-13-

5.3     The Trustees shall have discretionary authority to determine eligibility for benefits and, in making such determination, shall have discretionary authority to interpret the terms of the Plans and the Trust Agreement. The benefit eligibility decision and the interpretation of the terms of the Plans and the Trust Agreement shall be given deference in any arbitral or judicial appeal of the decision. In any such appeal, the Trustees' decision may be overturned only if the interpretation of the terms of the Plans or the Trust Agreement was arbitrary and capricious or if the decision was otherwise arbitrary and capricious.

6.0     Construction.

6.1     The masculine, feminine, and neuter genders, and singulars and plurals, are used interchangeably herein and include each other.

6.2     The headings and titles of the articles and sections herein are only for convenience of reference and are not for the purpose of construction or giving effect to or determining rights under any provision hereof.

6.3     This Trust Agreement shall be construed under the laws of the State of New York except as to matters governed by Federal Law.

7.0     Savings Clause.

7.1     If any provision of this Trust Agreement be held to be unlawful, or unlawful as to any person or instance, such fact shall not adversely affect the other provisions hereof or its application to any other person or instance, unless such illegality shall make the functioning of the Fund and/or the Plans impossible.

-14-

8.0    Other Employers and Employees.

8.1    The Trustees may, in their discretion, extend the coverage of this Trust Agreement to other parties upon the agreement of such parties to conform to the conditions of this Trust Agreement and to make actuarially equivalent contributions for benefits.

9.0    Judicial Settlement.

9.1    The Trustees shall be entitled, at any time, to have a judicial settlement of their accounts and to seek judicial approval or a judicial determination or instructions as to any question of construction or action hereunder.

10.0    Termination of Trust.

10.1    This Trust Agreement shall continue for such time as may be necessary to accomplish the purpose for which it was created but may be terminated at any time by the Trustees. The Union and a majority of Employers may also terminate this Trust Agreement by providing six (6) calendar months written notice to the Trustees. The Trust Agreement shall be deemed terminated at the expiration of the six (6) month period.

10.2    Upon any such termination, the Trustees shall notify forthwith each Employer and the Union. The Trustees shall continue as Trustees for the purpose of dissolution and winding up the affairs of the Fund and the Plans. Upon termination, all of the Fund's assets shall be allocated as provided by the Plans or as required by law. The Trustees shall apply the assets of the Plans to pay or to provide for the payment of all administration expenses and contractual obligations of the Plans and shall apply any remaining assets in accordance with the Plans, subject to any priorities or other provisions established by ERISA. Under no

-15-

circumstances shall any portion of the assets of the Plans revert or be paid to an Employer or to the Union.

10.3    In the event of the termination of the Fund, it shall be the duty and obligation of the Trustees, and each of them, to execute such documents, deeds, assignments or other indicia of title as may be necessary and proper to effectuate such transfer and termination. In the event of such transfer or termination, the Trustees shall be held harmless for any further obligation of the Fund, for any further duties as Trustees, and the obligation and debts of the Fund shall not be considered or become a personal obligation of the Trustees or of the parties who originally designated the Trustees to act in that capacity.

11.0    <u>Amendments</u>.

11.1    The provisions of this Trust Agreement may be amended at any time by an instrument in writing executed by the Trustees, provided, that in no event shall the Fund and the Plans be used for any purpose other than the purposes herein set forth.

IN WITNESS WHEREOF, the Trustees have executed this Second Restated Trust
Agreement to evidence their acceptance of the Fund created hereunder and have agreed to be
bound by all of the terms of said agreements and by this instrument.

Dated: _Sept 28_, 1999

Union Trustees

_____
Robert Dowd

_____
Charles Petrone

_____
George Jennings

_____
Daniel Walchak

_____
Michael Curran

Employer Trustees

_____
Thomas Eagar

_____
Martin Burke

_____
Stephen J. Eagar, Sr.

_____
Joseph Nocera

_____
Jerome Cooper

-17-

RESOLUTION

SECOND RESTATED TRUST AGREEMENT
GOVERNING THE
T.W.U. - NEW YORK CITY PRIVATE BUS LINES PENSION TRUST

WHEREAS, the T.W.U. - New York City Private Bus Lines Pension Trust was established by an Agreement and Declaration of Trust (the "Trust Declaration"), dated as of November 23, 1963, and from time to time later amended by various instruments of amendment, under which a trust fund was established;

WHEREAS, the Trustees have adopted the T.W.U. – New York City Private Bus Lines Pension Trust (the "Pension Plan") and the T.W.U. – New York City Private Bus Lines 401(k) Savings Plan (the "Savings Plan");

WHEREAS, the Trust Declaration was amended and restated as the Restated Trust Agreement (the "Restated Trust Agreement"), effective as of January 1, 1976;

WHEREAS, the Restated Trust Agreement was amended and restated as the Second Restated Agreement and Declaration of Trust (the "Second Restated Trust Agreement"), effective as of January 1, 1999, and such Second Restated Trust Agreement governs the Pension Plan and the Savings Plan;

WHEREAS, pursuant to Section 4.8(1) of the Second Restated Trust Agreement, the Trustees have the power to construe the terms of the Trust Agreement; and

WHEREAS, it is the desire of the Trustees to clarify the meaning of the phrase "Impartial Chairman of the Local Private Transit Industry in New York City" found in section 3.7(5) of the Second Restated Trust Agreement, which addresses deadlocks among the Trustees;

NOW, THEREFORE, BE IT RESOLVED, that the phrase "Impartial Chairman of the Local Private Transit Industry in New York City" in Section 3.7(5) of the Second Restated Trust Agreement shall refer to the "Rotating Arbitrator," as selected by the Trustees. The Trustees shall select from the following three Rotating Arbitrators: Ralph Berger, Jacqueline Drucker and Roger Maher. When the need for an Impartial Chairman arises, a Rotating Arbitrator shall be selected in alphabetical order, using the individual's last name. Once a Rotating Arbitrator has served as the Impartial Chairman, he or she shall be placed at the end of the rotation. An individual shall not be selected out of turn to act as the Impartial Chairman unless a Rotating Arbitrator is unavailable within thirty (30) days (or a longer period if agreed to by the Trustees) of his or her selection.

9408074.6

IN WITNESS WHEREOF, this resolution is adopted this 16th day of July 2003.

<u>BOARD OF TRUSTEES</u>

Union Trustees:

Charles Woods R.

Kevin J. Cadigan

Victor Cannie.

Employer Trustees:

Myra Burke

9408074.6

# **EXHIBIT B**

TRANSPORT WORKERS UNION - NEW YORK CITY

PRIVATE BUS LINES

PENSION TRUST

Amended and Restated as of January 1, 2001

TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS..................................................................................................2

ARTICLE II ELIGIBILITY.................................................................................................9

| | | |
|---|---|---|
| 2.01 | Conditions Of Eligibility................................................ | 9 |
| 2.02 | Eligible Employee......................................................... | 9 |
| 2.03 | Determination Of Eligibility .......................................... | 10 |
| 2.04 | Termination Of Eligibility.............................................. | 10 |

ARTICLE III UNINTERRUPTED SENIORITY AND BREAKS IN SERVICE
FOR VESTING AND BENEFIT ACCRUAL .......................................10

| | | |
|---|---|---|
| 3.01 | Uninterrupted Seniority For Vesting Service ...................... | 10 |
| 3.02 | Severance From Service Date .......................................... | 10 |
| 3.03 | Additional Service Allowance .......................................... | 10 |
| 3.04 | Uninterrupted Seniority For Benefit Accrual ..................... | 10 |
| 3.05 | Pre-ERISA Service ....................................................... | 11 |
| 3.06 | Uninterrupted Seniority Following A Break In Service. ........ | 11 |
| 3.07 | Return To Employment After Disability ............................ | 11 |
| 3.08 | Service In The Armed Forces. ......................................... | 11 |

ARTICLE IV RETIREMENT CONDITIONS ....................................................12

| | | |
|---|---|---|
| 4.01 | Normal Retirement........................................................ | 12 |
| 4.02 | Delayed Retirement ...................................................... | 12 |
| 4.03 | Early Retirement. ......................................................... | 12 |
| 4.04 | Disability Retirement..................................................... | 13 |
| 4.05 | Suspension Of Benefits................................................... | 13 |
| 4.06 | Commencement Of Benefits............................................. | 14 |

ARTICLE V RETIREMENT BENEFITS .........................................................14

| | | |
|---|---|---|
| 5.01 | Normal Retirement Benefit.............................................. | 14 |
| 5.02 | Delayed Retirement Benefit............................................. | 15 |
| 5.03 | Early Retirement Benefit ................................................ | 15 |
| 5.04 | Maximum Retirement Benefit .......................................... | 15 |
| 5.05 | Cost of Living Increases. ................................................ | 23 |
| 5.06 | Required Benefit Commencement ..................................... | 24 |
| 5.07 | Retirement Benefit Rate.................................................. | 24 |

ARTICLE VI JOINT AND SURVIVOR AND PRERETIREMENT DEATH
BENEFITS.........................................................................................25

| | | |
|---|---|---|
| 6.01 | Automatic Joint And Survivor Annuity. ............................. | 25 |

| | | |
|---|---|---|
| 6.02 | Qualified Preretirement Survivor Annuity | 25 |
| 6.03 | Qualified Election | 26 |
| 6.04 | Notice Requirements | 27 |
| 6.05 | Transitional Rules. | 27 |
| 6.06 | In-Service Lump-Sum Death Benefit. | 29 |
| 6.07 | Post-Retirement Lump-Sum Death Benefit | 29 |
| 6.08 | Dependent Child's Pre-Retirement Death Benefit | 29 |
| 6.09 | Dependent Child's Post-Retirement Death Benefit | 30 |
| 6.10 | Payment Of Dependent Child's Benefit | 30 |

ARTICLE VII OPTIONAL METHODS OF RETIREMENT PAYMENTS ... 31

| | | |
|---|---|---|
| 7.01 | Optional Elections | 31 |
| 7.02 | Limitation On Optional Elections. | 31 |
| 7.03 | Further Limitations On Optional Elections | 31 |

ARTICLE VIII RETURN OF CONTRIBUTIONS. 32

| | | |
|---|---|---|
| 8.01 | Upon Termination Of Employment Prior To Vesting | 32 |
| 8.02 | Refund Upon Death. | 32 |
| 8.03 | Cessation of Payment Upon Death | 33 |
| 8.04 | Repayment Of Contributions Upon Reemployment | 33 |

ARTICLE IX REQUIRED COMMENCEMENT OF BENEFITS 34

| | | |
|---|---|---|
| 9.01 | General Rules. | 34 |
| 9.02 | Required Beginning Date. | 34 |
| 9.03 | Distribution Periods | 34 |
| 9.04 | Determination Of Amount To Be Distributed Each Year | 34 |
| 9.05 | Death Distribution Provisions. | 36 |
| 9.06 | Definitions | 37 |
| 9.07 | Distributions under Code Section 401(a)(9) | 38 |

ARTICLE X BENEFITS ON TERMINATION OF EMPLOYMENT AND
RETIREMENT UPON DISABILITY. 38

| | | |
|---|---|---|
| 10.01 | Termination Generally | 38 |
| 10.02 | Conditions For Vested Retirement Benefits | 38 |
| 10.03 | Amount Of Vested Retirement Benefits. | 38 |
| 10.04 | Single Sum Payment Of Value Of Vested Retirement Benefits | 39 |
| 10.05 | Participant And Spousal Consent For Immediately Distributable Benefits | 39 |
| 10.06 | Disability Termination. | 40 |
| 10.07 | Disability Retirement. | 40 |
| 10.08 | Trustee Review Of Disability Pension Payments | 41 |
| 10.09 | No Forfeiture Upon Withdrawal Of Employee Contribution | 41 |

ARTICLE XI FUNDING ...........................................................................................................41

11.01    Contributions By Participants. .........................................................................41
11.02    Contributions By Contributing Employers. ......................................................42
11.03    Fund .................................................................................................................43

ARTICLE XII PLAN ADMINISTRATION ...........................................................................43

12.01    The Board...........................................................................................................43
12.02    Delegation of Responsibility.............................................................................46

ARTICLE XIII AMENDMENT AND TERMINATION OF THE PLAN ...............................46

13.01    Amendment Of Plan. .........................................................................................46
13.02    Termination Of Plan. .........................................................................................47
13.03    Limit For 25 Highest Paid Employees................................................................49

ARTICLE XIV MISCELLANEOUS .......................................................................................51

14.01    Headings And Subheadings. ..............................................................................51
14.02    Gender And Number...........................................................................................51
14.03    Participant's Rights: Acquittance ......................................................................52
14.04    Receipt Or Release.............................................................................................52
14.05    Spendthrift Clause..............................................................................................52
14.06    Payments To Legally Incompetent.....................................................................52
14.07    Payment To Incapacitated Participant. ..............................................................52
14.08    Distribution Of Benefits Under Plan..................................................................52
14.09    Divestment Of Benefits......................................................................................53
14.10    Construction Of Plan..........................................................................................53
14.11    Execution Of Plan ..............................................................................................53
14.12    Deductibility Of Contributions. .........................................................................53
14.13    Lost Beneficiary Or Participant .........................................................................53
14.14    Duplication Of Benefits. ....................................................................................53
14.15    Merger Or Consolidation ...................................................................................54
14.16    Additional Contributing Employers....................................................................54
14.17    Return Of Contributions As A Result Of Mistake Of Fact................................54
14.18    Direct Rollover Of Eligible Rollover Distributions...........................................54
14.19    Qualified Domestic Relations Orders. ...............................................................55

ARTICLE XV TOP-HEAVY PROVISIONS.............................................................................58

15.01    Modification of Top-Heavy Rules......................................................................58
15.02    General Provisions..............................................................................................59
15.03    Minimum Vesting ...............................................................................................59
15.04    Minimum Benefits ..............................................................................................60
15.05    Limits On Compensation ...................................................................................60
15.06    Transitional Rule.................................................................................................60
15.07    Aggregation Of Plans..........................................................................................61

9104560.9

15.08    Top-Heavy Definitions. .................................................................................61
15.09    Excluded Participants.....................................................................................63

TRANSPORT WORKERS UNION - NEW YORK CITY

PRIVATE BUS LINES PENSION TRUST

The LOCAL 100, TRANSPORT WORKERS UNION, AFL-CIO, and TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, hereinafter jointly referred to as "Union", and QUEENS SURFACE CORP., and JAMAICA BUSES, INC., hereinafter referred to as "Employers", did separately and previously agree in a collective bargaining agreement to provide benefits under this Plan for the employees covered by said agreement and for whom the Union is the duly recognized collective bargaining agent.

The Plan and Trust were initially adopted on November 21, 1963. The Plan and Trust are intended to meet the requirements of Section 401(a) and 501(a) of the Internal Revenue Code of 1986, as amended. The Plan, as set forth herein, constitutes an amendment and restatement of the Plan effective as of January 1, 2001. The Plan was amended to conform to the requirements of the Uruguay Round Agreements Act of 1994, the Uniform Service Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, the Internal Revenue Service Restructuring and Reform Act of 1998 and the Community Tax Relief Act of 2000 (collectively, "GUST") and other applicable laws and to reflect certain administrative and conforming amendments.

This amendment and restatement is also adopted to reflect certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"). This amendment and restatement is intended as good faith compliance with the requirements of EGTRRA and is to be construed in accordance with EGTRRA and guidance issued thereunder. Any amendment intended to reflect EGTRRA shall supersede the provisions of the Plan to the extent those provisions are inconsistent with the provisions of such amendment.

The rights of anyone covered under the Plan before January 1, 2001 who retired, terminated employment or died before that date shall be determined in accordance with the terms and provisions of the Plan in effect on the date of such retirement, termination of employment or death, except as otherwise specifically provided herein.

9104560.9

ARTICLE I

DEFINITIONS

1.01    (a)    "Accrued Benefit" on behalf of any Participant shall be equal to the benefit calculated at any point in time and payable at Normal Retirement Date determined pursuant to Section 5.01.

(b)    A Participant's Accrued Benefit derived from Employee Contributions shall be equal to the Accumulated Employee Contributions Benefit.

(c)    Notwithstanding the above, a Participant's Accrued Benefit derived from Employer Contributions shall not be less than the minimum Accrued Benefit, if any, provided pursuant to Article XIV.

1.02    "Accumulated Employee Contributions Benefit" as of any date on or prior to a Participant's Normal Retirement Date means the Actuarial Equivalent of the Employee Contribution Benefit expressed as a monthly retirement benefit payable at his Normal Retirement Date.

1.03    "Actuarial Equivalent" means an equivalency in value, at a given point in time, between different forms of benefits, payable commencing at a date other than Normal Retirement Date. Unless the Plan is amended to change the actuarial assumptions on which calculation of equivalence is based, optional forms of benefits for all Participants shall be determined on the basis of the following conversion factors:

| Lump Sum Option | - | Effective on and after January 1, 2000, the investment return assumption will be the annualized rate of interest on 30 year-Treasury securities as specified by the Commissioner of Internal Revenue published in the month of December of the preceding Plan Year. The mortality table for this purpose is the table prescribed in the Regulations under Code Section 417(e) for use in the calendar year which contains the annuity starting date and which, until modified or superseded, is the table set forth in Revenue Ruling 95-6. |
| Joint and Survivor Option | - | UP 1984 Mortality Table, set ahead one (1) year for the Employee and set back four (4) years for the Spouse, with interest at the rate of six and one-half percent (6-1/2%) per annum. |
| Early Retirement Option | - | Reduce by three percent (3%) per year for years and months prior to age fifty-seven |

9104560.9

2

(57).

| | | |
|---|---|---|
| Maximum Permissible Benefits (under Plan Section 5.04) | - | UP 1984 Mortality Table, set ahead one (1) year, with interest at the rate of five percent (5%) per annum. |
| All other options | - | UP 1984 Mortality Table, set ahead one (1) year, with interest rates at six and one-half percent (6-1/2) per annum. |

1.04    "Agreement" means the collective bargaining agreement entered between the Union and Contributing Employers pursuant to which Contributing Employers are required to make contributions on behalf of their Eligible Employees.

1.05    "Annuity Starting Date" means the first day of the first period for which an amount is payable as an annuity or in the case of a benefit not payable in the form of an annuity, the first day on which all events have occurred which entitle the Participant to such benefit.

1.06    "Beneficiary" means the person designated to receive benefits which are payable under the Plan upon or after the death of a Participant.

1.07    "Board" means the Board of Trustees of the Transport Workers Union-New York City Private Bus Lines Pension Trust.

1.08    "Break in Service Year"

(a)    "Break in Service Year" means a twelve consecutive month Period of Severance as defined in Section 1.43. Further, solely for the purpose of determining whether a Participant has incurred a Period of Severance, a Period of Service shall be recognized for "authorized leaves of absence" and "maternity and paternity leaves of absence."

(b)    "Authorized leave of absence" means an unpaid, temporary cessation from active employment with the Employer pursuant to an established policy.

1.09    "Code" means Internal Revenue Code of 1986, as amended.

1.10    "Compensation" means Compensation as defined in Plan Section 5.04 (d)(iii) for purposes of the limitations on benefits.

(a)    For years beginning after December 31, 2000, the annual Compensation of each Participant taken into account under the Plan for any year shall not exceed $170,000. For years beginning after December 31, 2001, the annual Compensation of each Participant taken into account under the Plan for any year shall not exceed $200,000. This limitation shall be adjusted by the Commissioner for increases in the cost of living in accordance with Code Section 401(a)(17)(B). The cost-of-living adjustment in effect for a calendar year

applies to any period, not exceeding 12 months, over which Compensation is determined (determination period) beginning in such calendar year. If a determination period consists of fewer than 12 months, the annual Compensation limit will be multiplied by a fraction, the numerator of which is the number of months in the determination period and the denominator of which is 12.

If Compensation for any prior determination period is taken into account in determining an Employee's benefits accruing in the current Plan Year, the Compensation for that prior determination period is subject to the annual Compensation limit in effect for that prior determination period.

1.11    "Contiguous Noncovered Employment" means periods of employment which are contiguous to a period of Covered Employment with the same Contributing Employer, its predecessor, successor, or assigns.

1.12    "Contribution Date" means the date as of which an Employer is first obligated under the Agreement to make contributions to the Trust Fund.

1.13    "Contributions" means the payments to the Fund by a Contributing Employer which are provided for herein.

1.14    "Covered Employment" means employment of an Employee for the period during which he is in a collective bargaining unit represented by the Union. For periods prior to the Employer's Contribution Date the term shall include, in addition, for purposes of vesting and eligibility, the type of employment in the geographic area which is now or hereafter covered by a collective bargaining agreement with the Union.

1.15    "Delayed Retirement Date" means the date set forth in Article IV.

1.16    "Dependent Child or Children" means any unmarried child or children of the Participant under the age of nineteen (19) years, including any legally adopted child or children. "Dependent Child or Children" shall not include any person(s) who is an Employee under this Plan, nor any person(s) who is in the military or similar forces of any country or subdivision thereof.

If a person who would be a Dependent Child but for the fact that he has attained age nineteen (19) shall be incapable of self-sustaining employment by reason of mental retardation or physical handicap, and shall have been so incapable continuously since a date prior to his attainment of age nineteen (19), and shall be chiefly dependent upon the Participant for support and maintenance, then such person shall be a Dependent Child. The Trustees may require that proof of such continuous incapacity and dependency be furnished before any benefits become payable to or on behalf of such Child.

Each Dependent Child shall cease to be a Dependent Child on his nineteenth (19th) birthday, or, in the case of an incapacitated person as described in the preceding paragraph, on the later of such person's nineteenth (19th) birthday or the first date such person is no longer so incapacitated.

1.17    "Disability" means, for purposes of this Plan, a physical or mental condition of a Participant resulting from bodily injury, disease, or mental disorder which wholly prevents the disabled Participant from performing the duties of the occupation in which he was engaged at the time he became disabled, or the duties of a reasonably equivalent occupation, and which disability has continued without interruption for at least six (6) months. In any event, a Participant shall not be considered to be totally and permanently disabled for purposes of this Plan if he engages in any gainful occupation and earns $10,000 or more per year, or if his Disability shall result from any act of the Participant performed with the willful intention to bring about the injury or death of himself or another.

1.18    "Disability Retirement Date" means the date set forth in Article IV.

1.19    "Early Retirement Date" means the date set forth in Article IV.

1.20    "Effective Date" means November 21, 1963.    The provisions of this amended and restated Plan shall be effective as of January 1, 1989.

1.21    "Eligible Employee" means an Employee described in Section 2.02.

1.22    "Employee" means any person employed by a Contributing Employer. The term "Employee" shall also include any person employed by the Union who, immediately prior to such employment by the Union, was a member of a unit of employees covered by a collective bargaining agreement and that agreement or a successor agreement provides for the employee to benefit under the Plan. Such person shall remain an Employee for purposes of this Plan, provided his responsibilities as a Union employee are with respect to the collective bargaining unit in which he had been a member. Such continued participation in this Plan shall be subject to the execution of an agreement between the Union and the Trustees and subject to the requirement that contributions are made on behalf of the Union employee in an amount equal to the contribution that would be made if the Union employee was employed by a Contributing Employer.

1.23    "Employee Contribution" means the amount a Participant is required to contribute to the Plan pursuant to Section 11.01 in order to be eligible to participate in Plan benefits.

1.24    "Employee Contribution Benefit" means the Accrued Benefit derived from Employee Contributions made as of any specified date that is the amount equal to the Employee's accumulated contributions (defined hereafter) expressed as an annual benefit commencing at Normal Retirement Age, using the interest rate which would be used under the Plan as required by Code Section 417(e)(3) (as of the determination date). "Accumulated Contributions" means the total of:

(a)    Employee Contributions,

(b)    interest (if any) on such contributions, computed at the rate provided by the Plan to the end of the last Plan Year to which Code Section 411(a)(2) does not apply, and

(c)    interest on the sum of (a) and (b) above compounded annually:

(i)    at the rate of one hundred twenty percent (120%) of the federal midterm rate (as in effect under Code Section 1274 for the first month of a Plan Year) from the beginning of the first Plan Year to which Code Section 411(a)(2) applies and ending with the date on which the determination is being made, and

(ii)    at the interest rate used under the Plan pursuant to Code Section 417(e)(3) (as of the determination date) for the period beginning with the determination date and ending on the date on which the Participant would attain Normal Retirement Age.

1.25    "Employer" or "Contributing Employer" means an employing organization which, either directly or as a member of an association of Employers, is a party to a Collective Bargaining Agreement with the Union which provides that contributions shall be made to the Trust.

1.26    "Employment Commencement Date" means the date on which an Employee first performs an Hour of Service.

1.27    "Entry Date" means the date defined in Section 2.01 of the Plan.

1.28    "Fiduciary" means any Trustee, plan administrator and any other person who:

(a)    Exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets;

(b)    Has any discretionary authority or discretionary responsibility in the administration of the Plan; or

(c)    Is described as a "fiduciary" in Section 3(14) or (21) of ERISA or is designated to carry out fiduciary responsibilities pursuant to this Agreement to the extent permitted by Section 405(c)(1)(B) of ERISA.

1.29    "Fund" means the pension trust established in accordance with the Agreement between Contributing Employers and the Union the 21st day of November, 1963.

1.30    "Highly Compensated Employee" means an individual defined in accordance with Code Section 414(q) and the regulations thereunder. Effective for years beginning after December 31, 1996, the term highly compensated employee means any employee who (1) was a 5-percent owner at any time during the year or the preceding year, or (2) for the preceding year had compensation from the employer in excess of $85,000. In determining who is a highly compensated employee, a Contributing Employer shall make the following election(s) as provided for in Treasury Regulation 1.414(q)-1T:

(a)    the top-paid group election in accordance with Code Section 414(q)(1)(B)(ii); and

9104560.9

6

(b)    the calendar year election for the look-back year in accordance with Treasury Regulation 1.414(q)-1T, Q&A 14(b);

1.31    "Hour of Service" means each hour for which an Employee is paid, or entitled to payment for the performance of duties.

1.32    "Insurer" means any legal reserve life insurance company as elected by the Committee which shall issue one or more insurance contracts under the Plan.

1.33    "Investment Manager" means an entity that (a) has the power to manage, acquire, or dispose of Plan assets and (b) acknowledges fiduciary responsibility to the Plan in writing. Such entity must be a person, firm, or corporation registered as an investment adviser under the Investment Advisers Act of 1940, a bank, or an insurance company.

1.34    "Key Employee" means any Employee or former Employee (and the Beneficiaries of such Employee) who at any time during the determination period was an officer of the Employer if such individual's annual Compensation exceeds fifty percent (50%) of the dollar limitation under Code Section 415(b)(1)(A), an owner (or considered an owner under Code Section 318) of one of the ten largest interests in the Employer if such individual's Compensation exceeds one hundred percent (100%) of the dollar limitation under Code Section 415(c)(1)(A), a 5-percent owner of the Employer, or a 1-percent owner of the Employer who has an annual Compensation of more than $150,000. Annual Compensation means Compensation as defined in Code Section 415(c)(3), but including amounts contributed by the Employer pursuant to a salary reduction agreement which are excludable from the Employee's gross income under Code Sections 125, 132(f)(4), 402(a)(8), 402(h) or 403(b). The determination period is the Plan Year containing the determination date and the four (4) preceding Plan Years.    The determination of who is a Key Employee will be made in accordance with Code Section 416(i)(1) and the regulations thereunder.

1.35    "Maternity or Paternity Leave of Absence" means, for Plan Years beginning after December 31, 1984, an absence from work for any period by reason of the employee's pregnancy, birth of the Employee's child, placement of a child with the Employee in connection with the adoption of such child, or any absence for the purpose of caring for such child for a period immediately following such birth or placement. For this purpose, a period of maternity or paternity leave shall be treated as neither a Period of Service nor a Period of Severance prior to the end of the twelve (12) month period following such absence.

1.36    "Non-Highly Compensated Employee" means all Employees who are not Highly Compensated Employees and shall be construed in accordance with the provisions of Code Section 414(q) and the regulations thereunder.

1.37    "Non-Key Employees" means any Employee or former Employee (and any Beneficiary of an Employee or former Employee) who is not a Key Employee.

1.38    "Normal Form of Retirement Benefit" means (a) for Participants who retire on or after eligibility for an early retirement benefit or a normal retirement benefit, a pension payable for life beginning as of the Participant's Early or Normal Retirement Date or, if later, the income commencement date, but in the event of the Participant's death before receiving

91045609                                          7

sixty (60) monthly payments, his pension continues to his Beneficiaries until the balance of the sixty (60) monthly payments has been paid; (b) for each other Participant, a pension payable for life beginning as of the Participant's Disability Retirement Date or the date on which a Participant commences a vested benefit or, if later, the income commencement date and ceasing upon the Participant's death.

1.39    "Normal Retirement Age" means age on the date on which a Participant attains either (a) age fifty-seven (57) and completes twenty (20) years of Uninterrupted Seniority or (b) the later of age sixty-five (65), or the fifth anniversary of the date the Employee became a Participant.

1.40    "Normal Retirement Date" is the date described in Plan Section 4.01.

1.41    "Participant" means any Eligible Employee who participates in the Plan as provided in Article II and any other Employee or former Employee having a right or contingent right to benefits hereunder. "Active Participant" means an Eligible Employee who participates in the Plan and has not for any reason become ineligible to participate further in the Plan.

1.42    "Period of Service" means a period of Covered and Non-Covered Employment of an Employee commencing on his Employment Commencement Date or Reemployment Commencement Date, whichever is applicable, and ending on his Severance From Service Date.

1.43    "Period of Severance" means the period of time commencing on the Severance from Service Date in accordance with Section 3.02 of an Employee and ending on the Reemployment Commencement Date.

1.44    "Plan" means the Transport Workers Union - New York City Private Bus Lines Pension Trust established by the Contributing Employers pursuant to the Agreement with the Union and wherever necessary or appropriate, includes the Plan as it was previously constituted prior to this amendment.

1.45    "Plan Sponsor" means the Trustees of the Transport Workers Union - New York City Private Bus Lines Pension Trust.

1.46    "Plan Year" means each twelve (12) consecutive month period commencing with each January 1 and each anniversary thereafter.

1.47    "Qualified Domestic Relations Order" means a domestic relations order as defined in Section 14.19 in accordance with Code Section 414(p).

1.48    "Reemployment Commencement Date" means the first date, following a Period of Severance on which the Employee performs an Hour of Service.

1.49    "Seniority" means the length of service credited to an Employee for the purpose of job pick and vacation pick purposes pursuant to a collective bargaining agreement between the Union and the Employers.

1.50    "Spouse" means the person to whom the Participant has been legally married as of the Participant's death or Annuity Starting Date, whichever is earlier. The term "spouse" will also include a surviving spouse of the Participant, provided that a former spouse will be treated as the spouse or surviving spouse and a current spouse will not be treated as the spouse or surviving spouse to the extent provided under a qualified domestic relations order as described in Code Section 414(p).

1.51    "Trust" means a trust established by the Employer in accordance with Article XI hereof.

1.52    "Trust Agreement" means an agreement made pursuant to the Agreement which establishes the Trust.

1.53    "Trustees" means the individuals designated from time to time pursuant to the terms of the Agreement.

1.54    "Uninterrupted Seniority" means the period of employment required for vesting and benefit accrual under the Plan, determined as set forth in Article III hereof. Uninterrupted Seniority will be determined on the basis of elapsed time.

1.55    "Union" means Local 100, Transport Workers Union of America, AFL-CIO, and Transport Workers Union of America, AFL-CIO.

## ARTICLE II

## ELIGIBILITY

2.01    Conditions Of Eligibility.

(a)    Any Employee who was a Participant in the Plan prior to the effective date of this amendment and restatement shall continue to participate in the Plan. Any other Eligible Employee shall participate in the Plan on the Entry Date.

(b)    Entry Date means the date an Eligible Employee first performs one Hour of Service.

(c)    To be a Participant, each Eligible Employee must agree to make mandatory Employee Contributions. Such Employee Contributions shall be made in accordance with written procedures established by the Employer and administrator. A Contributing Employer shall give each Eligible Employee written notice of his required contribution in sufficient time to enable such Eligible Employee to make his Employee Contribution in accordance with procedures established.

2.02    Eligible Employee. "Eligible Employee" means any Employee employed in Covered Employment by a Contributing Employer. An "Eligible Employee" shall also mean any Employee employed by the Union pursuant to Section 1.22.

2.03    Determination Of Eligibility. The Trustees shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Contributing Employer. Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to this Article II.

2.04    Termination Of Eligibility.

(a)    In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee, such Participant shall continue to vest in his Accrued Benefit under the Plan for each Year of Service completed while an ineligible Employee, until such time as his Accrued Benefit shall be forfeited or distributed pursuant to the terms of the Plan.

(b)    In the event an Employee who is not a member of an eligible class of Employees becomes a member of an eligible class, such Employee will participate immediately if such Employee would have otherwise previously become a Participant.

## ARTICLE III

## UNINTERRUPTED SENIORITY AND BREAKS IN SERVICE
### FOR VESTING AND BENEFIT ACCRUAL

3.01    Uninterrupted Seniority For Vesting Service. The Uninterrupted Seniority for Vesting Service of an Employee shall be the aggregate of his Periods of Service as of the date benefits are to be determined under any provisions of the Plan. For this purpose, Periods of Service shall include Covered Employment and Contiguous Noncovered Employment.

3.02    Severance From Service Date. A Severance From Service Date shall be deemed to occur on the earlier of:

(a)    the date on which the Employee quits, retires, is discharged or dies; or

(b)    the first anniversary of the first date of a period in which the Employee remains absent from service (with or without pay) with a Contributing Employer for any reason other than quit, retirement, discharge or death, subject to the provisions of Section 3.03 hereof.

3.03    Additional Service Allowance. If an Employee performs an Hour of Service within twelve (12) months of the Severance From Service Date, the Period of Severance shall be included as a Period of Service for purposes of determining years of Uninterrupted Seniority under any of the provisions of the Plan.

3.04    Uninterrupted Seniority For Benefit Accrual. The Uninterrupted Seniority for Benefit Accrual of a Participant, as of the date the benefits are to be determined under the Plan, shall include all Periods of Service with a Contributing Employer during which time the Employee was a Participant in the Plan. In computing years of Uninterrupted Seniority for Benefit Accrual, a major fraction of a year shall be considered to be a year. In no event shall an

Employee receive Uninterrupted Seniority for benefit purposes for any period of employment during which the Employee elected not to or was not permitted to make Employee Contributions.

3.05    Pre-ERISA Service.  Notwithstanding the above, Uninterrupted Seniority prior to January 1, 1976 shall, with respect to Employees participating in this Plan as of January 1, 1976, be equal to the Uninterrupted Seniority of such Employees in accordance with the terms and provisions of this Plan as it existed on December 31, 1975 as reflected on the books and records of the Employer as of such date.

3.06    Uninterrupted Seniority Following A Break In Service.

(a)    For an Employee who shall have incurred a Break in Service Year and subsequently thereto shall become reemployed, both periods of employment shall be aggregated for purposes of determining Uninterrupted Seniority for of Vesting and Benefit Accrual, except that if the Employee shall not have satisfied the requirements for a deferred vested benefit prior to the Break in Service, and if upon reemployment his number of consecutive Break in Service Years shall equal or exceed the greater of (i) five (5) or (ii) his number of Uninterrupted Seniority years, he shall be deemed newly employed for all purposes hereunder and his Uninterrupted Seniority shall not include any period prior to the Break in Service Year.

(b)    Any period for which a Participant is eligible to make contributions to the Plan and fails to do so shall not be included in the Participant's Uninterrupted Seniority.  Any period for which a Participant makes the required contributions and later receives a cash refund thereof pursuant to the provisions of Section 8.01, and for which he is eligible to repay said withdrawal or refund pursuant to the provisions of Section 8.04, shall be included in a Participant's Period of Service for the sole purpose of determining whether a Participant has earned a vested right to a pension as provided in Section 10.02 hereof; provided, however, that this subsection shall not limit the effect of a repayment pursuant to the provisions of Section 8.04.

3.07    Return To Employment After Disability.  If a Participant retired on Disability recovers and returns to Covered Employment with a Contributing Employer, he shall be entitled to his Uninterrupted Seniority and vesting service accrued as of the time his absence for disability commenced.  No Uninterrupted Seniority or shall accrue, however, for the period of time that the Employee received benefits for total and permanent disability, or prior to his return to Covered Employment.

3.08    Service In The Armed Forces.

(a)    Any Employee who left Covered Employment of a Contributing Employer to enter the Armed Forces of the United States, and whose reemployment rights are protected by Federal law, shall receive Uninterrupted Seniority for the period of his Military Service, that he would have earned had he instead continued his prior employment with a Contributing Employer, provided that the Employee returns to work in compliance with any requirements of such law.

(b)    If a Participant shall be reemployed in employment covered by the Plan following an absence caused by military service as provided in subsection (a) above, he shall be given a reasonable opportunity to contribute to the Plan the amounts which he would have been required to contribute had he remained in employment covered by the Plan during the period of military service plus interest thereon. If the Participant shall agree to make such contributions, his normal pension benefit, determined in accordance with Section 5.01, shall be determined on the basis of all his Uninterrupted Seniority, including the period of military service.

(c)    If a Participant described in Subsection (a) above shall decline to make contributions to the Plan as described in subsection (b) above, his normal pension benefit, determined in accordance with Section 5.01, shall be determined on the basis of all his Uninterrupted Seniority, including the period of military service; provided, however, that the benefit will be reduced by an amount which is the actuarial equivalent of the amount of contributions which the Participant would have been required to make to the Plan had he remained in employment covered by the Plan during the period of military service, plus interest thereon.

(d)    Notwithstanding any provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code Section 414(u).

## ARTICLE IV

### RETIREMENT CONDITIONS

4.01    Normal Retirement. The Normal Retirement Date of a Participant shall be the first day of the month coinciding with or next following the date he attains Normal Retirement Age.

4.02    Delayed Retirement. If a Participant shall remain in employment beyond his Normal Retirement Date, his Delayed Retirement Date shall be the first day of the month coinciding with or next following the date such Participant notifies the Employer that his retirement is to be effective. A Participant who remains in employment beyond his Normal Retirement Date shall be deemed to have retired on the first day of the first month in which he completes less than eight (8) days of employment.

4.03    Early Retirement.

(a)    A Participant may elect to retire from the employment of the Employer prior to his Normal Retirement Date on his Early Retirement Date, which is the first day of any month coinciding with or following the date he both attains the age of fifty-five (55) and completes twenty (20) years of Uninterrupted Seniority and elects to retire. A Participant may further elect to have his retirement benefit commence on the first day of any month between his Early Retirement Date and his Normal Retirement Date.

(b)    If a Participant separates from Covered Employment before satisfying the age requirement for early retirement, but has satisfied the service requirement, the

Participant will be entitled to elect commencement of his retirement benefit upon satisfaction of such age requirement.

4.04    Disability Retirement. Upon demonstration of a Participant's Disability to the satisfaction of the Trustees, a Participant shall be eligible for disability retirement under Section 10.06 provided he has completed fifteen (15) years of Uninterrupted Seniority.

4.05    Suspension Of Benefits.

(a)    If a Participant who is receiving or is entitled to receive retirement benefits under this Plan re-enters employment hereunder or of any other employer in the industrial and geographic area of the Union for eight (8) or more days per month, the Trustees shall suspend such benefits during the period of such employment. Payment for one (1) hour of service in a day will equal one (1) day of employment. Upon subsequent termination of such employment and upon reapplication by the Participant to the Trustees, benefit payments will resume on the first day of the month following approval of his reapplication to the Trustees. Such benefit amount shall be calculated on the basis of the benefit rate determined as of his subsequent retirement date and the Participant's Uninterrupted Seniority earned prior and subsequent to his reemployment hereunder, reduced by the actuarial value of the payments previously made, but in no event less than the benefit amount as paid prior to the suspension of his pension. For the purpose of the above sentence, a Participant who has satisfied the requirements for a normal retirement benefit pursuant to the provisions of Section 4.01 shall not be considered as having entered employment hereunder, unless such employment is for eight (8) or more days per month.

(b)    The Trustees shall have the right to deduct, from payments becoming due after the Participant ceases such active work, any payments made during the period of employment and prior to the date they had notice that the Participant was so employed. In no event, however, will the deduction for any month exceed 25% of the monthly benefit otherwise payable to such Participant. The Trustees may require of each retired Participant proof that he is not working full or part time for an Employer hereunder or any other employer in the industrial and geographic jurisdiction of the Union; but the Trustees shall not require such proof more often than once in a calendar quarter. Failure to furnish such proof shall be grounds for suspension of pension payments until such proof has been furnished.

(c)    A Pensioner may request a ruling from the Trustees as to whether an occupation comes under the industrial and geographic jurisdiction of the Union by filing written notice thereof with the Trustees within 90 days from the date the Trustees issue such determination. As a result of such hearing, the Trustees may modify or correct the determination on the basis of proof submitted by the Participant and deemed satisfactory to the Trustees.

(d)    No payments shall be withheld by the Plan pursuant to this Section unless the Plan notifies the Participant by personal delivery or first class mail during the first calendar month or payroll period in which the Plan withholds payments that his or her benefits are suspended. Such notifications shall contain a description of the specific reasons why benefit payments are being suspended, a description of the plan provision relating to the suspension of payments, a copy of such provisions, and a statement to the effect that applicable Department of

Labor regulations may be found in Section 2530.203-3 of the Code of Federal Regulations. In addition, the notice shall inform the Participant of the Plan's procedures for affording a review of the suspension of benefits. Requests for such reviews may be considered in accordance with the claims procedure adopted by the Plan pursuant to Section 503 of Employee Retirement Income Security Act of 1974 (ERISA) and applicable regulations.

(e)    In the case of benefits payable periodically on a monthly basis for as long as a life (or lives) continues, such as a straight life annuity or a qualified joint and survivor annuity, an amount equal to the monthly retirement benefit shall be suspended.

4.06    Commencement Of Benefits.

(a)    Unless the Participant elects otherwise, distribution of benefits will begin no later than the 60th day after the latest of the close of the Plan Year in which:

(i)    the Participant attains age sixty-five (65) (or Normal Retirement Age, if earlier);

(ii)    occurs the tenth (10th) anniversary of the year in which the Participant commenced participation in the Plan; or

(iii)    the Participant terminates service with the Employer.

(b)    Notwithstanding the foregoing, the failure of a Participant and Spouse to consent to a distribution while a benefit is immediately distributable, within the meaning of Section 10.05 of the Plan, shall be deemed to be an election to defer commencement of payment of any benefit sufficient to satisfy this Section.

ARTICLE V

RETIREMENT BENEFITS

5.01    Normal Retirement Benefit.  A Participant shall, upon retirement at his Normal Retirement Date, receive a monthly retirement benefit which shall commence on such retirement date and shall be payable under the Normal Form of Retirement Benefit defined in Section 1.38 of the Plan. The amount of each such monthly retirement benefit shall, subject to the provisions of Section 5.04 hereof, be equal to his years of Uninterrupted Seniority for Benefit Accrual multiplied by the respective amount shown in the following schedule:

| Date of Initial Retirement | Monthly Benefit Per Year of Credit |
|---|---|
| April 1, 1988 - August 31, 1989 | $54.00 |
| September 1, 1989 - December 31, 1990 | $57.00 |
| January 1, 1991 - May 31, 1991 | $60.00 |
| June 1, 1991 - May 31, 1992 | $62.00 |
| June 1, 1992 – June 30, 1996 | $65.00 |
| July 1, 1996 – December 31, 1996 | $68.00 |
| January 1, 1997 – September 30, 1997 | $70.00 |
| October 1, 1997 – September 30, 1998 | $74.00 |
| October 1, 1998 – February 29, 2000 | $78.00 |
| March 1, 2000 – | $82.00 |

5.02    Delayed Retirement Benefit.  A Participant shall, upon retirement on his Delayed Retirement Date, receive a monthly retirement benefit which shall commence on the date of such retirement or the first day of any month thereafter (but no later than required by Article IX and shall be payable under the Normal Form of Retirement Benefit).  The amount of each such monthly retirement benefit shall, subject to the provisions of Section 5.04 hereof, be determined in the same manner as for retirement at a Participant's Normal Retirement Date except that years of Uninterrupted Seniority for Benefit Accrual and benefit rate shall be determined as of the date of his actual retirement.

5.03    Early Retirement Benefit.  A Participant shall, upon retirement on Early Retirement Date, receive his Accrued Benefit which shall commence on the date elected in accordance with Section 4.03 and shall be payable under the Normal Form of Retirement Benefit.  The amount of such monthly retirement benefit shall, subject to the provisions of Section 5.04 hereof, be determined in the same manner as for retirement at his Normal Retirement Date, except that years of Uninterrupted Seniority for Benefit Accrual and benefit rate shall be determined as of his Early Retirement Date.  The benefit shall be reduced based on the number of months by which the Participant's early retirement precedes his attainment of age fifty-seven (57) using the factors listed in Section 1.03.

5.04    Maximum Retirement Benefit.  The definition of certain words and phrases used in this Section 5.04 are contained in Section 5.04(d) and shall, for purposes of this Section 5.04, supersede definition for such words and phrases contained in Article I.  Defined terms are capitalized.

(a)    This Section, except for Section (a)(iii), applies regardless of whether any Participant is or has ever been a Participant in another qualified plan maintained by the Employer.  For Plan Years beginning before January 1, 2000, if any Participant is or has ever been a Participant in another qualified plan maintained by the Employer, or a welfare benefit fund, as defined in Code Section 419(e), maintained by the Employer, or an individual medical account, as defined in Code Section 415(l)(2), which provides an Annual Addition, Section 5.04(b) is also applicable to that Participant's benefits.

9104560.9                                        15

(i)    The Annual Benefit otherwise payable to a Participant at any time will not exceed the Maximum Permissible Amount. If the benefit the Participant would otherwise accrue in a Limitation Year would produce an annual benefit in excess of the Maximum Permissible Amount, the rate of accrual will be reduced so that the annual benefit will equal the Maximum Permissible Amount.

(ii)    If a Participant has made nondeductible Employee contributions or mandatory employee contributions as defined in Code Section 411(c)(2)(C), under the terms of this Plan, the amount of contributions is treated as an Annual Addition to a qualified defined contribution plan, for purposes of Sections (a)(i) and (b)(ii) of this Section 5.04.

(iii)    The Maximum Permissible Amount limitation is deemed satisfied if the Annual Benefit payable to a Participant is not more than $1,000 multiplied by the Participant's number of Years of Service or portions thereof (not to exceed ten (10)) with the Employer, and the Employer has not at any time maintained a defined contribution plan, a welfare benefit plan as defined in Code Section 419(e), or an individual medical account as defined in Code Section 415(l)(2) in which such Participant participated.

(b)    (i)    For Plan Years beginning before January 1, 2000, this section (b) applies if any Participant also participates in any other plan maintained by the Employer, including a qualified plan, a welfare benefit fund, as defined in Code Section 419(e), or an individual medical account as defined in Code Section 415(1)(2), or a simplified employee pension that provides an Annual Addition.

(ii)    If a Participant is, or has ever been, covered under more than one defined benefit plan maintained by the Employer, the sum of the Participant's Annual Benefits from all such plans may not exceed the Maximum Permissible Amount.

(iii)    For Plan Years beginning before January 1, 2000, if the Employer maintains, or at any time maintained, one or more qualified defined contribution plans covering any Participant in this Plan, a welfare benefit fund, as defined in Code Section 419(e), or an individual medical account as defined in Code Section 415(1)(2), the sum of the Participant's Defined Contribution Fraction and Defined Benefit Fraction will not exceed 1.0 in any limitation year.

(iv)    If in any Plan Year the sum of the Defined Benefit Fraction and the Defined Contribution Fraction shall exceed 1.0 with respect to any Participant, the Employer shall reduce any contribution to the defined contribution plan on behalf of such Participant to the extent necessary to lower the numerator of the Defined Contribution Fraction so that the sum of both fractions does not exceed 1.0.

(c)    In the case of an individual who was a Participant in one or more defined benefit plans of the Employer as of the first day of the first Limitation Year beginning after December 31, 1986, the application of the limitations of this Article V shall not cause the Maximum Permissible Amount for such individual under all such defined benefit plans to be less than the individual's Accrued Benefit as of December 31, 1986. The preceding sentence applies

only if such defined benefit plans met the requirements of Code Section 415 for all Limitation Years beginning before January 1, 1987.

For this purpose, a Participant's Accrued Benefit under the Plan shall be determined as if the Participant had separated from service as of the close of the last Limitation Year beginning before January 1, 1987, expressed as an Annual Benefit within the meaning of Code Section 415(b)(2). In determining the amount of a Participant's current Accrued Benefit, the following shall be disregarded:

        (i)     any change in the terms and conditions of the Plan after May 5, 1986; and

        (ii)    any cost of living adjustments occurring after May 5, 1986.

(d)     In the case of an individual who was a Participant in one or more defined benefit plans of the Employer as of the first day of the first Limitation Year beginning after December 31, 1994, the application of the limitations of this Article V shall not cause the Maximum Permissible Amount for such individual under all such defined benefit plans to be less than the individual's Retirement Protection Act of 1994 old law benefit. The preceding sentence applies only if such defined benefit plans met the requirements of Code Section 415 on December 7, 1994.

(e)     <u>Definitions</u>.

        (i)    <u>Annual Additions</u>:  The sum of the following amounts credited to a Participant's account for limitation year:

        (A)    Employer contributions;

        (B)    Employee contributions;

        (C)    forfeitures, and

        (D)    Amounts allocated after March 31, 1984, to an individual medical account, as defined in Code Section 415(1)(2), which is part of a pension or annuity plan maintained by the Employer are treated as Annual Additions to a defined contribution plan. Also, amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits allocated to the separate account of a Key Employee, as defined in Code Section 419A(d)(3), under a welfare benefit fund, as defined in Code Section 419(e), maintained by the Employer, are treated as Annual Additions to a defined contribution plan.

        (ii)    <u>Annual Benefit</u>: A retirement benefit under the Plan which is payable annually in the form of a straight life annuity. A straight life annuity means an annuity payable in equal installments for the life of the Participant that terminates upon the Participant's death. Except as provided below, a benefit payable in a form other than a straight life annuity must be adjusted to an actuarially equivalent straight life annuity before applying the limitations of this Section 5.04. For Limitation Years beginning before January 1, 1995, such

9104560.9                             17

actuarially equivalent straight life annuity is equal to the greater of the annuity benefit computed using the interest rate specified in the Plan for adjusting benefits in the same form or five percent (5%). For Limitation Years beginning after December 31, 1994, the actuarially equivalent straight life annuity is equal to the greater of the annuity benefit computed using the interest rate and mortality table specified in the Plan for adjusting benefits in the same form, and the annuity benefit computed using a five percent (5%) interest rate assumption and the applicable mortality table set forth in Revenue Ruling 95-6. In determining the actuarially equivalent straight life annuity for a benefit form other than a nondescreasing annuity payable for a period of not less than the life of the Participant (or, in the case of a qualified pre-retirement survivor annuity, the life of the surviving spouse), or decreases during the life of the Participant merely because of (a) the death of the survivor annuitant (but only if the reduction is not below 50% of the annual benefit payable before the death of the survivor annuitant), or (b) the cessation or reduction of social security supplements of qualified disability payments (as defined in Section 401(a)(11), the "applicable interest rate," as defined in Section 1.03 of the Plan, will be substituted for a "five percent interest rate assumption" in the preceding sentence. No actuarial adjustment to the benefit is required for (a) the value of a qualified joint and survivor annuity, (b) the value of benefits that are not directly related to retirement benefits (such as the qualified disability benefit, pre-retirement death benefits, and post-retirement medical benefits), and (c) the value of post-retirement cost-of-living increases made in accordance with Code Section 415(d) and Section 1.415-3(c)(2)(iii) of the Federal Income Tax Regulations. The Annual Benefit does not include any benefits attributable to Employee contributions or rollover contributions, or the assets transferred from a qualified plan that was not maintained by the Employer.

(iii)    Compensation:    A Participant's earned income, wages, salaries, and fees for professional services, and other amounts received for personal services actually rendered in the course of employment with the Employer maintaining the Plan (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips bonuses and Employer contributions made pursuant to a salary reduction agreement which are not includible in the gross income of the employee under Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B) or 403(b)), and excluding the following:

(A)    Employer contributions to a plan of deferred compensation which are not included in the Employee's gross income for the taxable year in which contributed or Employer contributions under a Simplified Employee Pension Plan to the extent such contributions are deductible by the Employee, or any distributions from a plan of deferred compensation;

(B)    Amounts realized from the exercise of a nonqualified stock option, or when restricted stock (or property) held by the Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture;

(C)    Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option; and

(D)    Other amounts which received special tax benefits, or contributions made by the Employer (whether or not under a salary reduction agreement)

towards the purchase of an annuity described in Code Section 403(b) (whether or not the amounts are actually excludable from the gross income of the Employee).

Compensation for any limitation year is the compensation actually paid or includable in gross income during such year.

(iv)    Defined Benefit Dollar Limitation:    $140,000.    Effective for Limitation Years ending after December 31, 2001, the Defined Benefit Dollar Limitation is $160,000.  The Defined Benefit Dollar Limitation will be automatically adjusted by multiplying such limit by the cost of living adjustment factor prescribed by the Secretary of the Treasury under Code Section 415(d) in such manner as the Secretary shall prescribe.  The new limitation will apply to Limitation Years ending within the calendar year of the date of the adjustment.

(v)    Defined Benefit Fraction:    A fraction, the numerator of which is the sum of the Participant's projected Annual Benefits under all the defined benefit plans (whether or not terminated) maintained by the Employer, and the denominator of which is the lesser of one hundred twenty-five percent (125%) of the dollar limitation determined for the Limitation Year under Code Sections 415(b)(1)(A) and (d) and in accordance with Section 5.04(d)(x)(B) below or one hundred forty percent (140%) of the Participant's Highest Average Compensation, including any adjustments under Code Section 415(b).

Notwithstanding the above, if the Participant was a Participant as of the first day of the first Limitation Year beginning after December 31, 1986, in one or more defined benefit plans maintained by the Employer which were in existence on May 6, 1986, the denominator of this fraction will not be less than one hundred twenty-five percent (125%) of the sum of the Annual Benefits under such plans which the Participant had accrued as of the close of the last Limitation Year beginning before January 1, 1987, disregarding any changes in the terms and conditions of the Plans after May 5, 1986.  The preceding sentence applies only if the defined benefit plans individually and in the aggregate satisfied the requirements of Code Section 415 for all Limitation Years beginning before January 1, 1987.

(vi)    Defined Contribution Fraction:    A fraction, the numerator of which is the sum of the Annual Additions to the Participant's account under all the defined contribution plans (whether or not terminated) maintained by the Employer for the current and all prior Limitation Years, (including the annual additions attributable to the Participant's nondeductible Employee contributions to this and all other defined benefit plans, (whether or not terminated) maintained by the Employer, and the Annual Additions attributable to all welfare benefit funds, as defined in Code Section 419(e) or individual medical accounts, as defined in Code Section 415(l)(2), maintained by the Employer), and the denominator of which is the sum of the Maximum Aggregate Amounts for the current and all prior Limitation Years of service with the Employer (regardless of whether a defined contribution plan was maintained by the Employer).

The Maximum Aggregate Amount in any Limitation Year is the lesser of (1) one hundred twenty-five percent (125%) of the dollar limitation in effect under Code Section 415(c)(1)(A) after adjustment under Code Section 415(d), or (2) thirty-five percent (35%) of the Participant's Compensation for such year.

(vii)    Employer:  For purposes of this Article, Employer shall mean the Employer that adopts this Plan, and all members of a controlled group of corporations (as defined in Code Section 414(b), as modified by Code Section 415(h)), all commonly controlled trades or businesses (as defined in Section 414(c) as modified by Section 415(h)), or affiliated service groups (as defined in Section 414(m)) of which the adopting Employer is a part, and any other entity required to be aggregated with the Employer pursuant to regulations under Code Section 414(o).

(viii)    Highest   Average   Compensation:       The   average compensation for the three consecutive Years of Service with the Employer that produces the highest average.  In the case of a Participant who has separated from service, the Participant's highest average compensation will be automatically adjusted by multiplying such compensation by the cost of living adjustment factor described by the Secretary of the Treasury under Code Section 415(d) in such manner as the Secretary shall prescribe.  The adjusted compensation amount will apply to Limitation Years ending within the calendar year of the date of the adjustment.

(ix)    Limitation Year:  A calendar year.

(x)    Maximum  Permissible  Amount:    For Limitation Years ending after December 31, 2001, the maximum permissible amount is equal to the Defined Benefit Dollar Limitation.  For Limitation Years ending prior to January 1, 2002, the following rules shall apply:

(A)    The lesser of the Defined Benefit Dollar Limitation or one hundred percent (100%) of the Participant's Highest Average Compensation.

(B)    If the Participant has less than ten (10) years of participation in the Plan, the Defined Benefit Dollar Limitation shall be multiplied by a fraction, (i) the numerator of which is the number of years (or part thereof) of participation in the Plan, and (ii) the denominator of which is 10.  In the case of a Participant who has less than ten (10) years of service with the Employer, the compensation limitation shall be multiplied by a fraction, (i) the numerator of which is the number of years (or parts thereof) of service with the Employer and (ii) the denominator of which is 10.  The adjustments of this section (B) shall be applied in the denominator of the Defined Benefit Fraction based upon Years of Service.  For purposes of computing the Defined Benefit Fraction, only Years of Service shall include future years of service (or parts thereof) commencing before the Participant's Normal Retirement Age.  Such future years of service shall include the year that contains the date the Participant reaches Normal Retirement Age, only if it can be reasonably anticipated that the Participant will receive a Year of Credited Service for such year, or the year in which the Participant terminates employment, if earlier.  This paragraph does not apply for Limitation Years beginning on or after January 1, 2000.

(C)    If the annual benefit of the Participant commences before the Participant's Social Security Retirement Age, but on or after age sixty-two (62), the Defined Benefit Dollar Limitation as reduced in (B) above, if necessary, shall be determined as follows:

(1)    If a Participant's Social Security Retirement Age is sixty-five (65), the dollar limitation for benefits commencing on or after age sixty-two (62) is determined by reducing the Defined Benefit Dollar Limitation by five-ninths (5/9) of one percent (1%) for each month by which benefits commence before the month in which the participant attains age sixty-five (65).

(2)    If a Participant's Social Security Retirement Age is greater than sixty-five (65), the dollar limitation for benefits commencing on or after age sixty-two (62) is determined by reducing the Defined Benefit Dollar Limitation by five-ninths (5/9) of one percent (1%) for each of the first thirty-six (36) months and five-twelfths (5/12) of one percent (1%) for each of the additional months (up to twenty-four (24) months) by which benefits commence before the month of the Participant's Social Security Retirement Age.

(D)    If the Annual Benefit of a Participant commences prior to age sixty-two (62), the Defined Benefit Dollar Limitation shall be an Annual Benefit that is the actuarial equivalent of the Defined Benefit Dollar Limitation for age 62, as determined above, reduced for each month by which benefits commence before the month in which the Participant attains age sixty-two (62). The Annual Benefit beginning prior to age sixty-two (62) shall be determined as the lesser of the equivalent Annual Benefit computed using the interest rate and mortality table equivalence for early retirement benefits and the equivalent Annual Benefit computed using a five percent (5%) interest rate and the applicable mortality table set forth in Revenue Ruling 95-6. Any decrease in the Defined Benefit Dollar Limitation determined in accordance with this provision (D) shall not reflect any mortality decrement to the extent that benefits will not be forfeited upon the death of the Participant.

(E)    If the Annual Benefit of a Participant commences after the Participant's Social Security Retirement Age, the Defined Benefit Dollar Limitation, as reduced in (B) above, if necessary, shall be adjusted so that it is the actuarial equivalent of an Annual Benefit of such dollar limitation beginning at the Participant's Social Security Retirement Age. The equivalent Annual Benefit beginning after Social Security Retirement Age shall be determined as the lesser of the equivalent Annual Benefit computed using the interest rate and mortality table specified in the Plan for purposes of determining actuarial equivalence for delayed retirement benefits, and the equivalent Annual Benefit computed using a five percent (5%) interest rate assumption and the applicable mortality table set forth in Revenue Ruling 95-6.

(F)    Notwithstanding anything else in this Section to the contrary, the benefit otherwise accrued or payable to a Participant under this Plan shall be deemed not to exceed the Defined Benefit Dollar Limitation if:

(1)    The retirement benefits payable for a Plan Year under any form of benefit with respect to such Participant under this Plan and under all other defined benefit plans (regardless of whether terminated) ever maintained by the Employer do not exceed $1,000 multiplied by the Participant's number of years of service or parts thereof (not to exceed 10) with the Employer; and

        (2) The Employer has not at any time maintained a defined contribution plan, a welfare benefit plan, or an individual medical account in which the Participant participated.

        (G) For Limitation Years ending after December 31, 2001, the Maximum Permissible Benefit is the Defined Benefit Dollar Limitation (adjusted where required), as provided in (a) and, if applicable, in (b) or (c) below and limited, if applicable, as provided in (d) below:

        (1) If the Participant has less than ten (10) years of participation in the Plan, the Defined Benefit Dollar Limitation shall be multiplied by a fraction, (i) the numerator of which is the number of years (or part thereof) of participation in the Plan, and (ii) the denominator of which is 10.

        (2) If the benefit of a Participant begins prior to age 62, the Defined Benefit Dollar Limitation applicable to the Participant at such earlier age is an annual benefit payable in the form of a straight life annuity beginning at the earlier age that is the actuarial equivalent of the Defined Benefit Dollar Limitation applicable to the Participant at age 62 (adjusted under (a) above, if required). The Defined Benefit Dollar Limitation applicable to an age prior to age 62 is determined as the lesser of (i) the actuarial equivalent (at such age) of the Defined Benefit Dollar Limitation computed using the interest rate and mortality table set forth in Revenue Rule 95-6 and (ii) the actuarial equivalent (at such age) of the Defined Benefit Dollar Limitation computed using a five percent (5%) interest rate and the applicable mortality table as defined in Section 1.03 of the Plan. Any decrease in the Defined Benefit Dollar Limitation determined in accordance with this paragraph (b) shall not reflect a mortality decrement if benefits are not forfeited upon the death of the Participant. If any benefits are forfeited upon death, the full mortality decrement is taken into account.

        (3) If the benefit of a Participant begins after the Participant attains age 65, the Defined Benefit Dollar Limitation applicable to the Participant at the later age is the annual benefit payable in the form of a straight life annuity beginning at the later age that is actuarially equivalent to the Defined Benefit Dollar Limitation applicable to the Participant at age 65 (adjusted under (a) above, if required). The actuarial equivalent of the Defined Benefit Dollar Limitation applicable at an age after age 65 is determined as (i) the lesser of the actuarial equivalent (at such age) of the Defined Benefit Dollar Limitation computed using the interest rate and mortality table set forth in Revenue Rule 95-6 and (ii) the actuarial equivalent (at such age) of the Defined Benefit Dollar Limitation computed using a five percent (5%) interest rate and the applicable mortality table as defined in Section 1.03 of the Plan. For these purposes, mortality between age 65 and the age at which benefits commence shall be ignored.

        (xi) <u>Projected Annual Benefit</u>: The Annual Benefit as defined in Section (d)(ii), to which the Participant would be entitled under the terms of the Plan assuming:

        (A) the Participant will continue employment until Normal Retirement Age under the Plan (or current age, if later), and

(B)    the Participant's Compensation for the current Limitation Year and all other relevant factors used to determine benefits under the Plan will remain constant for all future Limitation Years.

(xii)    Social Security Retirement Age:  Age sixty-five (65) in the case of a Participant attaining age sixty-two (62) before January 1, 2000 (i.e., born before January 1, 1938), age sixty-six (66) for a Participant attaining age sixty-two (62) after December 31, 1999, and before January 1, 2017 (i.e., born after December 31, 1937, but before January 1, 1955), and age sixty-seven (67) for a Participant attaining age sixty-two (62) after December 31, 2016 (i.e., born after December 31, 1954).

(xiii)    Year of Participation:  The Participant shall be credited with a Year of Participation (computed to fractional parts of a year) for each accrual Computation Period for which the following conditions are met:  (1) The Participant is credited with a Period of Service for benefit accrual purposes, required under the terms of the Plan in order to accrue a benefit for the accrual Computation Period, and (2) the Participant is included as a Participant under the eligibility provisions of the Plan for at least one (1) day of the accrual Computation Period.  If these two conditions are met, the portion of a Year of Participation credited to the Participant shall equal the amount of benefit accrual service credited to the Participant for such accrual Computation Period.  A Participant who is permanently and totally disabled within the meaning of Plan Section 10.06 for an accrual Computation Period shall receive a Year of Participation with respect to that period.  In addition, for a Participant to receive a Year of Participation (or part thereof) for an accrual Computation Period, the Plan must be established no later than the last day of such accrual Computation Period.  In no event will more than one Year of Participation be credited for any 12-month period.

### 5.05    Cost of Living Increases.

(a)    All persons who are receiving pension payments hereunder as of May 31, 1991, whether as a normal retiree, an early retiree, a disability retiree, or a Survivor Annuitant (but excluding employees who terminated employment with vested rights prior to becoming eligible to commence pension payments, and who are, as of May 31, 1991, receiving pension payments), and whose first retirement payment commenced prior to April 1, 1985, shall receive a one-time payment of $500.00.

(b)    All persons who are receiving retirement payments hereunder, whether a normal retiree, an early retiree, a disability retiree or a Survivor Annuitant and whose first retirement payment commenced on or before July 1, 1996 shall receive a one-time thirteenth (13th) payment as of August 1, 1996.  Such payment shall be in the same amount as the monthly pension payment the person is currently receiving.

(c)    All persons who are receiving retirement payments hereunder as of August 1, 1994, whether a normal retiree, an early retiree, a disability retiree or a Survivor Annuitant and whose first retirement payment commenced on or after August 1, 1994 will receive a benefit improvement in their pension payments effective July 1, 1996.  Such benefit improvement shall be based on the $68.00 rate.

(d)     All persons who are receiving retirement payments hereunder, whether a normal retiree, an early retiree, a disability retiree or a Survivor Annuitant and whose first retirement payment commenced after July 1, 1996 and prior to January 1, 1997 shall receive a one-time thirteenth (13th) payment as of April 1, 1997. Such payment shall be in the same amount as the monthly pension payment the person is currently receiving.

(e)     All persons who are receiving payments hereunder as of December 31, 1998, whether a normal retiree, an early retiree, a disability retiree or a Survivor Annuitant (but excluding employees who terminated employment with vested rights prior to becoming eligible to commence pension payments, and who are, as of December 31, 1998, receiving pension payments), shall receive an increase in the amount of each monthly pension payment being received on and after January 1, 1999. The amount of such increase shall be determined based on the applicable percentage provided in the following schedule:

| Date of First Payment Received Under The Plan | Applicable Percentage |
|---|---|
| April 1, 1982 – March 31, 1985 | 6% |
| April 1, 1979 – March 31, 1982 | 10% |
| April 1, 1974 – March 31, 1979 | 14% |
| Prior to April 1, 1974 | 18% |

(f)     All persons who are receiving retirement payments hereunder, whether a normal retiree, an early retiree, a disability retiree or a Survivor Annuitant (but excluding employees who terminated employment with vested rights prior to becoming eligible to commence pension payments), and whose first retirement payment commenced during the period April 1, 1985 to September 30, 1997 or during the period February 1, 1998 to September 30, 1998, shall receive a one-time thirteenth (13th) payment as of December 1, 1999. Such payment shall be in the same amount as the monthly pension payment the person is currently receiving.

5.06     Required Benefit Commencement.     Notwithstanding the Delayed Retirement provisions above, each Participant who remains employed beyond his Required Beginning Date (as defined in Article IX), must begin to receive the minimum distributions required under Article IX. Such Participant's benefit shall be recalculated for each calendar year following the initial required distribution on the basis of his Uninterrupted Seniority and the Benefit Rate in effect as of each January 1, reduced by the actuarial value of the payments previously made, but in no event less than the benefit amount paid prior to the recalculation.

5.07     Retirement Benefit Rate. A Participant who satisfies the conditions for retirement and who elects to retire on or after October 1, 1997 but prior to January 1, 1998 shall be entitled to a retirement benefit as of the first day of the month coinciding with or next following his Retirement Date. The amount of this retirement benefit shall be calculated in accordance with Section 5.03 but based on a benefit rate of $82.00.

ARTICLE VI

JOINT AND SURVIVOR AND PRERETIREMENT DEATH BENEFITS

6.01    Automatic Joint And Survivor Annuity.

(a)    If the present value of a vested Participant's benefit is in excess of three thousand five hundred dollars ($3,500), a married Participant's vested Accrued Benefit will be paid in the form of an automatic joint and survivor annuity and an unmarried Participant's vested Accrued Benefit will be paid in the form of an immediate life annuity in accordance with the provisions of Section 1.38. The Participant may elect to have such annuity distributed upon attainment of the earliest retirement age under the Plan.

(b)    An "automatic joint and survivor annuity" is an immediate non-transferable annuity for the life of the Participant with a survivor annuity for the life of the Spouse which is fifty percent (50%) of the amount of the annuity which is payable during the joint lives of the Participant and the Spouse and which is the Actuarial Equivalent of the Normal Form of Retirement Benefit.

However, if the Spouse predeceases the Participant, the benefit shall revert to the increased life annuity for the lifetime of the Participant.

(c)    Participant's "earliest retirement age" is the earliest date on which, under the Plan, the Participant could elect to receive retirement benefits.

6.02    Qualified Preretirement Survivor Annuity.

(a)    If a vested Participant dies after the earliest retirement age, but prior to the Annuity Starting Date, such Participant's surviving Spouse, if any, will receive the same benefit that would be payable if the Participant had retired with an immediate automatic joint and survivor annuity payable on the day before such Participant's death.

(b)    The surviving Spouse may elect to commence payment under such annuity on the first day of any month after the Participant's death. The actuarial value of benefits which commence later than the date on which payments would have been made to the surviving Spouse under an automatic joint and survivor annuity in accordance with this provision shall be adjusted to reflect the delayed payment. In calculating the actuarial value of such benefit, the Participant's age will be assumed to be his age at his date of death.

(c)    If a vested Participant dies on or before the earliest retirement age, the Participant's surviving Spouse (if any) will receive the same benefit that would be payable if the Participant had:

(i)    separated from service on the date of death (or date of separation from service, if earlier),

(ii)    survived to the earliest retirement age,

9104560.9                                    25

(iii)    retired with an immediate qualified joint and survivor annuity at the earliest retirement age, and

(iv)    died on the day after the earliest retirement age.

(d)    Subject to the provisions of Section 9.04 of the Plan, a surviving Spouse will begin to receive payments at the Participant's earliest retirement age. Benefits commencing after the Participant's earliest retirement age will be the Actuarial Equivalent of the benefit to which the surviving Spouse would have been entitled if benefits had commenced at the earliest retirement age under an immediate automatic joint and survivor annuity.

(e)    For the purposes of this Section 6.02, the benefit payable to the surviving Spouse shall be attributable to Employee contributions in the same proportion as the total Accrued Benefit derived from Employee contributions is to the Accrued Benefit of the Participant.

6.03    Qualified Election. A Participant may waive the automatic joint and survivor annuity described in Section 6.01, receive a refund of his contributions under Article VIII or XI, or designate someone other than his Spouse, except for the benefit payable under the provisions of Sections 6.06 and 6.07 hereof, only if:

(a)    the Participant's Spouse consents in writing to the election;

(b)    with the exception of a life annuity the election designates a specific alternate Beneficiary, including any class of Beneficiaries or any contingent Beneficiaries, which may not be changed without spousal consent, or the Spouse expressly permits designations by the Participant without any further spousal consent;

(c)    the Spouse's consent acknowledges the effect of the election; and

(d)    the Spouse's consent is witnessed by a Plan representative or notary public. Additionally, a Participant's waiver of the qualified joint and survivor annuity will not be effective unless the election designates a form of benefit payment which may not be changed without spousal consent, or the Spouse expressly permits designations by the Participant without any further spousal consent. If it is established to the satisfaction of the Trustees that such written consent may not be obtained because there is no Spouse or the Spouse cannot be located, a waiver will be deemed a qualified election.

Any consent by a Spouse obtained under this provision (or establishment that the consent of a Spouse may not be obtained) shall be effective only with respect to such Spouse. A consent that permits designations by the Participant without any requirement of further consent by such Spouse must acknowledge that the Spouse has the right to limit consent to a specific Beneficiary, and a specific form of benefit where applicable, and that the Spouse voluntarily elects to relinquish either or both of such rights. A revocation of a prior waiver may be made by a Participant without the consent of the Spouse at any time prior to the commencement of benefits. The number of revocations shall not be limited. No consent obtained under this provision shall be valid unless the Participant has received notice as provided in 6.04 below.

9104560.9                                          26

6.04    Notice Requirements.

(a)    With regard to the automatic joint and survivor annuity described in Section 6.01, the Trustees shall provide each Participant, no less than thirty (30) days and no more than ninety (90) days prior to the Annuity Starting Date, a written explanation of:

(i)    the terms and conditions of an automatic joint and survivor annuity;

(ii)    the Participant's right to make and the effect of an election to waive the automatic joint and survivor annuity form of benefit;

(iii)    the rights of a Participant's Spouse;

(iv)    the right to make, and the effect of, a revocation of a previous election to waive the automatic joint and survivor annuity; and

(v)    the relative values of the various optional forms of benefit under the Plan.

(b)    If the Participant, after having received this notice, affirmatively elects a distribution, the distribution may commence less than thirty (30) days after the notice was given if the Trustees provide information to the Participant clearly indicating that the Participant has a right to at least thirty (30) days to consider whether to consent to the distribution.

6.05    Transitional Rules.

(a)    Any living Participant not receiving benefits on August 23, 1984, who would otherwise not receive the benefits prescribed by the previous Sections of this Article must be given the opportunity to elect to have the prior Sections of this Article apply if such Participant is credited with at least one (1) Hour of Service under this Plan or a predecessor plan in a Plan Year beginning on or after January 1, 1976, and such Participant had at least ten (10) years of vesting Service when he separated from Service.

(b)    Any living Participant not receiving benefits on August 23, 1984, who was credited with at least one (1) Hour of Service under this Plan or a predecessor plan on or after September 2, 1974, and who is not otherwise credited with any Service in a Plan Year beginning on or after January 1, 1976, must be given the opportunity to have his benefits paid in accordance with paragraph (d) below.

(c)    The respective opportunities to elect (as described in paragraphs (a) and (b) above) must be afforded to the appropriate Participants during the period commencing on August 23, 1984, and ending on the date benefits would otherwise commence to said Participants.

(d)    Any Participant who has elected pursuant to paragraph (b) above and any Participant who does not elect under paragraph (a) above or who meets the requirements

9104560.9                                              27

of paragraph (a) above except that such Participant does not have at least ten (10) years of vesting Service when he separates from service, shall have his benefits, if any, distributed in accordance with all of the following requirements if benefits would have been payable in the form of a life annuity:

(i)      Automatic joint and survivor annuity.    If benefits in the form of a life annuity become payable to a married Participant who:

(A)      begins to receive payments under the Plan on or after Normal Retirement Age; or

(B)      dies on or after Normal Retirement Age while still working for the Employer; or

(C)      begins to receive payments on or after the qualified early retirement age; or

(D)      separates from service on or after attaining Normal Retirement Age (or the qualified early retirement age) and after satisfying the eligibility requirements for the payment of benefits under the Plan and thereafter dies before beginning to receive such benefits;

then such benefits will be received under this Plan in the form of a qualified joint and survivor annuity, unless the Participant has elected otherwise during the election period.  The election period must begin at least six (6) months before the Participant attains qualified early retirement age and end not more than ninety (90) days before the commencement of benefits.  Any election hereunder will be in writing and may be changed by the Participant at any time.

(ii)      Election of early survivor annuity.    A Participant who is employed after attaining the qualified early retirement age will be given the opportunity to elect, during the election period, to have a survivor annuity payable on death.  If the Participant elects the survivor annuity, payments under such annuity must not be less than the payments which would have been made to the Spouse under the qualified joint and survivor annuity if the Participant had retired on the day before his death.  Any election under this provision will be in writing and may be changed by the Participant at any time.  The election period begins on the later of (1) the 90th day before the Participant attains the qualified early retirement age, or (2) the date on which participation begins, and ends on the date the Participant terminates employment.

(iii)      For purposes of this paragraph (d), the "qualified early retirement age" is the latest of:

(A)      the earliest date, under the Plan, on which the Participant may elect to receive retirement benefits,

(B)      the first day of the 120th month beginning before the Participant reaches normal retirement age, or

9104560.9                                    28

(C)    the date the Participant begins participation.

The "qualified joint and survivor annuity" is an annuity for the life of the Participant with a survivor annuity for the life of the Spouse as described in Section 6.01.

6.06    In-Service Lump-Sum Death Benefit.

(a)    A lump-sum death benefit shall be payable to the designated Beneficiary of an Active Participant in an amount equal to twenty-five thousand dollars ($25,000). This benefit shall be in addition to, and not in limitation of, any other benefits provided under the terms of this Plan. The benefit shall be paid as soon as is practicable after the date of such Participant's death.

(b)    An Active Participant who sustains accidental bodily injury and which accidental injury results in death or loss of hand, foot, or sight will be covered for up to $25,000, depending upon whether the injury results in death ($25,000), loss of one hand, one foot or one eye ($12,500) or loss of two or more members ($25,000). This benefit shall be in addition to, and not in limitation of, any other benefits provided under the terms of this Plan. The benefit shall be paid as soon as is practicable after the date of such Participant's injury.

6.07    Post-Retirement Lump-Sum Death Benefit. A lump-sum death benefit shall be payable to the designated Beneficiary of a Participant who has retired under the Normal, Early, Delayed or Disability provisions of the Plan in an amount equal to ten thousand dollars ($10,000). This benefit shall be in addition to, and not in limitation of, any other benefits provided under the terms of this Plan. The benefit shall be paid as soon as is practicable after the date of such Participant's death.

6.08    Dependent Child's Pre-Retirement Death Benefit. If a Participant who has both attained the age of fifty-five (55) and completed twenty (20) years of Uninterrupted Seniority dies prior to retirement or termination of employment, and at the time of his death is survived by a Dependent Child or Children, a monthly death benefit shall be payable on behalf of such Dependent Child or Children. The amount of monthly benefit payable on behalf of each Dependent Child shall be equal to fifty percent (50%) of the surviving spouse's pension payable in accordance with Section 6.02 hereof, or, in the event the Participant has no Spouse at the time of his death, fifty percent (50%) of the Spouse's pension that would have been payable in accordance with Section 6.02 hereof if the Participant had had, at the time of his death, a surviving Spouse who was two (2) years younger than himself; provided, however, that the total amount of death benefit payable on behalf of all such Dependent Children shall in no event be more than one hundred percent (100%) of such surviving Spouse's pension. If there shall be more than two (2) such Dependent Children, the total death benefit payable shall be allocated equally among them. The provisions of this Section 6.08 shall be subject to the provisions of Section 8.02.

6.09    Dependent Child's Post-Retirement Death Benefit.

(a)    An unmarried Participant may elect to provide death benefit protection for his Dependent Children after his retirement. The election shall be made by filing a request with the Trustees, on forms to be provided by the Trustees, at any time prior to actual retirement. The request shall include such information as the Trustees may require, and the Participant and all persons claiming under him shall be bound by the information provided. If an unmarried Participant who has elected such protection retires at a Normal or Early Retirement Date, and upon his subsequent death is survived by a Dependent Child or Children, a monthly death benefit shall be payable on behalf of such Dependent Child or Children. The amount of monthly death benefit payable on behalf of each Dependent Child shall be equal to twenty-five percent (25%) of the reduced pension which would have been payable to the Participant if he had, at retirement, a Spouse two (2) years younger than himself and had elected to receive his pension in the form described in Section 6.01(a), with such Spouse as his survivor annuitant; provided, however, that the total amount of such death benefit payable on behalf of all such Dependent Children shall in no event be more than fifty percent (50%) of such reduced pension. If there shall be more than two (2) such Dependent Children, the total death benefit payable shall be allocated equally among them.

(b)    If a married Participant retires at a Normal or Early Retirement Date and elects or is deemed to have elected to receive his pension pursuant to Section 6.01, and upon his subsequent death is survived by a Dependent Child or Children, a monthly death benefit shall be payable on behalf of such Dependent Child or Children. The amount of monthly death benefit payable on behalf of each Dependent Child shall be equal to twenty-five percent (25%) of the reduced pension which would have been payable to the Participant if he had elected to receive his pension in the form described in Section 6.01(a) above; provided, however, that the total amount of death benefit payable on behalf of all such Dependent Children shall in no event be more than fifty percent (50%) of such reduced pension. If there shall be more than two (2) such Dependent Children, the total death benefit payable shall be allocated equally among them.

6.10    Payment Of Dependent Child's Benefit.    The monthly death benefit payable on behalf of a Dependent Child, as provided in Section 6.08 or 6.09 hereof, shall be paid to the person principally responsible for the financial support of such Dependent Child, and shall commence on the first day of the month following the month in which the death of the Participant or retired former Participant occurred. Such benefit shall be payable monthly thereafter until the Dependent Child on whose behalf the benefit is being paid ceases to be a Dependent Child in accordance with Section 1.16 hereof; provided, however, that if at the time a Dependent Child ceases to be a Dependent Child there shall still be two (2) or more Dependent Children of the deceased Participant or retired former Participant, then the death benefit being paid on behalf of the child who ceases to be a Dependent Child shall not terminate but shall be allocated equally among all remaining Dependent Children and shall continue to be paid on their behalf.

## ARTICLE VII

## OPTIONAL METHODS OF RETIREMENT PAYMENTS

7.01    Optional Elections.  Each married vested Participant whose Accrued Benefit has a present value in excess of three thousand five hundred dollars ($3,500), shall have the right, at any time and from time to time prior to the commencement of a retirement benefit hereunder, to elect to have such retirement benefit payable under any one of the options hereinafter set forth in this Section in lieu of the retirement benefit otherwise payable under any of the provisions of the Plan.  The amount of any optional retirement benefit shall be the Actuarial Equivalent of the Normal Form of Retirement Benefit otherwise payable to such Participant.  The Participant shall make such an election by written request to the Trustees and such an election will be subject to the spousal consent requirement of Article X.

Joint and Survivor Option:  A married Participant may elect to receive a monthly retirement benefit during the lifetime of the Participant and have either (a) fifty percent (50%) or (b) one hundred percent (100%) of such monthly retirement benefit continued after the Participant's death to a Spouse during the remaining lifetime of the Spouse within the restrictions contained in Section 9.04(b)(ii).

7.02    Limitation On Optional Elections.

(a)    Payments under any optional retirement benefit elected under the provisions of Section 7.01 hereof shall be subject to the distribution period restrictions of Sections 9.03 and 9.04.

(b)    A Participant may not elect irrevocably before retirement any option which would with certainty pay all or part of his non-forfeitable interest to a designated Beneficiary after the Participant's death.

(c)    Any annuity contract distributed by the Plan must be nontransferable.

(d)    Once distributions under an optional form of benefit have begun, such form of payment shall be irrevocable except in the case of a distribution made in the form of a joint and survivor annuity where the Spouse predeceases the Participant in which case the joint and survivor form of payment shall be automatically converted to an Actuarial Equivalent life annuity.

7.03    Further Limitations On Optional Elections.  After an election of an Option has been made, such election shall be automatically null and void in the following circumstances:

(a)    If the survivor annuitant predeceases the Participant or ceases to be married to the Participant prior to his actual retirement under the Plan, the Option shall not become effective, and payment shall be made as otherwise provided in the Plan as if an Option had never been elected; except that if the Participant remarries prior to the date of his actual

retirement, he will be permitted to again elect a joint and survivor option naming his new Spouse as survivor annuitant, provided he fulfills all other requirements of Section 7.01.

(b)    If the Participant who had elected an Option dies prior to actual retirement under the Plan, the Option shall not become effective and the survivor annuitant shall not be entitled to any payments under the provisions of this Article VII, except as may be provided by Section 7.02 hereof.

## ARTICLE VIII

### RETURN OF CONTRIBUTIONS

8.01    Upon Termination Of Employment Prior To Vesting.    Any Participant who loses his status as an Employee hereunder before having completed five (5) years of Uninterrupted Seniority, whether by reason of his resignation from or abandonment of his employment with the Employer, or by reason of his discharge from employment, or by reason of his Employer's failure to enter into a collective bargaining agreement with the Union, or to make contributions required therein, or who loses his status as an Employee hereunder for any other reason whatsoever, shall be entitled to and shall be paid a refund of his contributions, without interest for any period prior to January 1, 1976, with interest at the rate of five percent (5%) per annum from January 1, 1976 through December 31, 1987, and after December 31, 1987, with interest at the rate of one hundred twenty percent (120%) of the federal mid-term rate (as in effect under Code Section 1274 for the first month of a Plan Year) from the beginning of the first Plan Year to which Code Section 411(a)(2) applies and ending with the date on which the determination is being made, and shall not be entitled to any benefits hereunder. Any Participant who loses his status as an Employee as above, but after having completed five (5) years of Uninterrupted Seniority, shall still be entitled to a benefit upon attaining age sixty-five (65). The amount of such pension shall be calculated in accordance with Section 5.01, but will be reduced by the value of such Participant's Employee Contribution Benefit determined in accordance with Section 1.24, which has been received by the Participant; provided further, such Participant may elect not to withdraw such contribution plus interest, in which case his pension upon attaining age sixty-five (65) will be calculated as in Section 5.01. Any election by such Participant to withdraw his contributions with interest must be made in accordance with the provisions of Section 6.03.

8.02    Refund Upon Death.

(a)    If a Participant dies prior to satisfying the requirements for a benefit under Section 4.03, the Fund shall pay to the Beneficiary designated by such Participant, or to his widow, or to the guardian of his minor children if his wife has pre-deceased him, or to his estate, the total amount of such Participant's contributions with interest except as provided in subsection (b) hereof. Interest shall be determined as provided in Section 8.01. The provisions of this Section 8.02 shall not apply if the Participant's Spouse is entitled to a Spouse's pension, as provided in Section 6.02(a). The benefit payable to the Spouse of a Participant under the provisions of Section 6.02(c) hereof will be reduced by the Employee Contribution Benefit, determined in accordance with Section 1.24, which has been received by such Spouse under the provisions of this Section 8.02.

9104560.9                                  32

If an unmarried Participant dies while in the active employment of an Employer, and is survived by a Dependent Child or Children on whose behalf death benefits are payable in accordance with Section 6.08 hereof, the provisions of this Section 8.02 shall apply in lieu of said Section 6.08 if and only if the total amount of such Participant's contributions with interest shall be greater than the present value of the Dependent Child's death benefit.

(b)    The Spouse of a Participant who is eligible for a benefit under the provisions of Section 6.02(c) hereof may elect not to take a distribution of the deceased Participant's contributions plus interest in which event the benefit payable to such Spouse under the provisions of Section 6.02(c) hereof will not be reduced as provided under subsection (a) hereof. However, if a Spouse elects not to take a distribution of a Participant's contributions with interest and then dies prior to the commencement of benefits under the provisions of Section 6.02(c), the Participant's contributions with interest will be paid to the Spouse's designated Beneficiary.

8.03    Cessation of Payment Upon Death. In the event a Participant dies after monthly pension payments have commenced, no further payment shall be made from the Fund and his estate or any Beneficiary designated by such deceased Participant shall have no claim under the provisions of this Plan, except that the balance, if any, of the Participant's contribution to the Fund shall be paid to the deceased Participant's designated Beneficiary or legal representative. Lacking such designated Beneficiary or legal representative, payment shall be made in the following order of priority:

(a)    to his surviving spouse, or if there be no surviving spouse,

(b)    to his surviving children, per stirpes, in equal parts, provided, however, that children by blood, marriage or adoption shall be considered children of the Participant or of his children, as the case may be, or if there be none surviving,

(c)    to his surviving mother and father, in equal parts, or if there be none surviving,

(d)    to his estate.

The provisions of this Section 8.03 shall not apply if the Participant's Spouse will receive a Spouse's pension, as provided in Section 6.01 or Section 6.02(a). Furthermore, the provisions of this Section 8.03 shall not apply if the Participant's Beneficiary will receive a monthly pension as provided in Section 1.38(a).

8.04    Repayment Of Contributions Upon Reemployment. If the employment of a Participant is terminated prior to his completion of five (5) years of Uninterrupted Seniority, he shall receive a cash refund equal to his contributions plus interest, as provided in Section 8.01. If such a Participant shall thereafter again become a Participant hereunder and provided that he has not been absent from employment under the Plan for the number of Break in Service Years described in Section 3.06(a) hereof, such Participant may, within five (5) years of his date of reemployment, repay to the Fund the amount of the contributions and interest thereon paid to him in accordance with this paragraph, together with interest from the date of payment to the

date of repayment, in accordance with the provisions of subsections 1.24(b) and (c). If he so repays, he shall be treated as if he never received a refund of his contributions hereunder.

## ARTICLE IX

## REQUIRED COMMENCEMENT OF BENEFITS

9.01    General Rules.    The requirements of this Article shall apply to any distribution of a Participant's interest in the Plan and will take precedence only if the operations of the provisions of any other Article would be inconsistent with the provisions of this Article. Unless otherwise specified, the provisions of this Article apply to calendar years beginning after December 31, 1984. All distributions required under this Article shall be determined and made in accordance with the Income Tax Regulations under Code Section 401(a)(9), including the minimum distribution incidental benefit requirement of Section 1.401(a)(9)-2 of the proposed Income Tax Regulations. Words and phrases used in this Article that are capitalized but not defined in Article I are defined in Section 9.06.

9.02    Required Beginning Date.    The entire interest of a Participant must be distributed or must have begun to be distributed no later than the Participant's Required Beginning Date.

9.03    Distribution Periods.    As of the first Distribution Calendar Year, distributions, if not made in a single-sum, may only be made over one of the following periods, or a combination thereof:

(a)    the life of the Participant,

(b)    the life of the Participant and a Designated Beneficiary,

(c)    a period certain not extending beyond the Life Expectancy of the Participant, or

(d)    a period certain not extending beyond the Joint and Last Survivor Expectancy of the Participant and a Designated Beneficiary.

9.04    Determination Of Amount To Be Distributed Each Year.    If the Participant's interest is to be paid in the form of annuity distributions under the Plan, payments under the annuity shall satisfy the following requirements:

(i)    the annuity distributions must be paid in periodic payments made at intervals not longer than one (1) year;

(ii)    the distribution period must be over a life (or lives) or over a period certain not longer than a Life Expectancy (or Joint Life and Last Survivor Expectancy) described in Code Sections 401(a)(9)(A)(ii) or 401(a)(9)(B)(iii), whichever is applicable;

(iii)    the Life Expectancy (or Joint and Last Survivor Expectancy) for purposes of determining the period certain shall be determined without recalculation of Life Expectancy;

(iv)    once payments have begun over a period certain, the period certain may not be lengthened even if the period certain is shorter than the maximum permitted;

(v)    payments must either be nonincreasing or increase only as follows:

(A)    with any percentage increase in a specified and generally recognized cost-of-living index;

(B)    to the extent of the reduction to the amount of the Participant's payments to provide for a survivor benefit upon death, but only if the Beneficiary whose life was being used to determine the distribution period described in subparagraph (ii) above dies and the payments continue otherwise in accordance with that subparagraph over the life of the Participant;

(C)    to provide cash refunds of Employee contributions upon the Participant's death;

(D)    because of an increase in benefits under the Plan.

(vi)    If the Participant elects the Joint and Survivor Option, the amount which must be distributed on or before the Participant's Required Beginning Date (or, in the case of distributions after the death of the Participant, the date distributions are required to begin pursuant to Section 9.05 below) shall be the payment which is required for one (1) payment interval. The second payment need not be made until the end of the next payment interval even if that payment interval ends in the next calendar year. Payment intervals are the periods for which payments are received, e.g., bimonthly, monthly, semi-annually, or annually.

(b)    Annuities purchased after December 31, 1988, are subject to the following additional conditions:

(i)    Unless the Participant's Spouse is the Designated Beneficiary, if the Participant's interest is being distributed in the form of a period certain annuity without a life contingency, the period certain as of the beginning of the first Distribution Calendar Year may not exceed the applicable period determined using the table set forth in Q&A A-5 of Section 1.401(a)(9)-2 of the proposed Income Tax Regulations.

(ii)    If the Participant's interest is being distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a nonspouse Beneficiary, annuity payments to be made on or after the Participant's Required Beginning Date to the Designated Beneficiary after the Participant's death must not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant using the table set forth in Q&A A-6 of Section 1.401(a)(9)-2 of the proposed Income Tax Regulations.

(c)     If the form of distribution is an annuity made in accordance with this Section 9.04(d), any additional benefits accruing to the Participant after his or her Required Beginning Date shall be distributed as a separate and identifiable component of the annuity beginning with the first payment interval ending in the calendar year immediately following the calendar year in which such amount accrues.

(d)     Any part of the Participant's interest which is in the form of an individual account shall be distributed in a manner satisfying the requirements of Code Section 401(a)(9) and the regulations thereunder.

9.05     Death Distribution Provisions.

(a)     Distribution beginning before death. If the Participant dies after distribution of his interest has begun, the remaining portion of such interest will continue to be distributed at least as rapidly as under the method of distribution being used prior to the Participant's death.

(b)     Distribution beginning after death. If the Participant dies before distribution of his interest begins, distribution of the Participant's entire interest shall be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death except to the extent that an election is made to receive distributions in accordance with (i) or (ii) below:

(i)     if any portion of the Participant's interest is payable to a Designated Beneficiary, distributions may be made over the life or over a period certain not greater than the Life Expectancy of the Designated Beneficiary commencing on or before December 31 of the calendar year immediately following the calendar year in which the Participant died;

(ii)     if the Designated Beneficiary is the Participant's surviving Spouse, the date distributions are required to begin in accordance with (i) above shall not be earlier than the later of December 31 of the calendar year immediately following the calendar year in which the Participant died, or December 31 of the calendar year in which the Participant would have attained age 70½. If the Participant has not made an election pursuant to this Section by the time of his death, the Participant's Designated Beneficiary must elect the method of distribution no later than the earlier of December 31 of the calendar year in which distributions would be required to begin under this Section, or December 31 of the calendar year which contains the fifth anniversary of the date of death of the Participant. If the Participant has no Designated Beneficiary, or if the Designated Beneficiary does not elect a method of distribution, then distribution of the Participant's entire interest must be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(c)     For purposes of Section 9.05(b) above, if the surviving Spouse dies after the Participant, but before payments to such Spouse begin, the provisions of Section 9.05(b), with the exception of paragraph (ii) therein, shall be applied as if the surviving Spouse were the Participant.

(d)    For purposes of this Section 9.05, distribution of a Participant's interest is considered to begin on the Participant's Required Beginning Date (or, if Section 9.05(c) above is applicable, the date distribution is required to begin to the surviving Spouse). If distribution in the form of an annuity described in Section 9.04 above irrevocably commences to the Participant before the Required Beginning Date, the date distribution is considered to begin is the date distribution actually commences.

9.06    Definitions.

(a)    Designated Beneficiary.  The individual who is designated as the Beneficiary under Articles VI and VII of the Plan.

(b)    Distribution Calendar Year.  A calendar year for which a minimum distribution is required.  For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date.  For distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin pursuant to Section 9.05 above.

(c)    Life Expectancy.  The Life Expectancy (or Joint and Last Survivor Expectancy) calculated using the attained age of the Participant (or Designated Beneficiary) as of the Participant's (or Designated Beneficiary's) birthday in the applicable calendar year.  The applicable calendar year shall be the first Distribution Calendar Year.  If the annuity payments commence before the Required Beginning Date, the applicable calendar year is the year such payments commence.  Life Expectancy and Joint and Last Survivor Expectancy are computed by use of the expected return multiples in Tables V and VI of Section 1.72-9 of the Income Tax Regulations.

(d)    Required Beginning Date.  The Required Beginning Date of a Participant (who is not a 5% Owner) is the first day of April of the calendar year following the calendar year in which the Participant attains age 70½. A Participant who turned age 70½ prior to January 1, 1988, must begin distribution of benefits no later than the April 1st of the calendar year following the later of (1) the calendar year in which the Participant attained age 70½ or (2) the calendar year in which the Participant retired or retires.  A Participant is treated as a 5% Owner for purposes of this Section if such Participant is a 5% Owner as defined in Code Section 416(i) (determined in accordance with Code Section 416 but without regard to whether the Plan is top-heavy) at any time during the Plan Year ending with or within the calendar year in which such owner attains age 66½ or any subsequent Plan Year.  Once distributions have begun to a 5% Owner under this Section, they must continue to be distributed, even if the Participant ceases to be a 5% Owner in a subsequent year.

(e)    For calendar years beginning after December 31, 1988, distributions must meet the minimum distribution incidental benefit requirements in Section 1.401(a)(9)-2 of the proposed Income Tax Regulations.  Any changes in the designation will be considered to be a revocation of the designation.  However, the mere substitution or addition of another Beneficiary (one not named in the designation) under the designation will not be considered to be a revocation of the designation, so long as such substitution or addition does not

alter the period over which distributions are to be made under the designation, directly or indirectly (for example, by altering the relevant measuring life). In the case in which an amount is transferred or rolled over to this Plan from another plan, the rules in Q&A J-2 and Q&A J-3 of Section 1.401(a)(9)-1 of the proposed Income Tax Regulations shall apply.

9.07    Distributions under Code Section 401(a)(9).    Notwithstanding any provisions of the Plan to the contrary, with respect to distributions under the Plan made for calendar years beginning on or after January 1, 2002, the Plan will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the regulations under Code Section 401(a)(9) that were proposed on January 17, 2001. This amendment shall continue in effect until the end of the last calendar year beginning before the effective date of final regulations under Code Section 401(a)(9) or such other date specified in guidance published by the Internal Revenue Service.

## ARTICLE X

## BENEFITS ON TERMINATION OF EMPLOYMENT AND RETIREMENT UPON DISABILITY

10.01    Termination Generally.    All rights of a Participant to all benefits under the Plan will cease upon his termination of Covered Employment prior to satisfaction of the conditions for retirement set forth in Article IV of the Plan, for a reason other than death, except as otherwise provided in the following Sections of this Article.  The only benefits of any kind payable under any of the provisions of the Plan in the event of the death of a Participant prior to commencement of his retirement benefit are those provided in Article VI and VII hereof.

10.02    Conditions For Vested Retirement Benefits.    If a Participant is in the employment of a Contributing Employer on the date he attains Normal Retirement Age, he shall have a one hundred percent (100%) vested interest in his Accrued Benefit.  If the Participant terminates Covered Employment at any time prior to his Normal or Early Retirement Date, other than by Disability, the Participant shall have a vested interest in his Accrued Benefit equal to the percentage determined in accordance with the following schedule on the basis of his Years of Uninterrupted Seniority:

| Number of Years | Percentage of Accrued Benefit |
|---|---|
| Less than 5 full years | 0% |
| 5 full years | 100% |

This schedule shall apply only to a Participant who has earned at least one (1) Hour of Service on or after January 1, 1998; with respect to any other Participant, the previous schedule shall apply.

10.03    Amount Of Vested Retirement Benefits.

(a)    A terminated vested Participant shall receive his Accrued Benefit, determined as provided in this Section 10.03, commencing on his Normal Retirement Date. The

amount of monthly retirement benefit payable shall be determined in the manner provided in Section 5.01 as applicable with years of Uninterrupted Seniority and benefit rate determined as of the date of his termination of employment with a Contributing Employer.

(b)    If a Participant satisfies the requirements for the commencement of benefits prior to his Normal Retirement Date in accordance with the provisions of Section 4.03(b) the amount of such pension shall be the vested amount provided in Section 10.02 reduced as provided in Section 1.03.

10.04  Single Sum Payment Of Value Of Vested Retirement Benefits.

(a)    The Committee shall direct the Trustee to pay a Participant, in a single sum, an amount equal to the Actuarial Equivalent value, as of the date of payment of the vested Accrued Benefit payable in lieu of any other form of such retirement benefit, provided the amount of such Actuarial Equivalent is not in excess of three thousand five hundred dollars ($3,500). The Actuarial Equivalent value of such cash out, shall be determined in accordance with the provisions of Section 1.03 of the Plan. The nonvested portion of a Participant's Accrued Benefit, if any, shall be treated as a forfeiture upon such cash out. For purposes of this Section, if the Actuarial Equivalent value of a Participant's vested Accrued Benefit is zero, the Participant shall be deemed to have received a distribution of such vested benefit.

(b)    If a Participant receives or is deemed to receive a distribution pursuant to this Section and the Participant resumes Covered Employment under the Plan, he shall have the right to restore his Employer-derived Accrued Benefit (including all optional forms of benefits and subsidies relating to such benefits) to the extent forfeited upon the repayment to the Plan of the full amount of the distribution plus interest, compounded annually from the date of distribution at the rate of five percent (5%) from January 1, 1976 through December 31, 1987, and after December 31, 1987, with interest in accordance with the provisions of Section 1.24(c). Such repayment must be made not later than five (5) years after the first date on which the Participant is subsequently reemployed in Covered Employment, or the date the Participant incurs five (5) consecutive 1-year Breaks in Service following the date of distribution.

10.05  Participant And Spousal Consent For Immediately Distributable Benefits. If the present value of a Participant's vested Accrued Benefit derived from Employer and Employee Contributions, if any, exceeds (or at any time of any prior distribution exceeded) three thousand five hundred dollars ($3,500), and the Accrued Benefit is immediately distributable, the Participant and the Participant's Spouse (or where either the Participant or the Spouse has died, the survivor) must consent to any distribution of such Accrued Benefit. The consent of the Participant and the Participant's Spouse shall be obtained in writing within the 90-day period ending on the Annuity Starting Date. The Trustees shall notify the Participant and the Participant's Spouse of the right to defer any distribution until the Participant's Accrued Benefit is no longer immediately distributable. Such notification shall include a general description of the material features, and an explanation of the relative values of, the optional forms of benefit available under Article VII of the Plan in a manner that would satisfy the notice requirements of Code Section 417(a)(3), and shall be provided no less than thirty (30) days and no more than ninety (90) days prior to the Annuity Starting Date. However, distribution may commence less

than thirty (30) days after the notice described in the preceding sentence is given, provided the distribution is one to which Code Sections 401(a)(11) and 417 do not apply, the Plan Administrator clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution, and the Participant after receiving the notice, affirmatively elects a distribution.

Notwithstanding the foregoing, only the Participant need consent to the commencement of a distribution in the form of an Automatic Joint and Survivor Annuity, described in Section 6.01 of the Plan, while the Accrued Benefit is immediately distributable. Neither the consent of the Participant nor the Participant's Spouse shall be required to the extent that a distribution is required to satisfy Code Sections 401(a)(9) or 415. An Accrued Benefit is "immediately distributable" if any part of the Accrued Benefit could be distributed to the Participant (or surviving Spouse) before the Participant attains (or would have attained if not deceased) the later of Normal Retirement Age or age sixty-two (62).

10.06  Disability Termination.

(a)    A Participant shall be eligible for a Disability Retirement as defined in Section 4.04 if he has incurred, through some unavoidable cause, a total and permanent Disability as defined in Article I. Disability shall be deemed to have resulted from an unavoidable cause unless it was contracted, suffered, or incurred while the Participant was engaged in a willful criminal enterprise or resulted from a deliberate self-inflicted injury.

(b)    Upon a Participant's retirement under this Section 10.06, the Participant shall be automatically entitled to receive a monthly retirement benefit, commencing on the first day of the seventh month following his date of Disability, and continuing on the first day of each month thereafter during his lifetime.  Such monthly retirement benefit shall be determined in the same manner as the monthly retirement benefit payable upon retirement at the Normal Retirement Date of the Participant, with Uninterrupted Seniority and Benefit Rate determined as of the date of his Disability retirement.

(c)    Benefits payable under this Section 10.06 shall be in lieu of any benefits payable under any other Section of this Plan; provided however, any loss of rights to benefits under this Section 10.06 shall not deprive a Participant of any benefits that he might otherwise be entitled to receive under the Plan.

(d)    If a Participant loses all rights to any benefits under this Section 10.06 because, prior to his Normal Retirement Date, his total and permanent Disability has ceased, and if such Participant resumes Covered Employment immediately after the cessation of such Disability, then automatically after such resumption of employment he shall resume participation in the Plan provided he agrees to make mandatory Employee Contributions pursuant to Section 2.01(c). The benefits to which such Participant will subsequently be entitled, however, will be calculated in accordance with the provisions of Section 10.08 hereof.

10.07  Disability Retirement.  Where a Participant applies to the Trustees for a Disability pension and the Trustees, at a meeting, find upon all the medical evidence before that

such Participant is totally and permanently disabled, they shall set forth in full in the minutes of the meeting their specific findings as to the nature, cause and extent of the Disability.

10.08   Trustee Review Of Disability Pension Payments.  The continued payment of a Disability pension shall be subject to review by the Trustees at any time upon the motion of any Trustee.  If at any time before the Normal Retirement Date of a Participant who is the recipient of a Disability retirement pension, the Trustees find based upon all the medical evidence before them that the Participant is no longer totally and permanently disabled, the Participant's Disability retirement benefits shall cease.  Upon the subsequent retirement of such Participant, whether at normal retirement, early retirement, or a subsequent Disability retirement, the Participant's pension will be calculated as the sum of (i) a benefit based on the Participant's Uninterrupted Seniority as of his Disability Retirement Date and the Benefit Rate in effect at that time, and (ii) a benefit based on the Participant's Uninterrupted Seniority earned after his Disability ceases, if any, and the Benefit Rate in effect on his subsequent retirement date.  Continued payment of a Disability pension shall not be subject to review after the Participant shall have attained the age of sixty-five (65), or, if the Participant has at least twenty (20) years of Uninterrupted Seniority, after he has attained the age of fifty-seven (57), nor shall he be required to establish continuing Disability after such date.

10.09   No Forfeiture Upon Withdrawal Of Employee Contribution.   If a Participant has a nonforfeitable right to at least fifty percent (50%) of his employer-derived Accrued Benefit, then no forfeitures will occur solely as a result of a Participant's withdrawal of Employee Contributions.  Regardless of a Participant's nonforfeitable percentage, a withdrawal of Employee Contributions will not result in a forfeiture of the minimum benefit, if any, provided under Article XV.

## ARTICLE XI

## FUNDING

11.01   Contributions By Participants.

(a)      Each Participant shall be obligated and required to make contributions to the Fund in such amounts and at such times as shall be provided in the collective bargaining agreements or other agreements.  The rate of contribution payable by the Participant shall not exceed the amount payable by his Employer.

(b)      Each Participant shall execute a wage deduction authorization, authorizing and directing the Employer to deduct weekly from any wages, vacation benefits or sick benefits payable to him by the Employer, the amounts payable under subsection (a) above and directing the Employer to pay over to the Fund, within ten (10) days after the day on which the deduction is made, the amount so deducted.  Such authorization shall not be revocable.  For each week for which no such authorization is on file with the Employer because of the failure of the Participant to execute and deliver such authorization, there shall be added to the Participant's obligation to the Fund the sum of one dollar ($1.00) to cover administrative expenses, and no monies so paid over and above the basic contribution shall be refundable under any circumstances.

9104560.9                                                  41

(c)    When for any week or weeks other than for a period described in Section 3.07 no deduction is made on behalf of an Employee because neither wages, vacation benefits nor sick benefits were paid to such Employee for such week or weeks, the deduction on such Employee's behalf in each subsequent week, or weeks, shall be one hundred fifty percent (150%) of the basic contribution rate until such Employee's past obligations to the Fund are fully met.

(d)    Any Participant who transfers, or is transferred, to a position with the Employer not within the unit of Employees represented by the Union may continue as a Participant and retain his eligibility for benefits hereunder by so electing in a written statement filed with the Secretary of the Fund, provided contributions are continued in amounts aggregating the Employer's plus the Employee's Contributions required under this Article XI. Such contributions may be made by the Employer, the Employee or any combination thereof approved by the Trustees. Any such Participant may elect to withdraw his contributions to the Fund by so notifying the Secretary in writing. The repayment of such contributions by the Fund shall bear interest at the rate of five percent (5%) compounded annually for contributions received by the Fund after December 31, 1975 and prior to January 1, 1988 and at one hundred twenty percent (120%) of the Federal mid-term rate as in effect on the first day of each Plan Year for all years after December 31, 1987. Upon withdrawal of such contributions, the following shall govern:

(i)    If the Participant was transferred before completing five (5) years of Uninterrupted Seniority, all his rights to benefits hereunder shall cease.

(ii)    If the Participant was transferred after completing five (5) years of Uninterrupted Seniority, he shall be entitled, upon attaining age sixty-five (65), to that part of his normal pension benefit which is attributable to Employer contributions. This election to withdraw his own contributions shall be subject to the provisions of Section 6.03 hereof.

(e)    Employee Contributions, plus the interest earned thereon, shall be nonforfeitable at all times.

11.02    Contributions By Contributing Employers.

(a)    Each Employer shall make contributions to the Fund in such amounts and at such times as shall be provided in the Agreements between the Employer and the Union, or as they may be amended from time to time. Contributions by the Employers to the Fund shall be accompanied by reports containing such information as may be prescribed by the Board of Trustees. All contributions shall be irrevocable and may be used only for the benefit of the Participants and their Spouses and/or Beneficiaries. The actuarial liabilities for benefits under the Plan that may be forfeited in the event of severance of employment, death, or for any other reason, shall be used in the determination of Employer Contributions made immediately following such forfeiture to effect a reduction in such contributions and shall in no event be applied to increase any of the benefits under the Plan.

(b)    In addition to its contributions, the Employer may elect to pay all the administrative expenses of the Plan and all fees and retainers of the Plan's Trustee, actuary,

9104560.9                                    42

accountant, counsel, consultant, administrator, or other specialist so long as the Plan or Trust Fund remains in effect. If the Employer does not pay all or part of such expenses, the Trustee shall pay these expenses from the Trust Fund. All expenses directly relating to the investments of the Trust Fund, including taxes, brokerage commissions, and registration charges must be paid from the Trust Fund.

11.03    Fund. The Trust has been established pursuant to the Agreement, whereby Employer contributions are held, invested and applied to the payment of benefits hereunder. The Trust Agreement shall contain such powers and reservations as to investments, reinvestment, control and disbursements of the funds, and such other provisions consistent with the provisions of the Plan and its nature and purposes as shall be agreed upon and set forth therein. The Trustees shall, in accordance with the terms of such agreement, accept and receive all sums of money paid to it from time to time by the Employer and the Participants and shall hold, invest, reinvest, manage and administer such moneys and the increment, increase, earnings and income thereof as a fund for the exclusive benefit of the Participants and their Spouses and/or Beneficiaries.

## ARTICLE XII

## PLAN ADMINISTRATION

### 12.01    The Board

(a)    The Board shall serve as the Administrator but shall have the discretion to appoint one or more persons as Administrator, who may also be removed by the Board. If any individual is appointed as Administrator, and the individual is an Employee, the individual will be considered to have resigned as Administrator if he or she terminates Employment and at least one other person continues to serve as Administrator. Employees shall receive no compensation for their services rendered to or as Administrator.

(b)    Subject only to the provisions set forth in the Trust Agreement with relation to deadlocks, the decision of the Board shall be final and binding with respect to all disputes concerning the meaning and application of the Plan, and such decisions of the Board shall be final and binding upon all persons including the Employer, the Union, Employees and Participants. The Board may at any time, by resolution duly adopted, appoint a committee for the hearing and consideration of any matters specified by the board, and the report of such committee shall be binding on all parties subject only to approval, disapproval or modification by the Board.

(c)    The Board shall have the responsibility for administering this Plan and making determinations as to its effect and application. The Board may appoint a Fund Manager who shall be responsible for the day-to-day operation of the Plan. Forms or documents filed with the Fund Manager shall be deemed filed when received by the Fund Manager.

(d)    The Board may take any action that is in accordance with the provisions of the Plan. Further, the Board may amend the Plan pursuant to the provisions of

9104560.9                                        43

Article XI hereof. Any action or decision made by the Trustees shall be binding if taken in accordance with the Trust Agreement.

(e)    Claims Procedure

(i)    Filing A Claim for Benefits. Any request or claim for benefits under the Plan shall be submitted to the Fund Manager in writing, on forms prescribed by the Fund Manager, for processing and determination in accordance with procedures established from time to time by the Fund Manager. The Fund Manager may refer any application to the Trustees, for a ruling on whether the application should be denied in whole or in part. A claim shall be deemed filed when a written communication is received by the Fund Manager.

(ii)    Timing of Notification of Benefit Determination. The Fund Manager shall make a determination with respect to an application for benefits within ninety (90) days after receipt of the claim by the Plan unless it is determined that special circumstances require an extension of time for processing the claim, not to exceed an additional ninety (90) days. If such extension is required, the Fund Manager shall provide written notice of the extension prior to the expiration of the initial 90-day period. The notice of extension shall indicate the special circumstances requiring an extension of time and the date by which the Fund Manager expects to render a determination with respect to the claim. It is the intent of the Plan to respond to claims promptly. However, if notice of the denial of a claim for benefits is not furnished in accordance with the above within 90 days, the Participant's claim for benefits shall be deemed denied. The Participant shall then be permitted to proceed to the next stage as described hereafter.

(iii)    Manner and Content of Notification of Benefit Determination. The Fund Manager shall notify the claimant whether his application has been granted or whether it has been denied in whole or in part. The Fund Manager shall provide a claimant with written or electronic notification of any adverse benefit determination. The notification shall set forth, in a manner calculated to be understood by the claimant:

(A)    The specific reason or reasons for the adverse benefit determination;

(B)    Reference to the specific provisions of the Plan on which the determination is based;

(C)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(D)    A description of the Plan's review procedures and the applicable time limits including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review.

(iv)    Appeal of Adverse Benefit Determination.  If an adverse benefit determination is made by the Fund Manager, the claimant (or authorized representative) may request an appeal of such determination by the Trustees (or designated committee).  All requests for review must be sent in writing to the Fund Manager within sixty (60) days after receipt of a notification of adverse benefit determination.  In connection with the request for review, the claimant (or authorized representative) may submit written comments, documents, records and other information relating to the claim for benefits.  In addition, the claimant will be provided, upon written request and free of charge, with reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim for benefits, as determined under Labor Regulation Section 2560.503-1.  The review by the Trustees (or designated committee) shall take into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(v)    Timing of Notification of Benefit Determination on Review.  A decision on review shall be made by the Trustees (or a committee designated by the Trustees) at its next regularly scheduled meeting following receipt of the request for review, unless the request is filed less than thirty (30) days prior to the next regularly scheduled meeting, in which case a decision will be made at the second regularly scheduled meeting following receipt of such request for review.  If special circumstances require a further extension of time for processing the request for review, a benefit determination shall be made no later than the third meeting following the Plan's receipt of the request for review, in which case the Administrator shall notify the claimant, before the commencement of the extension, of the need for the extension of time and the special circumstances and the date as of which the benefit determination will be made.  If the extension is required due to the claimant's failure to submit information necessary to decide the claim, the period for making the determination will be tolled from the date on which the extension notice is sent to the claimant until the date on which the claimant responds to the Administrator's request for information.  The decision of the Trustees (or designated committee) shall be communicated to the claimant in writing within five days after the benefit determination is made.  If the decision on review is not furnished by the Administrator within ninety (90) days after receipt of the request for review, the claim shall be deemed denied on review.

(vi)    Manner and Content of Notification of Benefit Determination on Review.  The Administrator shall provide a claimant with written or electronic notification of the benefit determination on review.  In the case of an adverse benefit determination, the notification shall set forth in a manner calculated to be understood by the claimant:

(A)    The specific reason or reasons for the adverse benefit determination;

(B)    Reference to the specific provisions of the Plan on which the adverse benefit determination is based;

(C)    A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and

9104560.9                                          45

other information relevant to the claimant's claim for benefits, as determined under Labor Regulation Section 2560.503-1.

(D)    A statement of the claimant's rights to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

(vii)    In the event of a dispute by the applicant of the denial of his claim by the Board, in whole or in part, the controversy or claim shall be settled by arbitration in accordance with the employee benefit claims arbitration rules of the American Arbitration Association. One half of the expenses of the arbitration, including the arbitrator's fees and charges shall be paid for from the funds of the Plan, and the other half shall be paid by the applicant if he loses and by the Plan if he wins. The arbitrator shall determine whether the applicant won or lost as part of his decision. The decision and award of the arbitrator shall be final and binding in all respects.

(f)    Any question within the scope of the Board upon which no agreement is reached shall be determined as provided in the Trust Agreement.

(g)    The Board may retain such actuarial, legal, accounting, clerical and other assistance as it deems advisable and it shall be entitled to rely upon the correctness of any information furnished by the Employer. The fees and expenses of any individuals or companies retained under this Section shall be borne by the Trust Fund.

(h)    Except as provided by ERISA, it is expressly stipulated that the Board is in no event to be under any personal obligation, that its obligation shall be solely as trustees of the Trust Fund, that the distributions provided in this Plan are to be paid solely out of Plan assets as such and are payable only to the extent that assets are available for that purpose.

### 12.02    Delegation of Responsibility

The Board may designate persons, including persons other than "named fiduciaries" (as defined in ERISA Section 402(a)(2)) to carry out the specified responsibilities of the Board and shall not be liable for any act or omission of a person so designated.

### ARTICLE XIII

### AMENDMENT AND TERMINATION OF THE PLAN

### 13.01    Amendment Of Plan.

(a)    The Trustees shall have the right at any time, and from time to time, to amend, in whole or in part, any or all of the provisions of the Plan in accordance with the Plan's duly authorized procedures. However, no such amendment shall authorize or permit any part of the Fund (other than such part as is required to pay taxes and administration expenses) to be used or diverted to purposes other than for the exclusive benefit of the Participants or their Spouses or Beneficiaries; no such amendment shall cause any reduction in the amount of benefits which at the time of such amendment shall have accrued for the Participants or their Spouses or Beneficiaries so long as funds are available for such benefit, or cause or permit any portion of the

9104560.9                                46

Fund to revert to or become property of any contributing Employer in the event of the termination of the Plan. No such amendment shall have retroactive effect except that an amendment adopted during a Plan Year, or within two and one-half (2-1/2) months after the close of the Plan Year, which does not reduce the Accrued Benefit of any Participant may be made effective retroactively, but in no event shall the retroactive date of the effect of such amendment be earlier than the first day of the Plan Year.

(b)    Furthermore, no amendment shall be made to the vesting provisions of Article X of the Plan which has the effect of reducing the nonforfeitable benefit to which the Participant would have been entitled to in accordance with the provisions of Article X if he had terminated his employment with the Employer on the date on which such amendment is to be effective, nor shall any amendment affecting the vesting provisions in Article X of the Plan be made unless any Participant who has completed three (3) Years of Service on the date on which such amendment is to be effective, is allowed to elect to have this nonforfeitable percentage computed under the prior vesting schedule. For Participants who do not have one (1) Hour of Service in any Plan Year beginning after December 31, 1988, the preceding sentence shall be applied by substituting "five (5)" for "three (3)" Years of Service. The period during which the election may be made shall commence with the date the amendment is adopted or deemed to be made and shall end on the latest of:

(i)    sixty (60) days after the amendment is adopted;

(ii)    sixty (60) days after the amendment becomes effective; or

(iii)    sixty (60) days after the Participant is issued written notice of the amendment by the Trustees.

(c)    Any amendment to the Plan shall become effective upon execution of an appropriate written instrument, except that for the purposes of this Section 13.01, should the top-heavy provisions of Section 15.03 become operative, the vesting schedule in Section 10.02 shall be deemed to have been amended.

13.02  Termination Of Plan.

(a)    If the Plan terminates or is partially terminated, under no condition will any portion of the Fund at any time revert to or become the property of any Contributing Employer. Upon termination or partial termination of the Plan, the rights of each Participant involved in such termination to benefits accrued to the date of such termination or partial termination are nonforfeitable, and the assets of the Fund shall be allocated as described in the remainder of this Section 13.02 except as otherwise required by the terms of the Multiemployer Pension Plan Amendments Act of 1980. The Fund shall be the sole source of benefits under the Plan, and except as otherwise required by the Employee Retirement Income Security Act of 1974 (ERISA), neither the Contributing Employers or the Board assume liability or responsibility for the payment of such benefits. Each Participant, Spouse of a Participant, Contingent Annuitant, or Beneficiary who shall claim the right to any payment under the Plan shall be entitled to look only to the Fund for such payment and shall not have any right, claim or demand therefor against

the Employers, Union, the Board, or any Employee or officer/director of any Employer, or the Union or the Board.

(b)    After notice by the Board to the Pension Benefit Guaranty Corporation (PBGC) that the Plan is to be terminated and upon receipt by the Board of a notice from said corporation that the assets held under the Plan are sufficient to discharge when due all obligations of the Plan with respect to the basic benefits of Participants, or after said corporation has notified the Board that the Plan should be terminated and has applied for and been granted a decree by a United States District Court, adjudicating that the Plan must be terminated, the trustees appointed by the aforesaid court pursuant to said corporation's application shall allocate the assets of the Plan in accordance with Title IV of ERISA and regulations promulgated thereon by the PBGC, for the purposes set forth below and in the order set forth below, to the extent the assets are available to provide benefits to Participants and their Contingent Annuitants, Spouses or Beneficiaries. The trustees shall make the allocation referred to above as provided in subsection (d) below.

(c)    In the event of termination of the Plan as provided in this Article, the Fund shall be administered for the sole benefit of Participants and Contingent Annuitants, Spouses and Beneficiaries then entitled to receive benefits under the Plan, Contingent Annuitants, Spouses and Beneficiaries already designated by such Participants but not yet entitled to benefits under the Plan, Participants not then receiving retirement benefits and any future Contingent Annuitants or Beneficiaries who are designated by any of said Participants.

(d)    The amount of the Fund at the date of such termination shall be allocated by the Board in an equitable manner to provide benefits for the persons stated in subsection (c) of this Section 13.02 in the following order of priority:

(i)    First, to those annuity benefits that were in pay status, or could have been in pay status, before the beginning of the 3-year period ending on the date of termination of this Plan, such benefits to be determined under the provisions of this Plan (as in effect during the 5-year period ending on the termination date) under which the benefit would be the least;

(ii)    Second, to satisfy all other Accrued Benefits to the extent, if any, that such benefits are guaranteed by the PBGC;

(iii)    Third, to satisfy all other Accrued Benefits which are then nonforfeitable;

(iv)    Fourth, to satisfy all other Accrued Benefits hereunder.

In the application of this Section 13.02, if a Participant shall be eligible for more than one benefit under the terms of the Plan, the smallest such benefit shall be used in applying the provisions hereof. If the total funds available shall be insufficient to pay all amounts within any of the categories provided above, then the funds available shall be allocated in accordance with the applicable provision of Title IV of ERISA, and regulations issued by the PBGC thereunder, as amended, on the basis of the actuarial present value determined in accordance with subsection

(e) of this Section 13.02 and in accordance with the terms of the Multiemployer Pension Plan Amendments Act of 1980.

(e)     The allocation of the Fund provided for in subsection (d) of this Section 13.02 may, as decided by the Board, be carried out through the continuance of the Fund or the Fund may at any time be liquidated and insurance company contracts purchased to provide the benefits determined in accordance with said subsection (d), or the Fund may be distributed in one sum if the Participant does not elect to receive an annuity, which shall be equal to the actuarial present value of the Participant's Accrued Benefits. This actuarial present value shall be determined on the basis of the mortality and interest rates promulgated by the PBGC as in effect on the date of Plan termination. No Participant in the employ of a Contributing Employer on the date of termination of the Plan shall lose his right to any benefits under this Section 13.02 solely because he later terminated employment with a Contributing Employer prior to his Normal Retirement Date.

(f)     If, as of the date this Plan terminates, the value of Plan assets is not less than the present value of all Accrued Benefits (whether or not nonforfeitable) distributions of assets to each Participant equal to the present value of that Participant's Accrued Benefit will not be discriminatory if the formula for computing benefits as of the date of termination is not discriminatory.

All present values and the value of plan assets will be computed using assumptions satisfying Title IV of ERISA.

13.03    Limit For 25 Highest Paid Employees.

(a)     For Plan Years beginning before January 1, 1992, Employer contributions on behalf of any of the twenty-five (25) highest paid Employees at the time the Plan is established and whose anticipated annual benefit exceeds one thousand five hundred dollars ($1,500) will be restricted as provided in paragraph (b) upon the occurrence of the following conditions:

(i)     The Plan is terminated within ten (10) years after its establishment,

(ii)     The benefits of such highest paid Employee become payable within ten (10) years after the establishment of the Plan, or

(iii)     If Code Section 412 (without regard to Section 412(h)(2)) does not apply to this Plan, the benefits of such Employee become payable after the Plan has been in effect for ten (10) years, and the full current costs of the Plan for the first ten (10) years have not been funded.

(b)     Employer contributions which may be used for the benefit of an Employee described in paragraph (a) shall not exceed the greater of twenty thousand dollars ($20,000), or twenty percent (20%) of the first fifty thousand dollars ($50,000) of the Employee's compensation multiplied by the number of years between the date of the establishment of the Plan and:

(i)     If (a)(i) applies, the date of the termination of the Plan,

(ii)    If (a)(ii) applies, the date the benefits become payable, or

(iii)   If (a)(iii) applies, the date of the failure to meet the full current costs.

(c)    If the Plan is amended so as to increase the benefit actually payable in the event of the subsequent termination of the Plan, then the provisions of the above paragraphs shall be applied to the Plan as so changed as if it were a new Plan established on the date of the change. The original group of twenty-five (25) Employees (as described in (a) above) will continue to have the limitations in (b) apply as if the Plan had not been changed. The restrictions relating to the change of Plan should apply to benefits or funds for each of the twenty-five (25) highest paid Employees on the effective date of the change except that such restrictions need not apply with respect to any Employee in this group for whom the normal annual pension or annuity provided by Employer contributions prior to that date and during the ensuing ten (10) years, based on his rate of Compensation on that date, could not exceed one thousand five hundred ($1,500).

The Employer contributions which may be used for the benefit of the new group of twenty-five (25) Employees will be limited to the greater of:

(i)    The Employer contributions (or funds attributable thereto) which would have been applied to provide the benefits for the Employee if the previous Plan had been continued without change;

(ii)   Twenty thousand dollars ($20,000); or

(iii)  The sum of (A) the Employer contributions (or funds attributable thereto) which would have been applied to provide benefits for the Employee under the previous Plan if it had been terminated the day before the effective date of change, and (B) an amount computed by multiplying the number of years for which the current costs of the Plan after that date are met by (1) twenty percent (20%) of his annual Compensation, or (2) ten thousand dollars ($10,000), whichever is smaller.

(d)    Notwithstanding the above limitations, the following limitations will apply if they would result in a greater amount of Employer contributions to be used for the benefit of the restricted Employee:

(i)    In the case of a substantial owner (as defined in Section 4022(b)(5) of ERISA, a dollar amount which equals the present value of the benefit guaranteed for such Employee under Section 4022 of ERISA, or if the Plan has not terminated, the present value of the benefit that would be guaranteed if the Plan terminated on the date the benefit commences, determined in accordance with regulations of the PBGC; and

(ii)   In the case of the other restricted Employees, a dollar amount which equals the present value of the maximum benefit described in Section 4022(b)(3)(B) of ERISA (determined on the earlier of the date the Plan terminates or the date

9104560.9                50

benefits commence, and determined in accordance with regulations of PBGC) without regard to any other limitations in Section 4022 of ERISA.

(e)    Notwithstanding    the    otherwise    applicable    restrictions    on distributions of benefits incident to early Plan termination, a Participant's otherwise restricted benefit may be distributed in full upon depositing with an acceptable depository property having a fair market value equal to one hundred twenty-five percent (125%) of the amount which would be repayable had the Plan terminated on the date of the lump sum distribution.  If the market value of the property held by the depository falls below one hundred ten percent (110%) of the amount which would be repayable if the Plan were then to terminate, additional property necessary to bring the value of the property held by the depository up to one hundred twenty-five percent (125%) of such amount will be deposited.

(f)    In years beginning on or after January 1, 1992 and in the event of Plan termination, the benefit of any Highly Compensated active or former Employee is limited to a benefit that is nondiscriminatory under Section 401(a)(4).

For Plan Years beginning on or after January 1, 1992, benefits distributed to any of the twenty-five (25) most Highly Compensated active and former Highly Compensated Employees are restricted such that the annual payments are no greater than an amount equal to the payment that would be made on behalf of the Employee under a single life annuity that is the Actuarial Equivalent of the sum of the Employee's Accrued Benefit and the Employee's other benefits under the Plan.

The preceding paragraph shall not apply if: (i) after payment of the benefit to an Employee described in the preceding paragraph, the value of plan assets equals or exceeds one hundred ten percent (110%) of the value of current liabilities, as defined in Code Section 412(1)(7), or (ii) the value of the benefits for an Employee described above is less than one percent (1%) of the value of current liabilities.

For purposes of this Section, benefit includes loans in excess of the amount set forth in Code Section 72(p)(2)(a), any periodic income, any withdrawal values payable to a living Employee, and any death benefits not provided for by insurance on the Employee's life.

ARTICLE XIV

MISCELLANEOUS

14.01  Headings And Subheadings.  The headings and subheadings in the Plan have been inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

14.02  Gender And Number.  Wherever any words are used herein in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words are used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply.

9104560.9                                        51

14.03 <u>Participant's Rights: Acquittance</u>. Neither the establishment of the Plan, nor any modification thereof, nor the creation of the Fund, nor the payment of any benefits, shall be construed as giving to a Participant or other person any legal or equitable right against any Employer, or any officer or Employee thereof, or a Trustee, or the Trustees, except as herein provided. Under no circumstances shall the terms of employment of a Participant be modified or in any way affected hereby.

14.04 <u>Receipt Or Release</u>. Any payment to a Participant, Spouse or Beneficiary or to their legal representatives, in accordance with the provisions of the Plan, shall to the extent thereof be in full satisfaction of all claims hereunder against the Trustee, and any Employer, any of whom may require such Participant, Spouse, Beneficiary, or legal representative, as a condition precedent to such payment, to execute a receipt and release therefor in such form as shall be determined by a Trustee, or any Employer as the case may be.

14.05 <u>Spendthrift Clause</u>. Except insofar as may be contrary to any applicable law, no payment of any benefit under the Plan shall be assignable and no such payment or contribution shall be subject to the claims of any creditor. The preceding sentence shall not apply to the creation, assignment or recognition of a right to any benefit payable with respect to a Participant, pursuant to a qualified domestic relations order as defined in Code Section 414(p), or any domestic relations order entered before January 1, 1985. In any event, benefits shall be paid from the Plan in accordance with the applicable requirements of such qualified domestic relations order. The Trustees shall set forth in writing, reasonable procedures for determining the qualified status of a domestic relations order and for administering distributions under such qualified order.

14.06 <u>Payments To Legally Incompetent</u>. If any Participant, Spouse or Beneficiary is a minor or is, in the judgment of the Trustees, otherwise legally incapable of personally receiving and giving a valid receipt for any payment due him under the Plan, the Trustees may, unless and until claim shall have been made by a duly appointed guardian or committee of such person, make such payment or any part thereof to such person's Spouse, child, parent, brother or sister or other person deemed by the Trustees to have incurred expense for or assumed responsibility for the expenses of such person. Any payment so made shall be a complete discharge of any liability under the Plan for such payment.

14.07 <u>Payment To Incapacitated Participant</u>. In the event that a Participant suffers from an incapacity, the nature of which prevents his making an application for benefits hereunder either individually or through an exercise of a power of attorney, and such incapacity is evidenced by a written statement to that effect by a duly licensed physician, then an irrebuttable presumption shall arise that the Participant would have made such a claim if able, and the application shall be deemed made; provided, however, that the designated Beneficiary of such Participant consents in writing to the making of such claim and acknowledges that the making of payments thereunder could result in a possible loss to such Beneficiary.

14.08 <u>Distribution Of Benefits Under Plan</u>. No benefits shall be distributed under the Plan except (a) in the event of the retirement of a Participant as provided in Article IV hereof, (b) in the event of death, disability, or other termination of employment of a Participant before retirement for any cause as provided in Article VI and Article X hereof, or (c) in the event

that a court of competent jurisdiction compels payment of benefits from this Plan pursuant to an order which the Trustees determines to be a qualified domestic relations order, as described in Code Section 4l4(p). The Trustees shall establish rules to determine whether a court order is a qualified domestic relations order.

14.09  Divestment Of Benefits. No payment of benefits provided under the Plan shall be forfeited, when due, because of any action of a Participant or his Spouse or Beneficiary, except for the lack of fulfillment of any requirement under any of the terms of the Plan for the completion of any specified period of Uninterrupted Seniority or the attainment of any specified age, for qualification for such benefits.

14.10  Construction Of Plan. The Plan shall be governed and construed under the laws of the State of New York to the extent not preempted by ERISA.

14.11  Execution Of Plan. The Plan may be executed in any number of counterparts, each of which may be deemed the original although the others shall not be produced.

14.12  Deductibility Of Contributions. All Contributions made by Employers shall be conditional on their deductibility under Code Section 404. Any Employer Contributions which are determined to be nondeductible shall be returned to the affected Employers.

14.13  Lost Beneficiary Or Participant. If a benefit is forfeited because the Participant, Spouse, or Beneficiary cannot be found, such benefit will be reinstated if a claim is made by the Participant, Spouse, or Beneficiary.

In the event that any check or final notice of payment of benefits under the Plan remains outstanding at the expiration of six months from the date of mailing of such check or notice to the last known address of the payee, the Committee shall notify the Trustee to stop payment on all outstanding checks and to suspend the issuance of further checks or notice, if any, to such payee. If, during the three-year period (or such other period as specified in the Trust Agreement) from the date of mailing of the first such check or of notice that a benefit is due under the Plan, the Committee cannot establish contact with the payee by taking such action as it deems appropriate and the payee does not make contact with the Committee, any benefits to which such payee is entitled shall be forfeited. Any benefit so forfeited shall be restored if a claim is made for the unpaid benefit at any subsequent date and the Plan has not been terminated as of such date. Contributions required to be made in accordance with Article XI shall reflect such forfeitures and restoration in the same manner as expense gains and losses are reflected in the funding method used by the Plan.

14.14  Duplication Of Benefits.

(a)  If a Participant is entitled to any retirement income or other benefits attributable to Employer Contributions from any other qualified defined benefit retirement plan or annuity maintained by any Employer, the benefits to which such Participant may be entitled under this Plan shall be reduced by an amount equal to such other retirement income or benefits, to the extent such benefits are attributable to concurrent periods of employment.

(b)    In the determination of any benefit to which a Participant or Beneficiary will be entitled under the Plan, adjustments shall be made to reflect any amounts previously distributed under the Plan and to reflect any amounts required to be paid to the Participant's Spouse or former Spouse under any law or qualified domestic relations order as described in Code Section 414(p).

14.15  Merger Or Consolidation. The Plan may be merged or consolidated with, or its assets or liabilities transferred in whole or in part to, another plan which meets the requirements of Code Sections 401(a) and 501(a) only if each Participant would, if either the Plan or the other plan terminated immediately after the merger, consolidation or transfer, then receive a benefit which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer if the Plan then terminated.

14.16  Additional Contributing Employers.    A person, firm, company, corporation, or other business entity, which has employees whose employment is covered by a collective bargaining agreement with the Union, may be admitted as a Contributing Employer. The addition of any such new Contributing Employer shall be contingent upon the prior written agreement of the then existing parties hereto, which agreement shall provide for such adjustments in the contributions of such new Employer or its Employees or in the date when pensions would first be payable to Employees of such Employer, or such other adjustments as the then existing parties shall mutually determine to be necessary to maintain a sound pension Plan.

14.17  Return Of Contributions As A Result Of Mistake Of Fact. Notwithstanding any other provision to the contrary the general prohibition against diversion of plan assets does not preclude the return of contributions made by an Employer to the Plan if the contribution was made by reason of a mistake of fact and the return to the Employer of the amount involved is made within one year of the mistaken payment of the contribution.

14.18  Direct Rollover Of Eligible Rollover Distributions.

(a)    With respect to distributions made on and after January 1, 1993, a Distributee may elect, at the time and in the manner prescribed by the Committee, to have any portion of an Eligible Rollover Distribution paid, in a direct rollover, directly to an Eligible Retirement Plan specified by the Distributee, subject to the limitations and exceptions granted in proposed and temporary regulations issued under Code Section 401(a)(31) and other guidance issued for reliance by the Internal Revenue Service.

The Committee, in establishing administrative procedures and plan distribution rules, shall comply with the provisions of Code Section 401(a)(31) and proposed and temporary as well as any future final regulations thereunder, including any guidance issued for reliance by the Internal Revenue Service.

(b)    Definitions.

(i)    Eligible Rollover Distribution: An Eligible Rollover Distribution is any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: any distribution that is one of a

9104560.9                              54

series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated Beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); and the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities) or any distribution made on account of the hardship of a Participant, as defined in Section 1.401(k)-1(d)(2) of the Regulations.

(ii)     Eligible Retirement Plan:  An Eligible Retirement Plan is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b), an annuity plan described in Code Section 403(a), or a qualified trust described in Code Section 401(a), that accepts the Distributee's Eligible Rollover Distribution.  However, in the case of an Eligible Rollover Distribution to the surviving Spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

(iii)     Distributee:  A distributee includes an Employee or former Employee.  In addition, the Employee's or former Employee's surviving Spouse or former Spouse who is an alternate payee under a qualified domestic relations order as defined in Code Section 414(p), are Distributees with regard to the interest of the Spouse or former Spouse.

(iv)     Direct Rollover:  A Direct Rollover is a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

14.19  Qualified Domestic Relations Orders.

(a)     Qualified Domestic Relations Order

(i)     A Qualified Domestic Relations Order (hereinafter referred to as "QDRO") is a Domestic Relations Order which creates or recognizes the existence of an Alternate Payee's right to, or assigns to an Alternate Payee the right to, receive all or a portion of the benefits payable with respect to a Participant under the Plan, and which the Committee has determined meets the requirements of Paragraphs (ii) and (iii).

(ii)     A Domestic Relations Order meets the requirements of a QDRO only if the order clearly specifies

(A)     the name and the last known mailing address (if any) of the Participant and the name and mailing address of each Alternate Payee covered by the order;

(B)     the amount or percentage of the Participant's benefits to be paid by the Plan to each such Alternate Payee, or the manner in which such amount or percentage is to be determined;

(C)     the number of payments or period to which such order applies; and

(D)    that the order applies to this Plan.

(iii)    A Domestic Relations Order meets the requirements of a QDRO only if the order

(A)    does not require the Plan to provide any type or form of benefits, or any option, not otherwise provided under the Plan;

(B)    does not require the Plan to provide increased benefits (determined on the basis of actuarial value); and

(C)    does not require the payment of benefits to an Alternate Payee which are required to be paid to another Alternate Payee under another Domestic Relations Order previously determined to be a QDRO.

(iv)    In the case of any payment before a Participant has separated from service, a QDRO shall not be treated as failing to meet the requirements of Paragraph (iii)(A) above solely because the order requires the payment of benefits to an Alternate Payee

(A)    on or after the date on which the Participant attains (or would have attained) the Earliest Retirement Age;

(B)    as if the Participant had retired on the date such payment is to begin under such order; and

(C)    in any form in which such benefits may be paid under the Plan to the Participant (other than in the form of a joint and survivor annuity with respect to the Alternate Payee and his or her subsequent spouse).

(v)    For purposes of Paragraph (iv), Earliest Retirement Age means the earlier of

(A)    the date on which the Participant is entitled to a distribution under the Plan; or

(B)    the later of (1) the date the Participant attains age 50 or (2) the earliest date on which the Participant could begin receiving benefits under the Plan if such Participant separated from service.

Notwithstanding any provisions of the Plan to the contrary, for purposes of Subparagraph (A) above, a distribution to an Alternate Payee may be made prior to the date on which the Participant is entitled to a distribution under Section 4.03 if requested by the Alternate Payee to the extent such distribution is permitted under the QDRO. Nothing in this provision shall permit the Participant to receive a distribution at a date otherwise not permitted under Section 4.03 nor shall it permit the Alternate Payee to receive a form of payment not permitted in Section 7.01.

(b)    Procedures

Upon receipt of a Domestic Relations Order, the Committee shall take, or cause to be taken, the following actions:

(i)    The Committee shall promptly notify the Participant, each Alternate Payee covered by the order and each representative for these parties of the receipt of the Domestic Relations Order. Such notice shall include a copy of the order and these QDRO Procedures for determining whether such order is a QDRO.

(ii)    Once a Domestic Relations Order has been received no distributions will be made from the Plan to the Participant upon a subsequent termination until after the payment to the Alternate Payee has been determined, unless the Committee determines the order not to be a QDRO.

(iii)    Within a reasonable period after receipt of a Domestic Relations Order, the Committee shall determine whether it is a QDRO and shall notify the parties indicated in Paragraph (i) of such determination. Such notice shall indicate whether the benefits payable to the Alternate Payee in accordance with the QDRO are subject to a previously existing QDRO.

(iv)    Pending the Committee's determination of whether a Domestic Relations Order is a QDRO, if payments are due to be paid to the Participant, the Committee shall withhold payment and separately account for the amounts otherwise payable to the Alternate Payee during such period if the order is subsequently determined to be a QDRO (hereinafter referred to as the "segregated amounts"). If, within the 18-month period beginning with the date the first payment would have been required to be made under the Domestic Relations Order, the Committee determines the order to be a QDRO, the Committee shall pay the segregated amounts, including any interest thereon, to the person or persons entitled thereto. If, within such 18-month period, the Committee determines an order is not a QDRO or the Committee fails to reach a decision, the Committee shall pay the segregated amounts to the Participant. If, after the 18-month period, the Committee subsequently determines that the order is a QDRO, the Committee shall pay benefits subsequent to such determination in accordance with the order. If action is taken in accordance with this Subsection (b), the Plan's obligation to the Participant and each Alternate Payee shall be discharged to the extent of any payment made pursuant to the QDRO.

(v)    In determining the segregated amounts in accordance with Paragraph (iv), the Participant's vested interest shall be prorated between the Participant and Alternate Payee and the entire amount of any nonvested interest will be credited to the Participant and not taken into consideration in making such determination. Any future accruals will be credited to the Participant and not the Alternate Payee.

(vi)    Upon a determination by the Committee that a Domestic Relations Order is a QDRO, the Committee shall arrange for benefits to be paid to the Alternate Payee in accordance with such order and Sections 10.03 and 10.04 as if the Participant had terminated employment at such time.

(vii)   If benefits are not immediately distributable to the Alternate Payee, such amount shall be separately accounted for until such time as the distribution is made.

(viii)   The Alternate Payee shall be treated as a Beneficiary for all purposes of the Plan.

The foregoing provisions are effective for QDROs entered into on or after January 1, 1985, except that, in the case of a Domestic Relations Order entered into before January 1, 1985, the Committee (i) may treat such order as a QDRO even though such order fails to meet the requirements of Subsections (a)(ii) and (iii) above, and (ii) must treat such order as a QDRO if benefits were being paid pursuant to such order on January 1, 1985.

## ARTICLE XV

### TOP-HEAVY PROVISIONS

15.01  Modification of Top-Heavy Rules.

(a)   This Section shall apply for purposes of determining whether the Plan is a Top-Heavy Plan under Code Section 416(g) for Plan Years beginning after December 31, 2001, and whether the Plan satisfies the minimum benefits requirements of Code Section 416(c) for such years.

(b)   Determination of Top-Heavy Status.

(i)   Key Employee means any employee or former employee (including any deceased employee) who at any time during the Plan Year that includes the determination date was an officer of the Employer having annual compensation greater than $130,000 (as adjusted under Code Section 416(i)(1) for Plan Years beginning after December 31, 2002), a 5-percent owner of the Employer, or a 1-percent owner of the Employer having annual compensation of more than $150,000.   For this purpose, annual compensation means compensation within the meaning of Code Section 415(c)(3). The determination of who is a key employee will be made in accordance with Code Section 416(i)(1) and applicable Regulations and other guidance of general applicability issued thereunder.

(ii)   Determination of present values and amounts.   This subsection shall apply for purposes of determining the present value of accrued benefits and the amounts of account balances of employees as of the determination date.

(A)   Distributions during year ending on the determination date. The present values of accrued benefits and the amounts of account balances of an Employee as of the determination date shall be increased by distributions made with respect to the Employee under the Plan and any Plan aggregated with the Plan under Code Section 416(g)(2) during the 1-year period ending on the determination date.   The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code Section 416(g)(2)(A)(i).   In

9104560.9                              58

the case of a distribution made for a reason other than separation from service, death or Disability, this provision shall be applied by substituting "5-year period" for "1-year period."

(B) Employees not performing services during year ending on determination date. The accrued benefits and accounts of any individual who has not performed services for the Employer during the 1-year period ending on the determination date shall not be taken into account.

(c) Minimum benefits. For purposes of satisfying the minimum benefit requirements of Code Section 416(c)(1) and the Plan, in determining service with the Employer, any service with the Employer shall be disregarded to the extent that such service occurs during a Plan Year when the Plan benefits (within the meaning of Code Section 410(b)) no key employee or former key employee.

(d) Effective for purposes of determining whether the Plan satisfies the minimum benefit requirements of Code Section 416(c) for Plan Years beginning after December 31, 2001 in which the Plan is determined to be top-heavy, matching contributions shall be taken into account for purposes of satisfying the minimum contribution requirements of Section 416(c)(2) and the Plan. The preceding sentence shall apply with respect to matching contributions under the Plan. Matching contributions that are used to satisfy the minimum contribution requirements shall be treated as Employer matching contributions for purposes of the actual contribution percentage test and other requirements of Code Section 401(m).

15.02 General Provisions. For any Plan Year beginning prior to January 1, 2002, this Plan shall be subject to the following top-heavy rules:

(a) The vesting provisions of Section 15.03,

(b) The minimum benefit provisions of Section 15.04,

(c) The limitation on Compensation set by Section 15.05, and

(d) The limitation on benefits set by Section 15.06.

15.03 Minimum Vesting. Each Participant who has completed the number of Years of Service specified in the following table shall have a nonforfeitable right to the percentage of the benefit accrued under this Plan correspondingly specified in the following table:

| Years of Service | Percentage of Nonforfeitable Benefit |
|---|---|
| 2 | 20 |
| 3 | 40 |
| 4 | 60 |
| 5 or more | 100 |

15.04 <u>Minimum Benefits</u>. Each Participant who is a Non-Key Employee shall be entitled to an Accrued Benefit in the form of an annual benefit, payable as a single life annuity (with no ancillary benefits) beginning at the Participant's Normal Retirement Date, that shall be not less than the applicable percentage (as defined in paragraph (a) below) of the Participant's average annual Compensation for years in the testing period (as defined in paragraph (b) below).

(a)　　"Applicable percentage" means the lesser of two percent (2%) multiplied by the number of Plan Years in which the Plan is top-heavy or super top-heavy, or twenty percent (20%).

(b)　　"Testing period" means, with respect to a Participant, the period of consecutive Years of Service (not exceeding five (5)) during which the Participant had the greatest aggregate Compensation from the Employer. The testing period shall not include any year not included as a Year of Service in Article III hereof. The testing period shall also not include any Year of Service that ends in a Plan Year beginning before January 1, 1984, or that begins after the close of the last Plan Year in which the Plan was a top-heavy plan.

The minimum benefit under this Section 15.04 shall not take into account any benefits payable under the Social Security Act or any other Federal or state law.

15.05 <u>Limits On Compensation</u>. For any Plan Year in which the Plan is a top-heavy plan or a super top-heavy plan, annual Compensation taken into account under this Article XV shall be Compensation as defined in Article I, without regard to Code Sections 125, 402(a)(8), 402(h)(1)(B) or any Employer contributions under a salary reduction agreement, except those made under Code Section 403(b).

15.06 <u>Transitional Rule</u>.

(a)　　Except as otherwise provided in subsection (b) and (c) of this Section 15.06, if for any Plan Year this Plan is a top-heavy plan, or a super top-heavy plan then the denominator of both the Defined Contribution Fraction and the Defined Benefit Fraction shall be calculated as set forth in Section 5.04 for the limitation year ending in such Plan Year by substituting "1.0" for "1.25" in each place such figure appears. Furthermore, the transitional rule set forth in Section 5.04 shall be applied by substituting "$41,500" for "$51,875."

(b)　　If, but for this subsection (b), subsection (a) would begin to apply with respect to this Plan because it is determined to be top-heavy or super top-heavy, the application of subsection (a) shall be suspended with respect to any individual for whom there are no Employer contributions, forfeitures or voluntary nondeductible contributions allocated, or accruals for such individual under this Plan.

(c)　　For any Plan Year in which this Plan is a top-heavy plan, but not a super top-heavy plan, the provisions of Section 5.04 shall be applied without reference to subsection (a) above and the transitional rule set forth in Section 5.04 shall be applied without reference to subsection (a) above, provided that the "applicable percentage" in paragraph (a) of Section 15.04 is applied by substituting "three percent (3%)" for "two percent (2%)" and by

increasing twenty percent (20%) by one (1) percentage point (up to a maximum of thirty percent (30%)) for each year during which this subsection (c) applies.

15.07  Aggregation Of Plans.

(a)    In the event that another defined benefit plan provided by the Employer provides benefits for Participants in this Plan, and that plan is required to be aggregated with this Plan, the minimum benefit required by Section 15.04 shall be provided by this Plan.

(b)    "Aggregation group" means the group of plans, if any, that includes both the group of plans that are required to be aggregated and the group of plans that are permitted to be aggregated.

(i)    The group of plans that are required to be aggregated (the "Required Aggregation Group") includes each plan of the Employer in which a Key Employee is participating, and each other plan of the Employer which enables a plan in which a Key Employee participates to meet the requirements of either Code Section 401(a)(4) or Section 410.

(ii)    The group of plans that are permitted to be aggregated (the "Permissive Aggregation Group") includes any plan that is not part of the required group and that the Trustees certifies as constituting a plan within the permissive aggregation group. Such plan may be added to the permissive aggregation group only if, after the addition, the aggregation group as a whole continues to meet the requirements of both Code Sections 401(a)(4) and 410.

(c)    If any Participant is also covered by a defined contribution plan or plans maintained by the Employer, the minimum Accrued Benefit determined in accordance with subsection (a) shall be reduced by the amount of retirement income payable in the form of a life only annuity commencing on the first day of the month coincident with or next following the Participant's Normal Retirement Date which may be provided with the Participant's account in such defined contribution plan. The amount of retirement income available shall be determined using the actuarial assumptions specified in the Plan for determining the lump sum value of an Accrued Benefit.

(d)    For purposes of this Section, only benefits derived from Employer contributions are to be taken into account to determine whether the minimum benefit has been satisfied.

15.08  Top-Heavy Definitions.

(a)    Top-Heavy Plan

This Plan shall be a "top-heavy plan" for any Plan Year if, as of the Determination Date, the present value of the cumulative Accrued Benefits including the value of any non-proportionally subsidized benefits under the Plan for Participants (including former Participants) who are Key Employees exceeds sixty percent (60%) of the present value of such cumulative Accrued Benefits under the Plan for all Participants; or if this Plan is included in a

9104560.9                                61

Required Aggregation Group which for such Plan Year is a top-heavy group. In determining whether this Plan constitutes a top-heavy plan, the Trustees shall make the following adjustments in connection therewith:

(i)    In determining the present value of the cumulative Accrued Benefit of any Participant, such present value shall include the amount in dollar value of the aggregate distributions made to such Participant under the applicable plan during the five (5) year period ending on the Determination Date. The preceding sentence shall also apply to distributions made on account of death to the extent such benefits do not exceed the present value of Accrued Benefits existing immediately prior to death, as well as distributions under a terminated plan which if it had not been terminated would have been required to be included in an Aggregation Group.

(ii)    Further, in making any determination whether the Plan is top-heavy or the Aggregation Group of which it is a part is a top-heavy group, such present value shall not include any unrelated rollover contribution (or similar transfer) which is both initiated by the Participant and made to the Plan after December 31, 1983 from a plan maintained by another Employer.

(iii)    Further, in making such determination, in any case where an individual is a Non-Key Employee with respect to an applicable plan but was a Key Employee with respect to such plan for any prior Plan Year, any Accrued Benefit of such Participant shall be altogether disregarded. For this purpose, to the extent that a Key Employee is deemed to be a Key Employee if he or she met the definition of Key Employee within any of the four (4) preceding Plan Years, this provision shall apply following the end of such period of time.

(iv)    Further, in making such determination for Plan Years beginning after December 31, 1984, the present value of the Accrued Benefit or account of any Participant who has not received any Compensation from the Employer during the five (5) year period ending on the Determination Date, shall be disregarded.

(b)    Super Top-Heavy Plan

This Plan shall be a "super top-heavy plan" for any Plan Year if, as of the Determination Date, the Plan would be top-heavy if "ninety percent (90%)" were substituted for "sixty percent (60%)" in the preceding paragraph, or if this Plan is included in a Required Aggregation Group which for such Plan Year would be a Top-heavy Group, if "ninety percent (90%)" were substituted for "sixty percent (60%)" in the paragraph above.

(c)    Actuarial Factors

For the purpose of determining the present value of Accrued Benefits under this Article XV, the actuarial factors shall be in accordance with Section 1.03.

(d)    "Determination Date" means for any Plan Year the last day of the immediately preceding Plan Year.

9104560.9                                    62

(e)    "Too-Heavy Group" means the Required Aggregation Group, if as of the applicable Determination Date, the sum of the present value of the cumulative Accrued Benefits for Key Employees under all defined benefit plans included in the Required Aggregation Group plus the aggregate of the accounts of Key Employees under all defined contribution plans included in the Required Aggregation Group exceeds sixty percent (60%) of the sum of the present value of the cumulative Accrued Benefits for all Participants under all such defined benefit plans plus the aggregate accounts for all Participants under all such defined contribution plans.

15.09  Excluded Participants.  The provisions of this Article do not apply with respect to any Participant included in a unit of Participants covered by a collective bargaining agreement unless the application of this Article has been agreed upon with the collective bargaining agent.

# AMENDMENT
## TO THE
### TRANSPORT WORKERS UNION – NEW YORK CITY
### PRIVATE BUS LINES PENSION TRUST

In accordance with Article XIII of the Transport Workers Union – New York City Private Bus Lines Pension Trust (the "Plan"), the Plan is hereby amended as follows effective March 28, 2005:

1. The phrase "three thousand five hundred dollars ($3,500)" in Section 6.01(a) of the Plan is replaced with the phrase "one thousand dollars ($1,000)."

2. The phrase "three thousand five hundred dollars ($3,500)" in Section 7.01 of the Plan is replaced with the phrase "one thousand dollars ($1,000)."

3. The phrase "three thousand five hundred dollars ($3,500)" in Section 10.04(a) of the Plan is replaced with the phrase "one thousand dollars ($1,000)."

4. The phrase "three thousand five hundred dollars ($3,500)" in Section 10.05 of the Plan is replaced with the phrase "one thousand dollars ($1,000)."

5. The Plan, except as otherwise set forth herein, shall remain in full force and effect in all other respects.

IN WITNESS WHEREOF, this amendment is executed this 24th day of October , 2005.

## BOARD OF TRUSTEES

Union Trustees:

_____

_____

_____

_____

_____

Employer Trustees:

_____

_____

_____

_____

_____

9910112.1

TRANSPORT WORKERS UNION – NEW YORK CITY

PRIVATE BUS LINES PENSION TRUST

AMENDMENT

WHEREAS, the Pension Plan of the Transport Workers Union – New York City Private Bus Lines Pension Trust (the "Plan") was established for the benefit of its eligible participants and their beneficiaries; and

WHEREAS, pursuant to Article XII of the Plan, the Trustees of the Plan have the right to amend the Plan at any time; and

WHEREAS, the Trustees desire to amend the Plan to provide for special withdrawal liability rules, provided that such rules are approved by the Pension Benefit Guaranty Corporation (the "PBGC").

NOW THEREFORE, IT IS

RESOLVED, that effective immediately, subject to the approval of the PBGC, Article XI of the Plan is amended by the addition of a new Section 11.04 to read as follows:

11.04.  Withdrawal Liability.

(a)    Notwithstanding any provision of ERISA to the contrary, a withdrawal of an Employer from the Plan shall occur only if:

(i)    an Employer ceases to have an obligation to contribute under the Plan, and

(ii)    such Employer

(A) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

(B) resumes such work within five (5) years after the date on which the obligation to contribute to the Plan ceases, and does not renew the obligation at the time of the resumption.

(b)    In the case of the termination of the Plan by mass withdrawal (within the meaning of section 4041A(a)(2) of ERISA), paragraph (a) above shall be applied by substituting "three (3) years" for "five (5) years" in subparagraph (ii)(B).

IN WITNESS WHEREOF, the undersigned, being all of the Trustees of the Plan, have duly executed this Amendment as of the ___ day of _October_ , 2002.

**UNION TRUSTEES**                    **EMPLOYER TRUSTEES**

### FIRST AMENDMENT
### TO THE
### TWU NYC PRIVATE BUS LINES PENSION PLAN

WHEREAS, Section 13.01 of the TWU NYC Private Bus Lines Pension Plan (the "Plan") provides that the Trustees have the authority to amend the Plan, in whole or in part, at any time;

WHEREAS, the Trustees desire to amend the Plan to conform to certain technical and administrative amendments;

WHEREAS, the Trustees desire to amend the Plan, effective as of December 31, 2002, to conform to the technical requirements set forth in Revenue Ruling 2001-62, regarding the use of a new mortality table for purposes of determining the value of lump sum distributions and adjusting the maximum benefit limitations;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, the parties hereto agree, and

IT IS HEREBY RESOLVED, pursuant to and in exercise of the authority retained by the Trustees under the Plan, the Plan is hereby amended as follows:

Effective as of December 31, 2002, a new Appendix I shall be added to the Plan to read as follows:

### Appendix I

1. **Effective Date**

    This amendment shall apply to distributions with annuity starting dates on or after December 31, 2002.

2. Notwithstanding any Plan provisions to the contrary, the applicable mortality table used for purposes of adjusting any benefit or limitation under section 415(b)(2)(B), (C) or (D) of the Internal Revenue Code as set forth in section 5.04(e) of the Plan and the applicable mortality table used for purposes of satisfying the requirements of section 417(e) of the Internal Revenue Code as set forth in section 1.03 of the Plan is the table prescribed in Rev. Rul. 2001-62.

9343405.1

IN WITNESS WHEREOF, this amendment is executed this _____ day of
_____, 2002.

BOARD OF TRUSTEES

Union Trustees:                              Employer Trustees:

## RESOLUTION

### T.W.U. – NYC Private Bus Lines Pension Plan

WHEREAS, the LOCAL 100, TRANSPORT WORKERS UNION, AFL-CIO, and TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, hereinafter jointly referred to as "Union" and the QUEENS SURFACE CORPORATION, TRIBORO COACH CORP. and JAMAICA BUSES, INC., hereinafter referred to as "Employers", did separately and previously agree in a collective bargaining agreement to provide pension benefits for the employees covered by said agreement and for whom the Union is the duly recognized collective bargaining agent; and

WHEREAS, Section 31.01 of the T.W.U. – NYC Private Bus Lines Pension Plan (the "Plan") provides that the Trustees have the authority to amend the plan, in whole or in part, at any time;

WHEREAS, the Trustees desire to amend and restate the Plan, effective as of January 1, 2001, to conform to the statutory requirements of the Uruguay Round Agreements Act of 1994, the Uniform Service Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, the Internal Revenue Service Restructuring and Reform Act of 1998 and the Community Tax Relief Act of 2000 (collectively, "GUST"); and other applicable laws adopted since issuance of the prior Internal Revenue Service favorable determination letter;

WHEREAS, the Trustees further desire to amend the Plan to reflect certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"), effective as of the first day of the first plan year beginning after December 31, 2001, except as otherwise provided; and

WHEREAS, this amendment to the Plan is intended as good faith compliance with the requirements of EGTRRA and is to be construed in accordance with EGTRRA and guidance issued thereunder.

WHEREAS, unless otherwise provided herein, those provisions added or amended to comply with GUST or EGTRRA shall be effective as of the specified effective date.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, the parties hereto agree as follows:

It IS HEREBY RESOLVED, that subject to the approval of the Internal Revenue Service, the Plan, substantially in the form attached hereto as Exhibit A, be and hereby is approved and adopted in all respects, effective as of January 1, 2001; and it is further

9148182.1

IN WITNESS WHEREOF, this Amendment is executed this 22nd day of February 2002.

## BOARD OF TRUSTEES

Union Trustees:

_____

_____

_____

_____

Employer Trustees:

_____

_____

_____

_____

9148185.1

TOTAL P.05

# **EXHIBIT C**



CLOSE WINDOW

**FOR IMMEDIATE RELEASE**
**PR- 087-04**
**April 19, 2004**

## MAYOR MICHAEL R. BLOOMBERG, GOVERNOR GEORGE E. PATAKI AND MTA CHAIRMAN PETER KALIKOW ANNOUNCE MTA TAKEOVER OF PRIVATE BUSLINES

### *MTA Takeover will Improve Service for Almost 400,000 Riders in Queens, Brooklyn and the Bronx*

Mayor Michael R. Bloomberg, Governor George E. Pataki and Metropolitan Transportation Authority (MTA) Chairman Peter Kalikow today announced that the operation of seven private bus lines in Queens, Brooklyn and the Bronx will be transferred to the MTA by July 1, 2004. The MTA will assume all responsibility for the operation of the private lines. New York City will subsidize the MTA by financing the costs of operating the service beyond the revenue generated by State subsidies, fares and advertising. The transfer will ensure that the bus service is fully integrated with the transit service currently provided by the MTA and will result in a higher quality service and more efficient operations.

"The 390,000 residents of Co-op City, Canarsie, Middle Village, Rego Park and Forest Hills and the other neighborhoods that uses these buses deserve improved service and greater reliability," said Mayor Bloomberg. "For years they have stoically tolerated antiquated buses, and substandard and unreliable service. Nearly a third of the bus fleet is 17 years or older and many are not accessible for people with disabilities. Although, the City will continue to fully subsidize the bus service, it will get a better bang for its buck. New Yorkers will benefit from the efficiencies generated by this consolidation including the elimination of management and incentives fees paid to the private operators, reduced maintenance costs, insurance savings and the consolidation of fuel purchases."

"The MTA and the City have forged an important agreement to ensure better and more reliable bus service for commuters from Queens, Brooklyn, and the Bronx," Governor Pataki said. "Riders can look forward to improved service that will not keep people waiting at the curb, as well as 450 new, cleaner buses which will soon be added to the fleet. We will make sure that the transition is seamless so that commuters will not be inconvenienced while service is being transferred. I want to thank Mayor Bloomberg and Chairman Kalikow for working together to ensure that New York City riders get the transit service that they deserve."

"I want to thank Governor Pataki and Mayor Bloomberg for their continued commitment to mass transportation," said MTA Chairman Peter S. Kalikow. "The MTA provides the best and most efficient transportation service in the country and we look forward to bringing that same quality service to more transit customers in Brooklyn, Queens and the Bronx."

The City will lease all its bus-related assets to the MTA including approximately 450 new buses that are currently being purchased and the two bus depots that are owned by the City. At the City's request, the MTA will propose an amendment to its 2000-2004 Capital Plan to set aside a $322.5 million reserve that will be funded from resources originally allocated to the LaGuardia Airport subway extension, but are no longer slated for that project. This reserve will be used for additional fleet replacement, facilities and other necessary capital improvements.

The MTA will assume all union employees and will honor existing collective bargaining agreements and

collective bargaining obligations until new agreements are negotiated. To affect this, the parties plan to meet with the unions in the near future. To ensure a seamless transition of service between the MTA and the private operators, the City will also begin immediate efforts to negotiate agreements that address owners concerns quickly and fairly.

As part of this overall agreement, the City will support the MTA Capital Plan Amendments, including the accelerated purchase of new Metro North Railroad cars. In exchange, the MTA has agreed to address the Transit Authority's traditional Capital Plan funding in its next Capital Program.

"This historic agreement is extremely complex and I want to congratulate Governor George Pataki, MTA Chairman Peter Kalikow, Department of Transportation Commissioner Iris Weinshall, Budget Director Mark Page and the Director of the Mayor's Office of Operations, Susan Kupferman for their hard work in getting this done and their dedication to improving the transportation system for the citizens of New York," concluded Mayor Bloomberg.

**MEDIA CONTACT:**

Edward Skyler / Jordan Barowitz   (212) 788-2958

Lynn Rasic (Governor)   (212) 681-4640

Tom Kelly (MTA)   (212) 878-7440

# **EXHIBIT D**

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number

(212) 756-2050

Writer's E-mail Address

mark.brossman@srz.com

March 16, 2006

## VIA FEDERAL EXPRESS

Pension Benefit Guaranty Corporation
Insurance Programs Department
Attn. Robert Rideout/MEPD
1200 K Street, N.W.
Washington, D.C. 20005-4026

Re:    Notice of Termination of Multiemployer Plan by Mass Withdrawal

Dear Mr. Rideout:

Schulte Roth & Zabel LLP is co-counsel to the Transport Workers Union-New York City ("TWU-NYC") Private Bus Lines Pension Trust. The purpose of this letter is to notify the Pension Benefit Guaranty Corporation ("PBGC") of the withdrawal of all contributing employers to the TWU-NYC Private Bus Lines Pension Plan (the "Plan") and the termination of the Plan pursuant to Section 4041A(a)(2) of ERISA. Please note that by letter dated July 1, 2005, we advised Mr. John Foster of the PBGC that the first of the three contributing employers had withdrawn when the City of New York had acquired its assets. We also notified Mr. Foster that the City of New York was negotiating with the remaining employers; in 2006, the City of New York acquired their assets as well. The bus routes and operations of the former employers have been taken over by the Metropolitan Transportation Authority's MTA Bus, a New York State Agency.[1] Former union-represented employees of the private bus companies became employees of MTA Bus and are covered by a governmental pension plan which was created to mirror the terms of the Plan. On March 2, 2006, the Trustees of the Plan deadlocked on the Employer Trustees' motion to merge the Plan into the governmental plan, the MTA Defined Benefit Pension Plan. A deadlock arbitration is pending.

Pursuant to Section 4041A.12 of the PBGC's Regulations, we submit the following:

1.    The name of the Plan is the TWU-NYC Private Bus Lines Pension Plan.

2.    The Board of Trustees of the Plan can be contacted care of the Plan at 80 West End Avenue, Room 502, New York, New York 10023-6398. Mark E. Brossman, Esq. of

---

[1]    The City of New York also acquired the assets of four other private bus companies, not affiliated with the Plan, and those operations also are being run by MTA Bus.

March 16, 2006
Page 2

       Schulte Roth & Zabel LLP is the Plan's authorized representative. Mark Brossman can be contacted at 919 Third Avenue, New York, New York 10022, (212) 756-2050.

3.     Robert Hickey, Fund Director, 80 West End Avenue, Room 502, New York, New York 10023-6398, (212) 874-2500, will continue administering the Plan.

4.     A copy of the Plan's most recent Form 5500, including schedules is attached as Exhibit A.

5.     The date of termination of the Plan is February 20, 2006.

6.     A copy of the Plan in effect in February 2001, and amendments thereto are attached as Exhibit B.

7.     A copy of the Trust Agreement is attached as Exhibit C.

8.     A copy of the most recent actuarial statement and opinion (if any) relating to the Plan is attached as Exhibit D.

9.     There have been no material change in the assets or liabilities of the plan occurring after either the date of the actuarial statement referred to in item 8 above or the date of the Plan's Form 5500 submitted as part of this Notice.

10.     IRS determination letters are attached as Exhibit E.

11.     Upon information and belief, plan assets will be sufficient to pay all benefits in pay status during the 12-month period following the date of termination.

I hereby certify that all information and documents submitted herewith are true and correct to the best of my knowledge and belief.

               Very truly yours,

               Mark E. Brossman

Attachments

cc:    Denis Engel, Esq.
       Susan Jennik, Esq.
       Scott A. Gold, Esq.
       Trustees
       Mr. John Foster/PBGC
       Mr. Robert Hickey/Fund Director

# **EXHIBIT E**



 **PBGC** **Pension Benefit Guaranty Corporation**
Protecting America's Pensions    1200 K Street, N.W., Washington, D.C. 20005-4026

APR **2 1** 2006

Mark E. Brossman, Esquire
Schulte Roth & Zabel, LLP
919 Third Avenue
New York, NY 10022

> **Re:** Notice of termination by mass withdrawal of theTransport Workers Union
> – New York City Private Bus Lines Pension Trust (PBGC Case # 207312)

Dear Mr. Brossman:

I write in response to your letter dated March 16, 2006, giving notice of the termination by mass withdrawal of the above-referenced multiemployer pension plan (the "Plan"). Below you will find an overview of the the obligations and rules that the Employee Retirement Income Security Act, *as amended*, ("ERISA"), imposes on the plan sponsor of a multiemployer plan that terminates. [1]

General duties of a plan sponsor of a terminated multiemployer plan

Section 4041A of ERISA governs the payment of benefits to participants in terminated multiemployer plans. Section 4041A(c) provides that, except as provided in section 4041A(f)(1), the plan sponsor of a plan terminated by mass withdrawal shall –

(1)    limit the payment of benefits to benefits which are nonforfeitable under the plan as of the date of termination, and

(2)    pay benefits attributable to employer contributions, other than death benefits, only in the form of an annuity, unless plan assets are distributed in full satisfaction of all nonforfeitable benefits under the plan.

ERISA section 4041A(f)(1) permits a plan sponsor to pay a participant's entire nonforfeitable benefit attributable to employer contributions (other than a death benefit) in a form other than an annuity if the value of the benefit does not exceed $1,750. In

---

[1] As John Foster discussed with you and Mr. Scott Gold in a telephone call of April 20, with this termination notice we are closing the pending request for approval of a special withdrawal liability rule under 29 CFR Part 4204.

addition, that section allows the PBGC to authorize the payment of benefits other than nonforfeitable benefits and the payment of nonforfeitable benefits with a value in excess of $1,750 in a form other than an annuity. The PBGC may authorize such payment if it determines that the payment is not adverse to the interests of participants and beneficiaries generally and does not unreasonably increase the PBGC's risk of loss with respect to the plan. Pursuant to its authority under section 4041A(f), the PBGC has granted blanket approval for payment of a Qualified Preretirement Survivor Annuity to the surviving spouse of a participant who dies after termination (see 29 CFR § 4041A.22(c) and (d)), if plan assets are sufficient to provide for all nonforfeitable benefits.

### Closing out a terminated multiemployer plan

The plan sponsor of a plan terminated by mass withdrawal may distribute plan assets in full satisfaction of all nonforfeitable benefits under the plan. PBGC authorization of the distribution is not required if the rules below are followed.

To make such a distribution, the plan sponsor must determine each participant's entire nonforfeitable benefit under the plan and must ensure that each participant receives that amount. Each participant with a benefit payable as an annuity under the plan must receive that benefit in the form of an annuity unless the participant elects with spousal consent another form of distribution provided by the plan. Both the participant's election and the spouse's consent must be in writing. A participant may be offered additional forms of distribution (e.g., lump-sum payment of the commuted value of the annuity or transfer of such value to an individual account plan) that are permitted by the plan document. However, when a participant is afforded the opportunity to elect alternative forms of distribution, he or she must be advised of the estimated amounts of the annuity and of the alternative form(s) of distribution. A participant need not be offered an annuity if the present value of his or her annuity does not exceed $5,000.

However, if participants are being offered the opportunity to transfer their benefits to an individual account plan, their benefits may not be transferred without their consent. This applies even for a benefit that has a present value of $5,000 or less. In such cases, if an annuity is not offered, the participant must be offered a lump-sum distribution.

Under ERISA section 4219(c)(8), an employer's obligation to make withdrawal liability payments to a terminated plan ceases at the end of the plan year in which plan assets on hand (exclusive of withdrawal liability claims) are sufficient to meet the plan's obligations, as determined by PBGC. The PBGC has determined that, for purposes of section 4219(c)(8), a distribution of plan assets in full satisfaction of all nonforfeitable benefits under a plan establishes that the plan assets on hand are sufficient to meet all obligations of the plan.

We request that if a distribution of plan assets is made in full satisfaction of all nonforfeitable benefits under the plan, the PBGC be notified within 60 days of the date of

distribution. This notification will enable the PBGC to remove the plan from the premium payment mailing list. Please direct such notifications to Reports Processing, Insurance Programs (Suite 930), PBGC, 1200 K Street, N.W., Washington, D.C. 20005.

<u>Duties if a terminated multiemployer plan is not closed out</u>

If a plan does not close out by distributing plan assets in full satisfaction of all nonforfeitable benefits, section 4281 of ERISA imposes additional obligations on the plan sponsor. The most significant of these are the requirements relating to benefit reductions and benefit suspensions. Section 4281(b) requires that the value of the plan's nonforfeitable benefits and the value of plan assets, including outstanding claims for withdrawal liability, be valued as of the end of the plan year of termination and each plan year thereafter. The PBGC has published a final regulation containing rules for this valuation (29 CFR Part 4281). If the section 4281 valuation indicates that the value of nonforfeitable benefits exceeds the value of plan assets, the plan sponsor is required by section 4281(c)(1) to amend the plan to reduce benefits under the plan to the extent necessary to ensure that the plan's assets are sufficient, as determined and certified in accordance with regulations prescribed by the corporation, to discharge when due all of the plan's obligations with respect to nonforfeitable benefits. The benefits subject to reduction under section 4281(c) are benefits that are not guaranteeable benefits pursuant to section 4022A(b) of ERISA.

Once a plan has been amended to eliminate all benefits that are nonguaranteeable under section 4022A(b), the plan sponsor is required by section 4281(d) to monitor the plan's solvency. If the plan becomes insolvent (<u>i.e.</u>, its available resources are insufficient to pay benefits due under the plan for a plan year), the plan sponsor is required to suspend the payment of benefits that cannot be paid from the plan's available resources, but not below the level of benefits guaranteed by PBGC under section 4022A(c). If the plan's available resources are less than the amount necessary to pay benefits at the guaranteed level, the plan sponsor is required to apply to the PBGC for financial assistance so that benefits can be paid at the guaranteed level. The PBGC has published a final regulation containing rules for the administration of plans that have terminated by mass withdrawal, including solvency determinations and notices to participants, beneficiaries and the PBGC of benefit reductions and suspensions (29 CFR Part 4041A).

<u>Collection of withdrawal liability</u>

The plan sponsor has a statutory duty to determine, assess, and collect withdrawal liability if the plan is underfunded at termination. ERISA provides special rules regarding withdrawal liability in the case of a mass-withdrawal-termination. Employers may lose the benefit of any <u>de minimis</u> reduction under section 4209(c) and the 20-year payment limitation under section 4219(c)(1)(B). In addition, section 4219(c)(1)(D) requires that all unfunded vested benefits be allocated among all such employers. The PBGC has issued

a final regulation that establishes rules for redetermination of withdrawal liability upon mass withdrawal (29 CFR Part 4219). (As noted above, the distribution of plan assets in full satisfaction of all nonforfeitable benefits results in the cessation of employers' withdrawal liability payment obligations.)

If you have any questions, please contact me at (202) 326-4000, extension 3357.

Sincerely,

Robert Rideout
Associate Manager
Multiemployer Program Division
Insurance Programs

- 4 -

# EXHIBIT F

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number

(212) 756-2050

Writer's E-mail Address

mark.brossman@srz.com

March 3, 2006

**VIA E-MAIL & MAIL**

Jacquelin F. Drucker, Esq.
432 East 58th Street, Suite 2
New York, New York 10022-2331

Re:  T.W.U.-N.Y.C. Private Bus Lines Pension Trust

Dear Arbitrator Drucker:

Schulte Roth & Zabel LLP is counsel to the T.W.U.-N.Y.C. Private Bus Lines Pension Trust (the "Fund"), appointed by the Employer Trustees. At the March 2, 2006 meeting of the Board of Trustees of the Fund, the Employer Trustees and the Union Trustees deadlocked on the Employer Trustees' motion to merge the Fund with the MTA Defined Benefit Pension Plan.

Pursuant to the Trust's procedures, you have been jointly selected as an arbitrator of Trustee deadlocks (see enclosed Resolution). The Employer Trustees request you promptly schedule an arbitration of the deadlock of the Board of Trustees. Also enclosed is a copy of the Resolutions distributed by the Employer Trustees to effectuate the merger.

Please contact me to discuss dates for a hearing.

Thank you for your attention to this matter.

Sincerely,

Mark E. Brossman

Enclosures

cc:    Denis A. Engel, Esq.
       Scott A. Gold, Esq.
       Susan M. Jennik, Esq.
       Trustees

10085807.1

### RESOLUTION OF THE TRUSTEES
### OF THE TWU-NYC PRIVATE BUS LINES
### PENSION TRUST

#### March 2, 2006

WHEREAS, each of the contributing employers (the "Contributing Employers") of the TWU-NYC Private Bus Lines Pension Trust (the "Plan") has withdrawn as a contributing employer of the Plan and sold substantially all of its assets to the City of New York (the "City"); and

WHEREAS, in connection with such transfers of assets to the City, certain employees of each Contributing Employer became employees of the MTA Bus Company and are engaged in the business of providing bus service in the City of New York in the areas formerly served by the Contributing Employers; and

WHEREAS, the MTA Defined Benefit Pension Plan (the "MTA Plan") provides for pension benefits to the employees of MTA Bus Company, including those employees who are former employees of the Contributing Employers; and

WHEREAS, the MTA and the MTA Bus Company are willing to enter into an agreement in substantially the form presented to the Trustees and attached to this resolution (the "Pension Agreement") which will provide for the transfer of all assets and liabilities of the Plan to the MTA Plan; and

WHEREAS, the Pension Agreement has been reviewed by all Plan counsel and the Plan's actuaries, the first version of the Pension Agreement having been provided to all Plan counsel for comment in July 2005 and the current version of the Pension Agreement having been provided to all counsel on January 17, 2006; and

WHEREAS, the Trustees have been discussing the possible merger of the Plan into the MTA Plan since at least the Trustees' meeting of August 16, 2004 at which an amendment to Section 14.15 of the Plan was proposed to permit a merger with a government retirement plan; and

WHEREAS, the MTA is willing to amend the MTA Plan by adopting the amendment in substantially the form presented to the Trustees (the "MTA Plan Amendment") which will provide for the payment of benefits to Plan participants (including retirees and others who have not become employees of MTA Bus Company) on the same basis provided for in the Plan and will ensure that each Participant will receive a benefit which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger if the Plan had then terminated; and

WHEREAS, the MTA Plan Amendment has been reviewed by all Plan counsel and the Plan's actuaries, and

WHEREAS, an earlier version of the MTA Plan Amendment was presented to the Trustees at their meeting on February 14, 2005, an updated version of the MTA Plan Amendment was provided to all Plan counsel for comment in July 2005 and the current version of the MTA Plan Amendment was provided to all Plan counsel on January 26, 2006; and

WHEREAS, none of the changes to the MTA Plan Amendment since the version presented to the Trustees on February 14, 2005 has an impact on Plan participants or affects the structure of the proposed merger; and

WHEREAS, the Trustees were advised at their February 24, 2005 meeting that Queens Surface Corporation had signed an agreement with City and had withdrawn from the Plan effective February 27, 2005; and

WHEREAS, the Trustees discussed spin-off of assets of the Plan relating to Queens Surface Corporation participants to the MTA Plan at the February 24, 2005 meeting; and

WHEREAS, the Trustees were advised at their April 22, 2005 meeting that Jamaica Buses Inc. and Triboro Coach Corp. had reached an agreement in principle with the City and discussed the impact on the Plan, including consideration of an amendment to the Plan which would facilitate the merger of the Plan into a governmental plan; and

WHEREAS, the Trustees at their October 24, 2005 meeting discussed the merger of the Plan into the MTA Plan and the impending sale of the assets of the remaining two Contributing Employers to the Plan; and

WHEREAS, the Trustees, having taken into consideration, among other things, the withdrawal of all of the Contributing Employers and the termination of the Plan, the participation by certain of the former Plan participants in the MTA Plan, and the status of the MTA Plan as an ongoing governmental plan, have determined that the merger of the Plan into the MTA Plan is in the best interest of the Plan participants;

NOW THEREFORE BE IT RESOLVED, that the merger of the Plan into the MTA Plan pursuant to an Agreement in substantially the form attached hereto is approved.

FURTHER RESOLVED, that the Trustees shall execute such Agreement in substantially the form attached hereto, subject only to such non-substantive changes as may be determined by them to be necessary or desirable to facilitate such merger, each Trustee's signature on the agreement being conclusive evidence of his or approval of any such changes.

FURTHER RESOLVED, that the proper officers, employees and administrators of the Plan are authorized and directed to take any such actions as are necessary or desirable to effect the merger and the intent of the foregoing resolutions.

**IN WITNESS WHEREOF,** the undersigned, being the Trustees of the Plan, have duly executed this Resolution as of the ___ day of March, 2006.

<table>
<tr><td><strong><u>UNION TRUSTEES</u></strong></td><td><strong><u>EMPLOYER TRUSTEES</u></strong></td></tr>
</table>

<div style="display:flex; justify-content:space-between;">

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

</div>

01/16/2006 9:20 AM

## PENSION AGREEMENT

This Pension Agreement is entered into as of this _____ day of _____, 2006 by and among the Transport Workers Union – New York City Private Bus Lines Pension Trust (the "**TWU-NYC Plan**"), the undersigned trustees of the TWU-NYC Plan (the "**Trustees**"), Triboro Coach Corporation ("**Triboro**"), Jamaica Buses, Inc. ("**Jamaica**" and, together with Triboro, the "**Contributing Employers**"), Local 100, Transport Workers Union of America, AFL-CIO and Transport Workers Union of America, AFL-CIO (together, the "**Union**"), the MTA Bus Company ("**MTA Bus**") and the Metropolitan Transportation Authority ("**MTA**").

### WITNESSETH:

WHEREAS, the Contributing Employers and the Union have established the TWU-NYC Plan; and

WHEREAS, the Contributing Employers are contributing employers to the TWU-NYC Plan; and

WHEREAS, the Contributing Employers have been engaged in the business of providing bus service in the City of New York (the "**City**"); and

WHEREAS, the Contributing Employers will cease to provide bus service in the City effective on their respective Transition Dates and upon the day after each such date, MTA Bus will provide service in the areas currently served by the applicable Contributing Employers; and

WHEREAS, in connection with the termination of the Contributing Employers' operations in the City and the commencement of such bus service operations by MTA Bus in the areas currently served by the Contributing Employers, upon the day after the applicable

Transition Date, certain of the employees of the Contributing Employers who had been engaged in providing bus service in the City will terminate employment with the Contributing Employers and become employed by MTA Bus; and

WHEREAS, in connection with the termination of the Contributing Employers' bus operations and the commencement of bus service operations by MTA Bus in the areas currently served by the Contributing Employers, the parties desire to provide for the transfer of all assets and liabilities under the TWU-NYC Plan to the Metropolitan Transportation Authority Defined Benefit Pension Plan (the "**MTA Plan**");

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

<div align="center">

**ARTICLE I**

**DEFINITIONS**

</div>

**Asset Purchase Agreement** means the Asset Purchase Agreement by and among the City, the Contributing Employers, and certain other parties, dated as of November 29, 2005.

**Code** means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

**Effective Date** means the day after the last applicable Transition Date.

**Losses** means all claims, losses, damages, penalties, fines, liabilities, costs and expenses, including without limitation, reasonable legal fees and expenses.

<div align="center">2</div>

**Plan Participant** means any individual who, as of the last applicable Transition Date, is currently receiving benefits or who may become entitled to receive benefits under the TWU-NYC Plan, including participants, whether actively employed, retired or deferred vested, and any "alternate payee" under a "qualified domestic relations order" as such terms are defined in Section 414(p) of the Code, and beneficiaries of any such individual.

**Plan Records** means any document or information in the possession of the Contributing Employers, the Union, the Trustees or the TWU-NYC Plan relating to the establishment, amendment, termination or administration of the TWU-NYC Plan, including without limitation, (i) records relating to Plan Participant eligibility, vesting, accrued benefits, length of service, claims for benefits (including pending claims), beneficiary designations, distribution elections, qualified domestic relations orders and other TWU-NYC Plan administrative records, (ii) current and prior TWU-NYC Plan documents (including all amendments thereto), trust and custodial agreements, service agreements, insurance contracts, summary plan descriptions, favorable Internal Revenue Service ("**IRS**") determination letters, correspondence with the IRS or other government agencies with respect to the TWU-NYC Plan, copies of the most recent applications for IRS determination letters filed with respect to the TWU-NYC Plan, actuarial valuations, material TWU-NYC Plan-related communications and disclosures, and government filings, and (iii) the most recently available schedule of the assets of the TWU-NYC Plan.

**Transition Date** means, with respect to a Contributing Employer, the Transition Date applicable to such Contributing Employer under the terms of the Asset Purchase Agreement.

**Trust Fund** means, with respect to the TWU-NYC Plan, the fund held in trust under the trust agreement executed by the Trustees from which retirement benefits are paid.

## ARTICLE II

## TRANSFER OF ASSETS AND LIABILITIES,
## PLAN RECORDS

2.1     The Trustees shall take all steps necessary to cause the TWU-NYC Plan to pay all

benefits due through the date on which the assets of the TWU-NYC Plan are transferred to the

MTA Plan pursuant to Section 2.3.  The Trustees shall take all steps necessary to cause the

TWU-NYC Plan to cease all applicable benefit accruals with respect to affected employees as of

each applicable Transition Date.

2.2     The Trustees, the TWU-NYC Plan, the Union MTA Bus and the MTA intend and

agree that the TWU-Plan shall be merged with and into the MTA Plan.  The date as of which

such merger occurs is hereinafter referred to as the "**Merger Date**."

2.3     The Trustees shall, on or as soon as practicable after the last applicable Transition

Date, take all steps necessary to transfer the assets of the TWU-NYC Plan to the MTA Plan.  The

transfer shall be in accordance with Code Section 414(l) and shall be made in cash or, if

acceptable to the Trustees and the MTA Plan, in kind.  The Trustees shall endeavor to complete

such merger within 60 days of such Transition Date.

2.4     MTA shall cause the MTA Plan to assume all benefit liabilities of the TWU-NYC

Plan and those liabilities described in Section 3.3, upon the transfer of assets with respect to the

TWU-NYC Plan, effective as of the Merger Date.  Following such transfer, the Contributing

Employers, the Union, the Trustees and the TWU-NYC Plan shall have no responsibility for

such liabilities transferred, except to the extent otherwise provided herein.

2.5     As soon as practicable after the last applicable Transition Date, but no less than

30 days prior to the date of the transfer of assets described in Section 2.3, the Contributing

4

Employers, the Union and the Trustees shall transfer all Plan Records to the MTA and the MTA Plan; provided that the Trustees may retain copies of Plan Records.

2.6    In connection with the actions taken pursuant to this Article II, the Contributing Employers, the Union, MTA Bus, the MTA and the Trustees shall, cooperate in making any and all appropriate filings required under the Code or ERISA, transferring appropriate records and taking all such other actions as may be necessary or appropriate to implement the provisions of this Article II in a timely manner, including to enable the TWU-NYC Plan and the MTA Plan to provide benefits to the Plan Participants in pay status without interruption. The Contributing Employers, the Union, the Trustees, MTA Bus and the MTA shall each provide the others with courtesy copies of any benefit communications distributed to the Plan Participants between the date of the Agreement and the Merger Date.  The Trustees shall be responsible for all required government reporting (including, but not limited to, IRS Forms W-2P, 1099 and 5500) with respect to the TWU-NYC Plan for all periods prior to the Merger Date.

## ARTICLE III

## REPRESENTATIONS AND COVENANTS

3.1    The Trustees hereby make the following representations and warranties to the best of their knowledge:

(a)    Except as set forth on Exhibit A, the Plan Records delivered to MTA Bus or MTA pursuant to Section 2.5 are true, accurate and complete in all respects and are sufficient to allow for the proper administration and maintenance of the benefits and liabilities transferred from the TWU-NYC Plan to the MTA Plan.

(b)    Except as set forth on Exhibit A, the TWU-NYC

Plan complies in form and has been maintained and operated in

accordance with the requirements of all applicable laws, including

ERISA and the Code in all material respects, and the TWU-NYC

Plan has been maintained and operated in accordance with its

terms in all material respects.

(c)    Except as set forth on Exhibit A, neither any

Trustee, nor any other person who participates in the operation of

the TWU-NYC Plan has engaged in any transaction with respect to

the TWU-NYC Plan, or breached any applicable fiduciary

responsibility or obligation under Title I of ERISA that would

subject any of them to a tax, penalty or liability for prohibited

transactions or breach of any obligations under ERISA or the Code

or would result in any claim being made under, by or on behalf of

the TWU-NYC Plan by any party with standing to make such a

claim.

(d)    Except as set forth on Exhibit A, no Trustee has

incurred any material liability under Section 502(c) or any liability

or civil penalty under Section 409 or 502(l) of ERISA or liability

for any tax or excise tax arising under Chapter 43 or Section 6652

of the Code with respect to the TWU-NYC Plan, and no event has

occurred and no condition or circumstance exists that could

6

reasonably be expected to give rise to any such liability with respect to the TWU-NYC Plan.

(e)    Except as set forth on Exhibit A, there are no actions, suits or claims pending or threatened against or with respect to the TWU-NYC Plan or the assets of the TWU-NYC Plan (other than routine claims for benefits and appeals of denied claims), and no civil or criminal action brought pursuant to the provisions of Title I, Subtitle B, Part 5 of ERISA is pending or threatened against a Trustee or any fiduciary of the TWU-NYC Plan with respect to the TWU-NYC Plan.  Except as set forth on Exhibit A, no Trustee has received any written notice that the TWU-NYC Plan or any fiduciary thereof is presently the direct or indirect subject of an audit, investigation or examination by any governmental or quasi-governmental agency, and no such action has been threatened.

(f)    Except as set forth on Exhibit A, the TWU-NYC Plan and the Trust Fund established in connection with the TWU-NYC Plan is the subject of a favorable determination letter issued by the Internal Revenue Service and the remedial amendment period described in Section 401(b) of the Code applicable to any amendment of the TWU-NYC Plan adopted after the date of such letter has not expired.  Since the date of such determination letter, no event has occurred and no condition or circumstance exists that

7

has resulted or is reasonably likely to result in the revocation of

such determination letter or that is reasonably likely to adversely

affect the qualified status of the TWU-NYC Plan or the exempt

status of such Trust Fund.

(g)    Except as set forth on Exhibit A and except as

otherwise contemplated by the transactions described in this

Pension Agreement, (i) no reportable event under Section 4043 of

ERISA has occurred with respect to the TWU-NYC Plan, (ii) no

event has occurred and no condition has existed that could

constitute grounds under Section 4042 of ERISA for termination of

or appointment of a trustee to administer the TWU-NYC Plan, (iii)

no accumulated funding deficiency (as defined in Section 402 of

ERISA or Section 412 of the Code) exists nor has any funding

waiver from the Internal Revenue Service been received or

requested with respect to the TWU-NYC Plan, (iv) no excise or

other tax is due or owing because of any failure to comply with the

minimum funding standards of the Code or ERISA with respect to

the TWU-NYC Plan, and (v) all premiums payable to the Pension

Benefit Guaranty Corporation with respect to the TWU-NYC Plan

have been timely made.

3.2    The Contributing Employers hereby represent and warrant that the Contributing

Employers have made all contributions to the TWU-NYC Plan when due, and the Contributing

8

Employers and the Union each hereby represent and warrant, to the best of each of their knowledge, that the representations and warranties in Section 3.1 are true.

3.3    The Trustees shall cause the TWU-NYC Plan to continue to be administered up to the Merger Date in accordance with applicable law and as it has been administered immediately prior to the date of this Agreement. The TWU-NYC Plan shall not be amended after the date of this Agreement, except as may be required to effectuate the transactions required by this Agreement or to maintain the TWU-NYC Plan's tax qualification. Administrative fees (e.g., legal, actuarial and accounting fees, PBGC premiums) that in the ordinary course previously had been paid by the TWU-NYC Plan, investment expenses (e.g., brokerage commissions, bank custodian fees, investment management fees), or TWU-NYC Plan Trustee expenses (including, but not limited to, for fiduciary liability insurance to remain in effect for six (6) years following the Merger Date, provided that such coverage is available on commercially reasonable terms and conditions) may, to the extent permitted by ERISA, continue to be paid by the TWU-NYC Plan prior to the date of transfer of assets pursuant to Section 2.3 and such permitted fees or expenses which (i) are accrued but unpaid on the Merger Date or (ii) become due thereafter, shall become the liability of the MTA Plan as of the Merger Date.

3.4    MTA Bus and MTA hereby make the following representations and warranties:

(a)    The MTA Plan documents delivered to counsel for the TWU-NYC Plan are true, accurate and complete in all respects.

(b)    Except as set forth in Exhibit B, the MTA Plan complies in form and has been maintained and operated in accordance with the requirements of all applicable laws, including the Code, and has been maintained and operated in accordance with its terms.

9

(c)    Except as set forth on Exhibit B, the MTA Plan and the Trust Fund established in connection therewith is the subject of a favorable determination letter issued by the Internal Revenue Service and the remedial amendment period described in Section 401(b) of the Code applicable to any amendment of the MTA Plan adopted after the date of such letter has not expired. Since the date of each such determination letter, to the best knowledge of MTA Bus and MTA, no event has occurred and no condition or circumstance exists that has resulted or is reasonably likely to result in the revocation of any such determination letter or that is reasonably likely to adversely affect the qualified status of the MTA Plan or the exempt status of any such trust.

(d)    Except as set forth on Exhibit B and to the best knowledge of MTA and MTA Bus, no person who participates in the operation of the MTA Plan has engaged in any transaction with respect to the MTA Plan, or breached any fiduciary duty or other obligation under applicable law that would subject him or her to a material tax, penalty or liability for breach of any such duty or obligation under applicable law or would result in any material claim being made under, by or on behalf of the MTA Plan by any party with standing to make such a claim.

(e)    Except as set forth on Exhibit B, no person who participates in the operation of the MTA Plan has incurred any liability for any tax or excise tax arising under the Code with respect to the MTA Plan, and, to the best knowledge of MTA and MTA Bus, no event has occurred and no condition or circumstance

10

exists that could reasonably be expected to give rise to any such liability with respect to the MTA Plan.

(f)    Except as set forth on Exhibit B, there are no actions, suits or claims pending or, to the best knowledge of MTA and MTA Bus, threatened against or with respect to the MTA Plan or the assets of the MTA Plan (other than routine claims for benefits and appeals of denied claims).  Except as set forth on Exhibit B, neither MTA Bus nor the MTA has received any written notice that the MTA Plan or any fiduciary thereof is presently the direct or indirect subject of an audit, investigation or examination by any governmental or quasi-governmental agency, and no such action has been threatened.

3.5    MTA and MTA Bus acknowledge and agree that upon the transfer of the assets and liabilities of the TWU-NYC Plan to the MTA Plan as provided in this Agreement, it shall be the responsibility and obligation of the MTA Plan to provide pension benefits to Plan Participants, including, without limitation, those Plan Participants who do not become employed by MTA Bus, in accordance with the terms of the MTA Plan, as amended to include a restated Article 15 to be adopted by the MTA effective as of the Effective Date.

## ARTICLE IV

## INDEMNIFICATION

4.1    MTA and MTA Bus shall, jointly and severally, indemnify the Trustees, the Contributing Employers, the TWU-NYC Plan, and the Union and their respective officers, directors, employees, fiduciaries, agents, administrators and representatives and hold them harmless from any Losses to the extent  arising from, relating to or otherwise in respect of the TWU-NYC Plan, including but not limited to, any breach of the obligations to be performed by

11

MTA, MTA Bus or the MTA Plan set forth in Article II of this Agreement or any breach of the

representations and warranties or covenants set forth in Sections 3.4 and 3.5 of this Agreement,

but excluding any Loss (a) that arises from, relates to or is otherwise in respect of any breach by

a Trustee, a Contributing Employer, the Union or the TWU-NYC Plan of any representations and

warranties or covenants set forth in Sections 3.1, 3.2 and 3.3 of this Agreement, or (b) arises or is

related to or is otherwise in respect of any event occurring prior to the Merger Date.

## ARTICLE V

## GENERAL PROVISIONS

    **5.1**    No provision of this Agreement shall be construed to limit the right of MTA Bus

or its affiliates to (i) amend or terminate the MTA Plan, subject to any obligations under any

collective bargaining agreement or applicable law, or (ii) create any right or entitlement

whatsoever in any Plan Participant including a right to continued employment or to any benefit

under the MTA Plan or any other compensation provided that no amendment may reduce any

benefit accrued by a Plan Participant except as permitted by Internal Revenue Code Section

411(d)(6). This Agreement is solely for the benefit of the parties hereto and should not be

deemed to confer upon third parties any remedy, claim, liability reimbursement, claim of action

or other right in excess of those existing without reference to this Agreement.

    **5.2**    This Agreement shall survive the closing of the transactions contemplated by this

Agreement.

    **5.3**    Except as otherwise preempted by federal law, this Agreement shall be governed

by and construed in accordance with the laws of the State of New York as to all matters,

including matters of validity, construction, performance and remedies, excepting New York

choice of law provisions. The parties hereby consent to submit to the jurisdiction of the State and Federal courts within the City for all purposes in connection with this Agreement.

    **5.3**    This Agreement may be amended, modified or supplemented only by a written agreement signed by the parties hereto.

    **5.4**    This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

    **5.5**    This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one instrument.

    **5.6**    This Agreement and the rights and obligations of the parties hereunder shall be effective and contingent upon the consummation of the acquisition of both the Jamaica and Triboro businesses by the City on the last applicable Transition Date. No party to this Agreement shall have any right or obligation hereunder unless and until both such acquisitions are consummated.

MTA BUS COMPANY

By:_____

Title:_____

METROPOLITAN TRANSPORTATION
AUTHORITY

By:_____

Title:_____

TRANSPORT WORKERS UNION – NEW
YORK CITY PRIVATE BUS LINES
PENSION TRUST

13

By:_____

Title:_____

TRUSTEES:

[NEED TO BE PROVIDED]

TRIBORO COACH CORPORATION

By:_____

Title:_____

JAMAICA BUSES, INC.

By:_____

Title:_____

LOCAL 100, TRANSPORT WORKERS UNION
OF AMERICA, AFL-CIO

By:_____

Title:_____

TRANSPORT WORKERS UNION OF
AMERICA, AFL-CIO

By:_____

Title:_____

# EXHIBIT A

## Exceptions to Representations and Warranties
in Sections 3.1

# EXHIBIT B

Exceptions to Representations and Warranties in Section 3.4

01/26/2006 12:56 PM

[MERGER VERSION]

ARTICLE 15

PROVISIONS APPLICABLE TO CERTAIN

FORMER EMPLOYEES OF QUEENS SURFACE CORP., JAMAICA BUSES, INC. AND

TRIBORO COACH CORPORATION

Amended & Restated as of January 30, 2006

3176520

# TABLE OF CONTENTS

Page No.

PREAMBLE ................................................................................................................ 4
   15.1.01   "Accrued Benefit" ...................................................................... 6
   15.1.02   "Accumulated Employee Contributions Benefit" ................................. 6
   15.1.03   "Actuarial Equivalent" ............................................................... 7
   15.1.04   "Agreement" ............................................................................ 8
   15.1.05   "Annuity Starting Date" ............................................................. 8
   15.1.06   "Break in Service Year" ............................................................. 8
   15.1.07   "Covered Employment" .............................................................. 9
   15.1.08   "Delayed Retirement Date" ......................................................... 9
   15.1.09   "Dependent Child or Children" ..................................................... 9
   15.1.10   "Disability" ............................................................................ 10
   15.1.11   "Disability Retirement Date" ..................................................... 10
   15.1.12   "Early Retirement Date" ........................................................... 10
   15.1.13   "Effective Date" ..................................................................... 11
   15.1.14   "Eligible Employee" ................................................................ 11
   15.1.15   "Employee" ........................................................................... 11
   15.1.16   "Employee Contribution" .......................................................... 12
   15.1.17   "Employee Contribution Benefit" ................................................ 12
   15.1.18   "Employer" ........................................................................... 13
   15.1.19   "Employment Commencement Date" ............................................ 13
   15.1.20   "Former QJT Employee" ........................................................... 13
   15.1.21   "Former QJT Service" .............................................................. 13
   15.1.22   "Hour of Service" ................................................................... 13
   15.1.23   "Maternity or Paternity Leave of Absence" .................................... 13
   15.1.24   "Normal Form of Retirement Benefit" .......................................... 14
   15.1.25   "Normal Retirement Age" ......................................................... 14
   15.1.26   "Normal Retirement Date" ........................................................ 14
   15.1.27   "Participant" .......................................................................... 15
   15.1.28   "Period of Service" ................................................................. 15
   15.1.29   "Period of Severance" means ..................................................... 15
   15.1.30   "Reemployment Commencement Date" ......................................... 15
   15.1.31   "Severance from Service Date" ................................................... 15
   15.1.32   "Spouse" ............................................................................... 16
   15.1.33   "TWU-NYC Plan" ................................................................... 16
   15.1.34   "Uninterrupted Seniority" ......................................................... 16
   15.1.35   "Union" ................................................................................ 16
 15.2   ELIGIBILITY ............................................................................ 17
   15.2.01   Conditions Of Eligibility. .......................................................... 17
   15.2.02   Eligible Employee. .................................................................. 17
   15.2.03   Determination of Eligibility. ...................................................... 17
   15.2.04   Termination of Eligibility. ......................................................... 17

- i -

15.3   UNINTERRUPTED SENIORITY AND BREAKS IN SERVICE FOR VESTING, ELIGIBILITY AND BENEFIT ACCRUAL ELIGIBILITY ................................. 18
    15.3.01   Uninterrupted Seniority for Vesting Service and Eligibility to Commence Receiving Benefits................................................................................................... 18
    15.3.02   Severance From Service Date. ................................................................. 18
    15.3.03   Additional Service Allowance. .................................................................. 19
    15.3.04   Uninterrupted Seniority For Benefit Accrual............................................ 19
    15.3.05   Uninterrupted Seniority Following a Break in Service. ............................. 20
    15.3.06   Return to Employment after Disability. .................................................... 20
    15.3.07   Service in the Armed Forces. .................................................................. 21
15.4   RETIREMENT CONDITIONS ............................................................................ 22
    15.4.01   Normal Retirement. ................................................................................. 22
    15.4.02   Delayed Retirement................................................................................. 22
    15.4.03   Early Retirement. .................................................................................... 22
    15.4.04   Disability Retirement. .............................................................................. 23
    15.4.05   Suspension of Benefits............................................................................ 23
    15.4.06   Commencement of Benefits. .................................................................... 25
15.5   RETIREMENT BENEFITS................................................................................. 26
    15.5.01   Normal Retirement. ................................................................................. 26
    15.5.02   Delayed Retirement Benefit. .................................................................... 26
    15.5.03   Early Retirement Benefit.......................................................................... 26
15.6   JOINT AND SURVIVOR AND PRERETIREMENT DEATH BENEFITS ................ 27
    15.6.01   Automatic Joint And Survivor Annuity. .................................................... 27
    15.6.02   Qualified Preretirement Survivor Annuity................................................. 28
    15.6.03   Qualified Election. ................................................................................... 29
    15.6.04   Notice Requirements................................................................................ 31
    15.6.05   In-Service Lump-Sum Death Benefit........................................................ 32
    15.6.06   Post-Retirement Lump-Sum Death Benefit. ............................................. 32
    15.6.07   Dependent Child's Pre-Retirement Death Benefit. ................................... 33
    15.6.08   Dependent Child's Post-Retirement Death Benefit. .................................. 33
    15.6.09   Payment Of Dependent Child's Benefit..................................................... 35
15.7   OPTIONAL METHODS OF RETIREMENT PAYMENTS....................................... 35
    15.7.01   Optional Elections. .................................................................................. 35
    15.7.02   Limitation On Optional Elections. ............................................................ 36
    15.7.03   Further Limitations On Optional Elections................................................ 37
15.8   RETURN OF CONTRIBUTIONS........................................................................ 38
    15.8.01   Upon Termination of Employment Prior to Vesting................................... 38
    15.8.02   Refund Upon Death.................................................................................. 39
    15.8.03   Cessation of Payment upon Death. .......................................................... 40
    15.8.04   Repayment of Contribution upon Reemployment. ..................................... 41
15.9   BENEFITS ON TERMINATION OF EMPLOYMENT AND RETIREMENT UPON DISABILITY........................................................................................................ 42
    15.9.01   Termination Generally. ............................................................................ 42
    15.9.02   Conditions for Vested Retirement Benefits. ............................................. 42
    15.9.03   Amount of Vested Retirement Benefits. ................................................... 43
    15.9.04   Single Sum Payment of Value of Vested Retirement Benefits.................... 43

15.9.05    Participant and Spousal Consent for Immediately Distributable Benefits. ......... 44
15.9.06    Disability Termination. ................................................................................. 45
15.9.07    Disability Retirement. .................................................................................. 47
15.9.08    Review of Disability Pension Payments. ...................................................... 47
15.9.09    No Forfeiture upon Withdrawal of Employee Contribution. ........................ 48
15.10  FUNDING ............................................................................................................... 48
15.10.01   Contributions By Participants. ..................................................................... 48
15.10.02   Contributions by Employers. ........................................................................ 50
15.11  MISCELLANEOUS ................................................................................................. 51
15.11.01   Participant's Rights; Acquittance. ............................................................... 51
15.11.02   Receipt or Release. ....................................................................................... 51
15.11.03   Payments To Legally Incompetent. ............................................................... 51
15.11.04   Payment To Incapacitated Participant. ......................................................... 52
15.11.05   Divestment of Benefits. ................................................................................. 52
15.11.06   Lost Beneficiary or Participant. ................................................................... 52
15.11.07   Duplication of Benefits. ............................................................................... 53
15.11.08   Amendment. .................................................................................................. 53
15.12  CERTAIN PARTICIPANTS IN THE TWU-NYC PLAN
OTHER THAN FORMER QJT EMPLOYEES ...................................................................... 53

## PREAMBLE

WHEREAS, Queens Surface Corp. ("Queens Surface"), Jamaica Buses, Inc. ("Jamaica") and Triboro Coach Corporation ("Triboro") have each at one time been a contributing employer under the Transport Workers Union – New York City Private Bus Lines Pension Trust, a multiemployer pension plan which was most recently amended as of December 31, 2002 (the "TWU-NYC Plan"); and

WHEREAS, Queens Surface, Jamaica and Triboro have been engaged in the business of providing public bus service in the City of New York (the "City"); and

WHEREAS, effective February 27, 2005, Queens Surface ceased to provide public bus service in the City of New York and after that date MTA Bus Company ("MTA Bus") has provided service in the areas formerly served by Queens Surface, and

WHEREAS, effective February 20, 2006, Triboro ceased to provide public bus service in the City of New York and after that date MTA Bus has provided service in the areas formerly served by Triboro, and:

WHEREAS, effective February 30, 2006, Jamaica ceased to provide public bus service in the City of New York and after that date MTA Bus has provided service in the areas formerly served by Jamaica (together with the service formerly provided by Queens Surface and Triboro the "Former QJT Service"); and

WHEREAS, in connection with the termination of bus service operations in the City by Queens Surface, Jamaica and Triboro and the commencement of bus service operations by MTA Bus, certain employees of Queens Surface, Jamaica and Triboro who had been engaged in providing bus service in the City have terminated or will terminate employment with Queens Surface, Jamaica or Triboro as the case may be and have become or will become employed by

MTA Bus in the Former QJT Service business ("Former QJT Employees") on the applicable Effective Date; and

WHEREAS, the Trustees of the TWU-NYC Plan and MTA Bus Company, among others, have entered into an agreement (the "Pension Agreement") concerning liabilities relating to pension benefits to or with respect to certain Former QJT Employees and certain other former participants in the TWU-NYC Plan; and

WHEREAS, pursuant to the Pension Agreement all benefit liabilities of the TWU-NYC Plan will be transferred to this Plan and this Plan shall assume and be solely responsible for such liabilities; and

WHEREAS, pursuant to the Pension Agreement, the assets of the TWU-NYC Plan shall be transferred from the trust funding the TWU-NYC Plan to the trust funding this Plan (the date on which such transfer occurs shall be referred to as the "Asset Transfer Date"); and

WHEREAS, this Plan was amended to add Article 15 the terms of which determine the benefits payable under the Plan to former Queens Surface employees; and

WHEREAS, the Board has resolved that Article 15 of this Plan be amended and restated in its entirety, the terms of which shall determine the benefits payable under the Plan to Former QJT Employees.

NOW THEREFORE, Article 15 of the Plan shall be amended and restated in its entirety as follows, effective upon the Asset Transfer Date.

**15.1    DEFINITIONS**

This Article 15 applies to:

(a)    Each individual who is a Participant (as defined in Section 15.1.27); and

(b)    A beneficiary of an individual described in subparagraph (a) above who becomes entitled to receive a benefit as a result of such individual's death.

The provisions of the Plan, to the extent not inconsistent with this Article, shall be applicable to this Article, including, but not limited to, Articles 1, 5, 6, 7, 8 and 9 and Section 3.09.

The following words and phrases used in this Article 15 which are defined in Article 1 of the Plan shall have the meaning set forth in Article 1, except where a different definition is expressly provided in this Article 15.

15.1.01    "Accrued Benefit"

on behalf of any Participant shall be equal to the benefit calculated at any point in time and payable at Normal Retirement Date determined pursuant to Section 5.01.    A Participant's Accrued Benefit derived from Employee Contributions shall be equal to the Accumulated Employee Contributions Benefit.

15.1.02    "Accumulated Employee Contributions Benefit"

- 6 -

as of any date on or prior to a Participant's Normal Retirement Date means the Actuarial Equivalent of the Employee Contribution Benefit expressed as a monthly retirement benefit payable at his Normal Retirement Date.

15.1.03         "Actuarial Equivalent"

means an equivalency in value, at a given point in time, between different forms of benefits, payable commencing at a date other than Normal Retirement Date. Unless this Article 15 is amended to change the actuarial assumptions on which calculation of equivalence is based, optional forms of benefits for all Participants shall be determined on the basis of the following conversion factors:

| Lump Sum Option | - | The investment return assumption will be the annualized rate of interest on 30 year-Treasury securities as specified by the Commissioner of Internal Revenue published in the month of December of the preceding Plan Year. The mortality table for this purpose is the table prescribed in the Regulations under Code Section 417(e) for use in the calendar year which contains the annuity starting date and which, until modified or superseded, is the table set forth in Revenue Ruling 2001-62. |

| Joint and Survivor Option | - | UP 1984 Mortality Table, set ahead one (1) year for the Employee and set back four (4) years for the Spouse, with interest at the rate of six and one-half percent (6-1/2%) per annum. |
| Early Retirement Option | - | Reduce by three percent (3%) per year for years and months prior to age fifty-seven (57). |
| All other options | - | UP 1984 Mortality Table, set ahead one (1) year, with interest rates at six and one-half percent (6-1/2) per annum. |

15.1.04    "Agreement"

means the collective bargaining agreement between the Union and the Employer pursuant to which the Employer is required to maintain the benefits provided for in this Article 15.

15.1.05    "Annuity Starting Date"

means the first day of the first period for which an amount is payable as an annuity or in the case of a benefit not payable in the form of an annuity, the first day on which all events have occurred which entitle the Participant to such benefit.

15.1.06    "Break in Service Year"

(a)    "Break in Service Year" means a twelve consecutive month Period of Severance as defined in Section 15.1.29.    Further, solely for the purpose of determining whether a Participant has incurred a Period of Severance, a Period of Service shall be recognized for Authorized Leaves of Absence and Maternity and Paternity Leaves of Absence.

(b)    "Authorized Leave of Absence" means an unpaid, temporary cessation from active employment with the Employer pursuant to an established policy.

15.1.07    "Covered Employment"

means employment of an Employee with the Employer who is eligible to be represented for collective bargaining purposes by the Union.

15.1.08    "Delayed Retirement Date"

means the date set forth in Section 15.4.02.

15.1.09    "Dependent Child or Children"

means any unmarried child or children of the Participant under the age of nineteen (19) years, including any legally adopted child or children.    "Dependent Child or Children" shall not include any person(s) who is an Employee under this Plan, nor any person(s) who is in the military or similar forces of any country or subdivision thereof.

If a person who would be a Dependent Child but for the fact that he has attained age nineteen (19) shall be incapable of self-sustaining employment by reason of mental retardation or physical handicap, and shall have been so incapable continuously since a date prior to his attainment of age nineteen (19), and shall be chiefly dependent upon the Participant for support and maintenance, then such person shall be a Dependent Child.  The Board of Managers

- 9 -

may require that proof of such continuous incapacity and dependency be furnished before any benefits become payable to or on behalf of such Child.

Each Dependent Child shall cease to be a Dependent Child on his nineteenth (19th) birthday, or, in the case of an incapacitated person as described in the preceding paragraph, on the later of such person's nineteenth (19th) birthday or the first date such person is no longer so incapacitated.

15.1.10    "Disability"

means, for purposes of this Article 15, a physical or mental condition of a Participant resulting from bodily injury, disease, or mental disorder which wholly prevents the disabled Participant from performing the duties of the occupation in which he was engaged at the time he became disabled, or the duties of a reasonably equivalent occupation, and which disability has continued without interruption for at least six (6) months. In any event, a Participant shall not be considered to be totally and permanently disabled for purposes of this Article 15 if he engages in any gainful occupation and earns $10,000 or more per year, or if his Disability shall result from any act of the Participant performed with the willful intention to bring about the injury or death of himself or another.

15.1.11    "Disability Retirement Date"

means the date set forth in Section 15.9.06(b).

15.1.12    "Early Retirement Date"

means the date set forth in Section 15.4.03.

15.1.13    "Effective Date"

means, with respect to a Participant, the date on which Queens, Jamaica or Triboro, as applicable, ceased to provide public bus service in the City.

15.1.14    "Eligible Employee"

means an Employee described in Section 15.2.02.

15.1.15    "Employee"

means an employee of the Employer. Notwithstanding any provisions of the Plan to the contrary, the terms "Employee" or "Eligible Employee" shall not include any individual not reported on the Employer's payroll records as an employee subject to payroll tax withholding, regardless of whether the Employer, a court or administrative agency later determines that such individual should have been classified as an employee subject to payroll tax withholding. "Employee" shall also include any person employed by the Union who, immediately prior to such employment by the Union, was a member of a unit of employees covered by a collective bargaining agreement and that agreement or a successor agreement provides for the employee to benefit under this Article 15. Such person shall remain an Employee for purposes of this Article 15, provided his responsibilities as a Union employee are with respect to the collective bargaining unit in which he had been a member. Such continued participation in this Plan shall be subject to the execution of an agreement between the Union and the Employer and subject to the requirement that contributions are made on behalf of the Union employee in an amount equal to the contribution that would be made if the Union employee was employed by the Employer.

15.1.16     "Employee Contribution"

means the amount a Participant is required to contribute to the Plan pursuant to Section 15.10.01 in order to be eligible to participate in the benefits provided by this Article 15 and all amounts a Participant was required to contribute to the TWU-NYC Plan prior to the Effective Date.

15.1.17     "Employee Contribution Benefit"

means the Accrued Benefit derived from Employee Contributions made as of any specified date that is, with respect to a Participant, the amount equal to such Participant's accumulated contributions (defined hereafter) pursuant to this Article 15 expressed as an annual benefit commencing at Normal Retirement Age, using the interest rate which would be used under this Article 15 as required by Code Section 417(e)(3) (as of the determination date). "Accumulated Contributions" means the total of:

(a)     Employee Contributions, and

(b)     interest (if any) on such contributions, computed at the rate provided by this Article 15 to the end of the last Plan Year to which Code Section 411(a)(2) does not apply, and

(c)     interest on the sum of (a) and (b) above compounded annually:

(i)     at the rate of one hundred twenty percent (120%) of the federal midterm rate (as in effect under Code Section 1274 for the first month of a Plan Year)

from the beginning of the first Plan Year to which Code Section 411(a)(2) applies and ending with the date on which the determination is being made, and

(ii)    at the interest rate used under this Article 15 pursuant to Code Section 417(e)(3) (as of the determination date) for the period beginning with the determination date and ending on the date on which the Participant would attain Normal Retirement Age.

15.1.18    "Employer"

means MTA Bus Company.

15.1.19    "Employment Commencement Date"

means the date on which an Employee first performs an Hour of Service.

15.1.20    "Former QJT Employee"

shall have the meaning assigned to that term in the Preamble.

15.1.21    "Former QJT Service"

shall have the meaning assigned to that term in the Preamble.

15.1.22    "Hour of Service"

means each hour for which an Employee is paid, or entitled to payment by the Employer for the performance of duties and each Hour of Service credited to a Participant as of  the Effective Date under the terms of the TWU-NYC Plan.

15.1.23    "Maternity or Paternity Leave of Absence"

- 13 -

means an absence from work for any period by reason of the employee's pregnancy, birth of the Employee's child, placement of a child with the Employee in connection with the adoption of such child, or any absence for the purpose of caring for such child for a period immediately following such birth or placement. For this purpose, a period of maternity or paternity leave shall be treated as neither a Period of Service nor a Period of Severance prior to the end of the twelve (12) month period following such absence.

15.1.24    "Normal Form of Retirement Benefit"

means (a) for Participants who retire on or after eligibility for an early retirement benefit or a normal retirement benefit, a pension payable for life beginning as of the Participant's Early or Normal Retirement Date or, if later, the income commencement date, but in the event of the Participant's death before receiving sixty (60) monthly payments, his pension continues to his Beneficiaries until the balance of the sixty (60) monthly payments has been paid; (b) for each other Participant, a pension payable for life beginning as of the Participant's Disability Retirement Date or the date on which a Participant commences a vested benefit or, if later, the income commencement date and ceasing upon the Participant's death.

15.1.25    "Normal Retirement Age"

means age on the date on which a Participant attains either (a) age fifty-seven (57) and completes twenty (20) years of Uninterrupted Seniority or (b) the later of age sixty-five (65), or (i) the fifth anniversary of the date the Employee became a Participant or (ii) the fifth anniversary of the date the Employee became a participant in the TWU-NYC Plan.

15.1.26    "Normal Retirement Date"

is the date described in Section 15.4.01.

15.1.27      "Participant"

means any Eligible Employee who participates under this Article 15 as provided in Section 15.2 and any other Employee or former Employee having a right or contingent right to benefits hereunder. "Active Participant" means an Eligible Employee who participates in this Article 15 and has not for any reason become ineligible to participate further in this Article 15. For purposes of Articles 1, 5, 6, 7, 8 and 9 and Section 3.09, the term "Member" shall include Participants under this Section 15.1.27.

15.1.28      "Period of Service"

means a period of Covered and non-Covered Employment of an Employee commencing on his Employment Commencement Date or Reemployment Commencement Date, whichever is applicable, and ending on his Severance From Service Date and including any Period of Service credited to a Participant under the terms of the TWU-NYC Plan as of the Effective Date.

15.1.29      "Period of Severance" means

the period of time commencing on the Severance from Service Date of an Employee and ending on the Employee's Reemployment Commencement Date.

15.1.30      "Reemployment Commencement Date"

means the first date, following a period of Severance on which the Employee performs an Hour of Service.

15.1.31      "Severance from Service Date"

- 15 -

shall have the meaning assigned to it in Section 15.3.02.

15.1.32    "Spouse"

means the person to whom the Participant has been legally married as of the Participant's death or Annuity Starting Date, whichever is earlier. The term "spouse" will also include a surviving spouse of the Participant; provided that a former spouse will be treated as the spouse or surviving spouse and a current spouse will not be treated as the spouse or surviving spouse to the extent provided under a qualified domestic relations order described in Code Section 414(p).

15.1.33    "TWU-NYC Plan"

shall have the meaning assigned to that term in the Preamble.

15.1.34    "Uninterrupted Seniority"

means the period of employment required for vesting and benefit accrual under this Article 15, determined as applicable under Section 15.3. Uninterrupted Seniority will be determined on the basis of elapsed time and shall include any Uninterrupted Seniority credited to a Participant under the terms of the TWU-NYC Plan as of the Effective Date.

15.1.35    "Union"

means Local 100, Transport Workers Union of America, AFL-CIO, and Transport Workers Union of America, AFL-CIO.

**15.2        ELIGIBILITY**

15.2.01         Conditions Of Eligibility.

Each Eligible Employee shall participate in this Plan pursuant to the provisions of this Article 15 on the date such Eligible Employee first performs an Hour of Service with the Employer on or after the Effective Date. To be a Participant, each Eligible Employee must agree to make mandatory Employee Contributions.    Such Employee Contributions shall be made in accordance with written procedures established by the Employer. The Employer shall give each Eligible Employee written notice of his required contribution in sufficient time to enable such Eligible Employee to make his Employee Contribution in accordance with procedures established by the Employer.

15.2.02         Eligible Employee.

"Eligible Employee" means any Employee who (i) was a participant in the TWU-NYC Plan as of the applicable Effective Date or, when first hired, is assigned by the Employer to the Former QJT Service and (ii) is in Covered Employment.

15.2.03         Determination of Eligibility.

The Board of Managers shall determine the eligibility of each Employee for participation in this Article 15 based upon information furnished by the Employer.    Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to this Section 15.2.

15.2.04         Termination of Eligibility.

- 17 -

(a)    In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee, such Participant shall continue to vest in his Accrued Benefit under this Article 15 for each Period of Service completed while an ineligible Employee, until such time as his Accrued Benefit shall be forfeited or distributed pursuant to the terms of this Article 15.

(b)    In the event an Employee who is not a member of an eligible class of Employees becomes a member of an eligible class, such Employee will participate immediately if such Employee would have otherwise previously become a Participant.

## 15.3    UNINTERRUPTED SENIORITY AND BREAKS IN SERVICE FOR VESTING, ELIGIBILITY AND BENEFIT ACCRUAL ELIGIBILITY

15.3.01    Uninterrupted Seniority for Vesting Service and Eligibility to Commence Receiving Benefits.

For purposes of determining a Participant's (i) vested interest in his Accrued Benefit and (ii) eligibility to commence receiving distribution of his or her Accrued Benefit, the Uninterrupted Seniority of such Participant shall be the aggregate of his Periods of Service subject to the provisions of Section 15.3.03 hereof, as of the date benefits are to be determined under any of the provisions of the Plan. For these purposes, Periods of Service shall include Covered Employment. For such purposes, the Uninterrupted Seniority for each Participant shall also include the Period of Service to which the Participant was entitled on the Effective Date under the TWU-NYC Plan for such purposes.

15.3.02    Severance From Service Date.

A Severance From Service Date shall be deemed to occur on the earlier of:

(a)    the date on which the Participant quits, retires, is discharged or dies; or

(b)    the first anniversary of the first date of a period in which the Participant remains absent from service (with or without pay) with the Employer for any reason other than quit, retirement, discharge or death, subject to the provisions of Section 15.3.03 hereof.

15.3.03    Additional Service Allowance.

If Participant performs an Hour of Service within twelve (12) months of the Severance From Service Date, the Period of Severance shall be included as a Period of Service for purposes of determining years of Uninterrupted Seniority for vesting purposes under any of the provisions of this Article 15.

15.3.04    Uninterrupted Seniority For Benefit Accrual.

For purposes of determining the Amount of a Participant's Accrued Benefit, the Uninterrupted Seniority for Benefit Accrual of a Participant, as of the date the benefits are to be determined under this Article 15, shall include all Periods of Service with the Employer during which time the Employee was a Participant in the Plan. In computing years of Uninterrupted Seniority for Benefit Accrual, a major fraction of a year shall be considered to be a year. In no event shall an Employee receive Uninterrupted Seniority for benefit purposes (including vesting) for any period of employment during which the Employee elected not to or was not permitted to make Employee Contributions. For purposes of this Section 15.3.04, the Uninterrupted Seniority for Benefit Accrual for each Participant shall include the Period of Service credited to the Participant as of the Effective Date under the TWU-NYC Plan.

- 19 -

15.3.05        Uninterrupted Seniority Following a Break in Service.

(a)    For a Participant who shall have incurred a 1-year Break in Service and subsequently thereto shall become reemployed, both periods of employment shall be aggregated for purposes of determining Uninterrupted Seniority for purposes of Vesting and Benefit Accrual, except that if the Participant shall not have satisfied the requirements for a deferred vested benefit prior to the Break in Service, and if upon reemployment his number of consecutive 1-year Breaks in Service shall equal or exceed the greater of (i) five (5) or (ii) his number of Uninterrupted Seniority years, he shall be deemed newly employed for all purposes hereunder and his Uninterrupted Seniority shall not include any period prior to the 1-year Break in Service.

(b)    Any period for which a Participant is eligible to make contributions to the Plan and fails to do so shall not be included in the Participant's Uninterrupted Seniority.  Any period for which a Participant makes the required contributions and later receives a cash refund thereof pursuant to the provisions of Section 15.8.01, and for which he is eligible to repay said withdrawal or refund pursuant to the provisions of Section 15.8.04, shall be included in a participant's Period of Service for the sole purpose of determining whether a Participant has earned a vested right to a pension as provided in Section 15.9.02 hereof; provided, however, that this subsection shall not limit the effect of a repayment pursuant to the provisions of Section 15.8.04.

15.3.06        Return to Employment after Disability.

If a Participant who retired on Disability recovers and returns to Covered Employment with the Employer, he shall be entitled to his Uninterrupted Seniority and vesting service accrued

- 20 -

as of the time his absence for disability commenced. No Uninterrupted Seniority or vesting service shall accrue, however, for the period of time that the Participant received benefits for Disability, or prior to his return to Covered Employment.

15.3.07     Service in the Armed Forces.

(a)     Any Employee who left Covered Employment of a Contributing Employer to enter the Armed Forces of the United States, and whose reemployment rights are protected by Federal law, shall be credited with a Period of Service for the period of his military service, that he would have earned had he instead continued his prior employment, provided that the Employee returns to work in compliance with any requirements of such law.

(b)     If a Participant shall be reemployed in employment covered by this Article 15 following an absence caused by military service as provided in subsection (a) above, he shall be given a reasonable opportunity to contribute to the Plan the amounts which he would have been required to contribute had he remained in employment covered by the Plan during the period of military service plus interest thereon. If the Participant shall agree to make such contributions, his normal pension benefit, determined in accordance with Section 15.5, shall be determined on the basis of all his Uninterrupted Seniority, including the period of military service.

(c)     If a Participant described in Subsection (a) above shall decline to make contributions to the Plan as described in subsection (b) above, his normal pension benefit, determined in accordance with Section 15.5, shall be determined on the basis of all his Uninterrupted Seniority, including the period of military service; provided, however, that the benefit will be reduced by an amount which is the actuarial equivalent of the amount of

- 21 -

contributions which the Participant would have been required to make to the Plan had he remained in employment covered by the Plan during the period of military service, plus interest thereon.

(d)    Notwithstanding any provision of this Article 15 to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code Section 414(u).

## 15.4    RETIREMENT CONDITIONS

15.4.01    Normal Retirement.

The Normal Retirement Date of a Participant shall be the first day of the month coinciding with or next following the date he attains Normal Retirement Age.

15.4.02    Delayed Retirement.

If a Participant shall remain in employment beyond his Normal Retirement Date, his Delayed Retirement Date shall be the first day of the month coinciding with or next following the date such Participant notifies the Employer that his retirement is to be effective. A Participant who remains in employment beyond his Normal Retirement Date shall be deemed to have retired on the first day of the first month in which he completes less than eight (8) days of employment.

15.4.03    Early Retirement.

(a)    A Participant may elect to retire from the employment of the Employer prior to his Normal Retirement Date on his Early Retirement Date, which is the first

day of any month coinciding with or following the date he both attains the age of fifty-five (55) and completes twenty (20) years of Uninterrupted Seniority and elects to retire. A Participant may further elect to have his retirement benefit commence on the first day of any month between his Early Retirement Date and his Normal Retirement Date.

(b)     If a Participant separates from Covered Employment before satisfying the age requirement for early retirement, but has satisfied the Uninterrupted Seniority requirement, the Participant will be entitled to elect commencement of his retirement benefit upon satisfaction of such age requirement.

15.4.04        Disability Retirement.

Upon demonstration of a Participant's Disability to the satisfaction of the Board of Managers, a Participant shall be eligible for Disability retirement under Section 15.9.06 provided he has completed fifteen (15) years of Uninterrupted Seniority.

15.4.05        Suspension of Benefits.

(a)     If a Participant who is receiving or is entitled to receive retirement benefits under this Plan re-enters employment hereunder or of any other employer in the industrial and geographic area of the Union for eight (8) or more days per month, the Board of Managers shall suspend such benefits during the period of such employment. Payment for one (1) hour of service in a day will equal one (1) day of employment. Upon subsequent termination of such employment and upon reapplication by the Participant to the Board of Managers, benefit payments will resume on the first day of the month following approval of his reapplication to the Board of Managers. Such benefit amount shall be determined pursuant to Section 15.5.01 as of his subsequent retirement date and the Participant's Uninterrupted Seniority earned prior and

subsequent to his reemployment hereunder, reduced by the actuarial value of the payments previously made from this Plan or the TWU-NYC Plan prior to the Effective Date, but in no event less than the benefit amount as paid prior to the suspension of his pension. For the purpose of the above sentence, a Participant who has satisfied the requirements for a normal retirement benefit pursuant to the provisions of Section 15.4.01 shall not be considered as having entered employment hereunder, unless such employment is for eight (8) or more days per month.

(b)    The Board of Managers shall have the right to deduct, from payments becoming due after the Participant ceases such active work, any payments made during the period of employment and prior to the date they had notice that the Participant was so employed. In no event, however, will the deduction for any month exceed 25% of the monthly benefit otherwise payable to such Participant. The Board of Managers may require of each retired Participant proof that he is not working full or part time for the Employer hereunder or any other employer in the industrial and geographic jurisdiction of the Union; but the Board of Managers shall not require such proof more often than once in a calendar quarter. Failure to furnish such proof shall be grounds for suspension of pension payments until such proof has been furnished.

(c)    A Participant may request a ruling from the Board of Managers as to whether an occupation comes under the industrial and geographic jurisdiction of the Union by filing written notice thereof with the Board of Managers within 90 days from the date the Board of Managers issue such determination. As a result of such hearing, the Board of Managers may modify or correct the determination on the basis of proof submitted by the Participant and deemed satisfactory to the Board of Managers.

(d)    No payments shall be withheld by the Plan pursuant to this Section unless the Plan notifies the Participant by personal delivery or first class mail during the first calendar month or payroll period in which the Plan withholds payments that his or her benefits are suspended. Such notifications shall contain a description of the specific reasons why benefit payments are being suspended, a description of the plan provision relating to the suspension of payments and a copy of such provisions. In addition, the notice shall inform the Participant of the Plan's procedures for affording a review of the suspension of benefits. Requests for such reviews may be considered in accordance with the claims procedure adopted by the review procedure provided by Section 6.03 of the Plan.

(e)    In the case of benefits payable periodically on a monthly basis for as long as a life (or lives) continues, such as a straight life annuity or a qualified joint and survivor annuity, an amount equal to the monthly retirement benefit shall be suspended.

15.4.06        Commencement of Benefits.

(a)    Unless the Participant elects otherwise, distribution of benefits will begin no later than the 60th day after the latest of the close of the Plan Year in which:

(i)    the Participant attains age sixty-five (65) (or Normal Retirement Age, if earlier);

(ii)    occurs the tenth (10th) anniversary of the year in which the Participant commenced participation under this Article 15 or the TWU-NYC Plan, if earlier; or

(iii)    the Participant terminates service with the Employer.

- 25 -

(b)    Notwithstanding the foregoing, the failure of a Participant and Spouse to consent to a distribution while a benefit is immediately distributable, within the meaning of Section 15.9.05 of this Article 15, shall be deemed to be an election to defer commencement of payment of any benefit sufficient to satisfy this Section.

## 15.5    RETIREMENT BENEFITS

15.5.01    Normal Retirement.

A Participant shall, upon retirement at his Normal Retirement Date, receive a monthly retirement benefit which shall commence on such retirement date and shall be payable under the Normal Form of Retirement Benefit defined in Section 15.1.24.    The amount of each such monthly retirement benefit shall be equal to his years of Uninterrupted Seniority for Benefit Accrual multiplied by $82.00.

15.5.02    Delayed Retirement Benefit.

A Participant shall, upon retirement on his Delayed Retirement Date, receive a monthly retirement benefit which shall commence on the date of such retirement or the first day of any month thereafter (but no later than required by Section 3.09 and shall be payable under the Normal Form of Retirement Benefit).    The amount of each such monthly retirement benefit shall be determined in the same manner as for retirement at a Participant's Normal Retirement Date except that years of Uninterrupted Seniority for Benefit Accrual and benefit rate shall be determined as of the date of his actual retirement.

15.5.03    Early Retirement Benefit.

- 26 -

A Participant shall, upon retirement on Early Retirement Date, receive his Accrued Benefit which shall commence on the date elected in accordance with Section 15.4.03 and shall be payable under the Normal Form of Retirement Benefit. The amount of such monthly retirement benefit shall be determined in the same manner as for retirement at his Normal Retirement Date, except that years of Uninterrupted Seniority for Benefit Accrual and benefit rate shall be determined as of his Early Retirement Date. The benefit shall be reduced based on the number of months by which the Participant's early retirement precedes his attainment of age fifty-seven (57) using the factors listed in Section 15.1.03.

**15.6     JOINT AND SURVIVOR AND PRERETIREMENT DEATH BENEFITS**

15.6.01     Automatic Joint And Survivor Annuity.

(a)     If the present value of a vested Participant's benefit is in excess of five thousand dollars ($5,000), a married Participant's vested Accrued Benefit will be paid in the form of an automatic joint and survivor annuity and an unmarried Participant's vested Accrued Benefit will be paid in the form of an immediate life annuity. The Participant may elect to have such annuity distributed upon attainment of the earliest retirement age under this Article 15.

(b)     An "automatic joint and survivor annuity" is an immediate nontransferable annuity for the life of the Participant with a survivor annuity for the life of the Spouse which is fifty percent (50%) of the amount of the annuity which is payable during the joint lives of the Participant and the Spouse and which is the Actuarial Equivalent of the Normal of Retirement Benefit.

However, if the Spouse predeceases the Participant, the benefit shall revert to the increased life annuity for the lifetime of the Participant.

(c)    Participant's "earliest retirement age" is the earliest date on which, under the Plan, the Participant could elect to receive retirement benefits.

15.6.02    Qualified Preretirement Survivor Annuity.

(a)    If a vested Participant dies after the earliest retirement age, but prior to the Annuity Starting Date, such Participant's surviving Spouse, if any, will receive the same benefit that would Participant had retired with an immediate automatic joint and survivor annuity payable on the day before such Participant's death.

(b)    The surviving Spouse may elect to commence payment under such annuity on the first day of any month after the Participant's death.  The actuarial value of benefits which commence later than the date on which payments would have been made to the surviving Spouse under an automatic joint and survivor annuity in accordance with this provision shall be adjusted to reflect the delayed payment.  In calculating the actuarial value of such benefit, the Participant's age will be assumed to be his age at his date of death.

(c)    If a vested Participant dies on or before the earliest retirement age, the Participant's surviving Spouse (if any) will receive the same benefit that would be payable if the Participant had:

(i)    separated from service on the date of death (or date of separation from service, if earlier),

(ii)    survived to the earliest retirement age,

(iii)    retired with an immediate qualified joint and survivor annuity at the earliest retirement age, and

- 28 -

(iv)    died on the day after the earliest retirement age.

(d)    A surviving Spouse will begin to receive payments at the Participant's earliest retirement age.   Benefits commencing after the Participant's earliest retirement age will be the Actuarial Equivalent of the benefit to which the surviving Spouse would have been entitled if benefits had commenced at the earliest retirement age under an immediate automatic joint and survivor annuity.

(e)    For the purposes of this Section 15.6.02, the benefit payable to the surviving Spouse shall be attributable to Employee contributions in the same proportion as the total Accrued Benefit derived from Employee contributions is to the Accrued Benefit of the Participant.

15.6.03       Qualified Election.

A Participant may waive the automatic joint and survivor annuity described in Section 15.6.01, receive a refund of his contributions under Section 15.8 or 15.10, or designate someone other than his Spouse, except for the benefit payable under the provisions of Sections 15.6.06 and 15.6.07 hereof, only if:

      (a)     the Participant's Spouse consents in writing to the election;

      (b)     with the exception of a life annuity the election designates a specific alternate Beneficiary, including any class of Beneficiaries or any contingent beneficiaries, which may not be changed without spousal consent, or the Spouse expressly permits designations by the Participant without any further spousal consent;

      (c)     the Spouse's consent acknowledges the effect of the election; and

      (d)     the Spouse's consent is witnessed by a Plan representative or notary public. Additionally, a Participant's waiver of the qualified joint and survivor annuity will not be effective unless the election designates a form of benefit payment which may not be changed without spousal consent, or the Spouse expressly permits designations by the Participant without any further spousal consent. If it is established to the satisfaction of the Board of Managers that such written consent may not be obtained because there is no Spouse or the Spouse cannot be located, a waiver will be deemed a qualified election.

Any consent by a Spouse obtained under this provision (or establishment that the consent of a Spouse may not be obtained) shall be effective only with respect to such Spouse. A consent that permits designations by the Participant without any requirement of further consent by such Spouse must acknowledge that the Spouse has the right to limit consent to a specific Beneficiary, and a specific form of benefit where applicable, and that the Spouse voluntarily elects to relinquish either or both of such rights. A revocation of a prior waiver may be made by a Participant without the consent of the Spouse at any time prior to the commencement of benefits. The number of revocations shall not be limited. No consent obtained under this provision shall be valid unless the Participant has received notice as provided in 15.6.04 below.

15.6.04        Notice Requirements.

(a)        With regard to the automatic joint and survivor annuity described in Section 15.6.01, the Board of Managers shall provide each Participant, no less than thirty (30) days and no more than ninety (90) days prior to the Annuity Starting Date, a written explanation of:

(i)        the terms and conditions of an automatic joint and survivor annuity;

(ii)        the Participant's right to make and the effect of an election to waive the automatic joint and survivor annuity form of benefit;

(iii)        the rights of a Participant's Spouse;

(iv)        the right to make, and the effect of, a revocation of a previous election to waive the automatic joint and survivor annuity; and

(v)        the relative values of the various optional forms of benefit under this Article 15.

(b)    If the Participant, after having received this notice, affirmatively elects a distribution, the distribution may commence less than thirty (30) days after the notice was given if the Board of Managers provides information to the Participant clearly indicating that the Participant has a right to at least thirty (30) days to consider whether to consent to the distribution.

15.6.05    In-Service Lump-Sum Death Benefit.

(a)    A lump-sum death benefit shall be payable to the designated Beneficiary of an Active Participant in an amount equal to twenty-five thousand dollars ($25,000). This benefit shall be in addition to, and not in limitation of, any other benefits provided under the terms of this Plan. The benefit shall be paid as soon as is practicable after the date of such Participant's death.

(b)    An Active Participant who sustains accidental bodily injury and which accidental injury results in death or loss of hand, foot, or sight will be covered for up to $25,000, depending upon whether the injury results in death ($25,000), loss of one hand, one foot or one eye ($12,500) or loss of two or more members ($25,000). This benefit shall be in addition to, and not in limitation of, any other benefits provided under the terms of this Article 15. The benefit shall be paid as soon as is practicable after the date of such Participant's injury.

15.6.06    Post-Retirement Lump-Sum Death Benefit.

A lump-sum death benefit shall be payable to the designated Beneficiary of a Participant who has retired under the Normal, Early, Delayed or Disability provisions of this Article in an amount equal to ten thousand dollars ($10,000). This benefit shall be in addition to, and not in

- 32 -

limitation of, any other benefits provided under the terms of this Article 15. The benefit shall be paid as soon as is practicable after the date of such Participant's death.

15.6.07    Dependent Child's Pre-Retirement Death Benefit.

If a Participant who has both attained the age of fifty-five (55) and completed twenty (20) years of Uninterrupted Seniority dies prior to retirement or termination of employment, and at the time of his death is survived by a Dependent Child or Children, a monthly death benefit shall be payable on behalf of such Dependent Child or Children. The amount of monthly benefit payable on behalf of each Dependent Child shall be equal to fifty percent (50%) of the surviving spouse's pension payable in accordance with Section 15.6.02 hereof, or, in the event the Participant has no Spouse at the time of his death, fifty percent (50%) of the Spouse's pension that would have been payable in accordance with Section 15.6.02 hereof if the Participant had had, at the time of his death, a surviving Spouse who was two (2) years younger than himself; provided, however, that the total amount of death benefit payable on behalf of all such Dependent Children shall in no event be more than one hundred percent (100%) of such surviving Spouse's pension. If there shall be more than two (2) such Dependent Children, the total death benefit payable shall be allocated equally among them. The provisions of this Section 15.6.07 shall be subject to the provisions of Section 15.8.02.

15.6.08    Dependent Child's Post-Retirement Death Benefit.

(a)    An unmarried Participant may elect to provide death benefit protection for his Dependent Children after his retirement. The election shall be made by filing a request with the Board of Managers, on forms to be provided by the Trustees, at any time prior to actual retirement. The request shall include such information as the Trustees may require, and

- 33 -

the participant and all persons claiming under him shall be bound by the information provided. If an unmarried participant who has elected such protection retires at a Normal or Early Retirement Date, and upon his subsequent death is survived by a Dependent Child or Children, a monthly death benefit shall be payable on behalf of such Dependent Child or Children. The amount of monthly death benefit payable on behalf of each Dependent Child shall be equal to twenty-five percent (25%) of the reduced pension which would have been payable to the Participant if he had, at retirement, a Spouse two (2) years younger than himself and had elected to receive his pension in the form described in Section 15.6.01(a), with such Spouse as his survivor annuitant; provided, however, that the total amount of such death benefit payable on behalf of all such Dependent Children shall in no event be more than fifty percent (50%) of such reduced pension. If there shall be more than two (2) such Dependent Children, the total death benefit payable shall be allocated equally among them.

(b)     If a married Participant retires at a Normal or Early Retirement Date and elects or is deemed to have elected to receive his pension pursuant to Section 15.6.01, and upon his subsequent death is survived by a Dependent Child or Children, a monthly death benefit shall be payable on behalf of such Dependent Child or Children. The amount of monthly death benefit payable on behalf of each Dependent Child shall be equal to twenty-five percent (25%) of the reduced pension which would have been payable to the Participant if he had elected to receive his pension in the form described in Section 6.01 (a) above; provided, however, that the total amount of death benefit payable on behalf of all such Dependent Children shall in no event be more than fifty percent (50%) of such reduced pension. If there shall be more than two (2) such Dependent Children, the total death benefit payable shall be allocated equally among them.

- 34 -

15.6.09        Payment Of Dependent Child's Benefit.

The monthly death benefit payable on behalf of a Dependent Child, as provided in Section 15.6.07 or 15.6.08 hereof, shall be paid to the person principally responsible for the financial support of such Dependent Child, and shall commence on the first day of the month following the month in which the death of the Participant or retired former Participant occurred. Such benefit shall be payable monthly thereafter until the Dependent Child on whose behalf the benefit is being paid ceases to be a Dependent Child in accordance with Section 15.1.09 hereof, provided, however, that if at the time a Dependent Child ceases to be a Dependent Child there shall still be two (2) or more Dependent Children of the deceased Participant or retired former Participant, then the death benefit being paid on behalf of the child who ceases to be a Dependent Child shall not terminate but shall be allocated equally among all remaining Dependent Children and shall continue to be paid on their behalf.

**15.7        OPTIONAL METHODS OF RETIREMENT PAYMENTS**

15.7.01        Optional Elections.

Each married vested Participant whose Accrued Benefit has a present value in excess of five thousand dollars ($5,000), shall have the right, at any time and from time to time prior to the commencement of a retirement benefit hereunder, to elect to have such retirement benefit payable under any one of the options hereinafter set forth in this Section in lieu of the retirement benefit otherwise payable under any of the provisions of this Article 15. The amount of any optional retirement benefit shall be the Actuarial Equivalent of the Normal Form of Retirement Benefit otherwise payable to such Participant.  The Participant shall make

- 35 -

such an election by written request to the Board of Managers and such an election will be subject to the spousal consent requirement of Section 15.9.05.

Joint and Survivor Option: A married Participant may elect to receive a monthly retirement benefit during the lifetime of the Participant and have either (a) fifty percent (50%) or (b) one hundred percent (100%) of such monthly retirement benefit continued after the Participant's death to a Spouse during the remaining lifetime of the Spouse within the restrictions contained in Section 3.09.

15.7.02    Limitation On Optional Elections.

(a)    Payments under any optional retirement benefit elected under the provisions of Section 15.7.01 hereof shall be subject to the distribution period restrictions of Section 3.09.

(b)    A Participant may not elect irrevocably before retirement any option which would with certainty pay all or part of his non-forfeitable interest to a designated Beneficiary after the Participant's death.

(c)    Any annuity contract distributed by the Plan must be nontransferable.

(d)    Once distributions under an optional form of benefit have begun, such form of payment shall be irrevocable except in the case of a distribution made in the form of a joint and survivor annuity where the Spouse predeceases the Participant in which case the joint and survivor form of payment shall be automatically converted to an Actuarial Equivalent life annuity.

15.7.03    Further Limitations On Optional Elections.

After an election of an option has been made, such election shall be automatically null and void in the following circumstances:

(a)    If the survivor annuitant predeceases the Participant or ceases to be married to the Participant prior to his actual retirement under this Article 15, the option shall not become effective, and payment shall be made as otherwise provided in this Article 15 as if an option had never been elected; except that if the Participant remarries prior to the date of his

actual retirement, he will be permitted to again elect a joint and survivor option naming his new Spouse as survivor annuitant, provided he fulfills all other requirements of Section 15.7.01.

(b)    If the Participant who had elected an option dies prior to actual retirement under the Plan, the option shall not become effective and the survivor annuitant shall not be entitled to any payments under the provisions of this Section 15.7, except as may be provided by Section 15.7.02 hereof.

## 15.8        RETURN OF CONTRIBUTIONS

15.8.01        Upon Termination of Employment Prior to Vesting.

Any Participant who loses his status as an Employee hereunder before having completed five (5) years of Uninterrupted Seniority, whether by reason of his resignation from or abandonment of his employment with the Employer, or by reason of his discharge from employment, or who loses his status as an Employee hereunder for any other reason whatsoever, shall be entitled to and shall be paid a refund of his contributions, with interest at the rate of one hundred twenty percent (120%) of the federal mid-term rate (as in effect under Code Section 1274 for the first month of a Plan Year) from the beginning of the first Plan Year to which Code Section 411(a)(2) applies and ending with the date on which the determination is being made, and shall not be entitled to any benefits hereunder. Any Participant who loses his status as an Employee as above, but after having completed five (5) years of Uninterrupted Seniority, shall still be entitled to a benefit upon attaining age sixty-five (65). The amount of such pension shall be calculated in accordance with Section 15.5.01, but will be reduced by the value of such Participant's Employee Contribution Benefit determined in accordance with Section 15.1.17, which has been received by the Participant; provided further, such Participant

- 38 -

may elect not to withdraw such contribution plus interest, in which case his pension upon attaining age sixty-five (65) will be calculated as in Section 15.5.01. Any election by such Participant to withdraw his contributions with interest must be made in accordance with the provisions of Section 15.6.03.

15.8.02        Refund Upon Death.

(a)        If a Participant dies prior to satisfying the requirements for a benefit under Section 15.4.03, the Plan shall pay to the Beneficiary designated by such Participant, or to his widow, or to the guardian of his minor children if his wife has pre-deceased him, or to his estate, the total amount of such Participant's contributions with interest except as provided in subsection (b) hereof. Interest shall be determined as provided in Section 15.8.01. The provisions of this Section 15.8.02 shall not apply if the Participant's Spouse is entitled to a Spouse's pension, as provided in Section 15.6.02(a). The benefit payable to the Spouse of a Participant under the provisions of Section 15.6.02(c) hereof will be reduced by the Employee Contribution Benefit, determined in accordance with Section 15.1.17, which has been received by such Spouse under the provisions of this Section 15.8.02.

If an unmarried Participant dies while in the active employment of an Employer, and is survived by a Dependent Child or Children on whose behalf death benefits are payable in accordance with Section 15.6.07 hereof, the provisions of this Section 15.8.02 shall apply in lieu of said Section 15.6.07 if and only if the total amount of such Participant's contributions with interest shall be greater than the present value of the Dependent Child's death benefit.

(b)        The Spouse of a Participant who is eligible for a benefit under the provisions of Section 15.6.02(c) hereof may elect not to take a distribution of the deceased

- 39 -

Participant's contributions plus interest in which event the benefit payable to such Spouse under the provisions of Section 15.6.02(c) hereof will not be reduced as provided under subsection (a) hereof. However, if a Spouse elects not to take a distribution of a Participant's contributions with interest and then dies prior to the commencement of benefits under the provisions of Section 15.6.02(c), the Participant's contributions with interest will be paid to the Spouse's designated Beneficiary.

15.8.03        Cessation of Payment upon Death.

In the event a Participant dies after monthly pension payments have commenced, no further payment shall be made from the Plan and his estate or any Beneficiary designated by such deceased Participant shall have no claim under the provisions of this Plan, except that the balance, if any, of the Participant's contribution to the Plan shall be paid to the deceased Participant's designated Beneficiary or legal representative.    Lacking such designated Beneficiary or legal representative, payment shall be made in the following order of priority.

(a)     to his surviving spouse, or if there be no surviving spouse,

(b)     to his surviving children, per stirpes, in equal parts, provided, however, that children by blood, marriage or adoption shall be considered children of the Participant or of his children, as the case may be, or if there be none surviving,

(c)     to his surviving mother and father, in equal parts, or if there be none surviving,

(d)     to his estate.

The provisions of this Section 15.8.03 shall not apply if the Participant's Spouse will receive a Spouse's pension, as provided in Section 15.6.01 or Section 15.6.02(a). Furthermore, the provisions of this Section 15.8.03 shall not apply if the Participant's Beneficiary will receive a monthly pension as provided in Section 15.1.24(a).

15.8.04     Repayment of Contribution upon Reemployment.

If the employment of a Participant is terminated prior to his completion of five (5) years of Uninterrupted Seniority, he shall receive a cash refund equal to his contributions plus interest, as provided in Section 15.8.01. If such a Participant shall thereafter again become a Participant hereunder and provided that he has not been absent from employment under this Article 15 for the number of 1-year Breaks in Service described in Section 15.3.05(a) hereof, such Participant may, within five (5) years of his date of reemployment, repay to the Plan the amount of the contributions and interest thereon paid to him in accordance with this paragraph, together with interest from the date of payment to the date of repayment, in accordance with the

provisions of subsections 15.1.17(b) and (c). If he so repays, he shall be treated as if he never received a refund of his contributions hereunder.

**15.9     BENEFITS ON TERMINATION OF EMPLOYMENT AND RETIREMENT UPON DISABILITY**

15.9.01          Termination Generally.

All rights of a Participant to all benefits under this Article 15 will cease upon his termination of Covered Employment prior to satisfaction of the conditions for retirement set forth in Section 15.4 of this Article 15, for a reason other than death, except as otherwise provided in this Section 15.9. The only benefits of any kind payable under any of the provisions of this Article 15 in the event of the death of a Participant prior to commencement of his retirement benefit are those provided in Sections 15.6 and 15.7 hereof.

15.9.02          Conditions for Vested Retirement Benefits.

If a Participant is in the employment of the Employer on the date he attains Normal Retirement Age, he shall have a one hundred percent (100%) vested interest in his Accrued Benefit. If the Participant terminates Covered Employment at any time prior to his Normal or Early Retirement Date, other than by Disability, the Participant shall have a vested interest in his Accrued Benefit equal to the percentage determined in accordance with the following schedule on the basis of his Years of Uninterrupted Seniority:

| Number of Years | Percentage of Accrued Benefit |
|---|---|
| Less than 5 full years | 0% |
| 5 full years | 100% |

15.9.03    Amount of Vested Retirement Benefits.

(a)    A terminated vested Participant shall receive his Accrued Benefit, determined as provided in this Section 15.9.03, commencing on his Normal Retirement Date. The amount of monthly retirement benefit payable shall be determined in the manner provided in Section 15.5.01 as applicable with years of Uninterrupted Seniority and benefit rate determined as of the date of his termination of employment with the Employer.

(b)    If a Participant satisfies the requirements for the commencement of benefits prior to his Normal Retirement Date in accordance with the provisions of Section 15.4.03(b), the amount of such pension shall be the vested amount provided in Section 15.9.02 reduced as provided in Section 15.1.03.

15.9.04    Single Sum Payment of Value of Vested Retirement Benefits.

(a)    The Board of Managers shall direct the Trustee to pay a Participant, in a single sum, an amount equal to the Actuarial Equivalent value, as of the date of payment of the vested Accrued Benefit payable in lieu of any other form of such retirement benefit, provided the amount of such Actuarial Equivalent is not in excess of five thousand dollars ($5,000). The Actuarial Equivalent value of such cash out, shall be determined in accordance with the provisions of Section 15.1.03 of this Article 15. The nonvested portion of a

- 43 -

Participant's Accrued Benefit, if any, shall be treated as a forfeiture upon such cash out. For purposes of this Section, if the Actuarial Equivalent value of a Participant's vested Accrued Benefit is zero, the Participant shall be deemed to have received a distribution of such vested benefit.

(b)    If a Participant receives or is deemed to receive a distribution pursuant to this Section and the Participant resumes Covered Employment under this Article 15, he shall have the right to restore his Employer-derived Accrued Benefit (including all optional forms of benefits and subsidies relating to such benefits) to the extent forfeited upon the repayment to the Plan of the full amount of the distribution, with interest in accordance with the provisions of Section 15.1.17(c). Such repayment must be made not later than five (5) years after the first date on which the Participant is subsequently reemployed in Covered Employment, or the date the Participant incurs five (5) consecutive 1-year Breaks in Service following the date of distribution.

15.9.05    Participant and Spousal Consent for Immediately Distributable Benefits.

If the present value of a Participant's vested Accrued Benefit derived from Employer and Employee Contributions, if any, exceeds (or at any time of any prior distribution exceeded) five thousand dollars ($5,000), and the Accrued Benefit is immediately distributable, the Participant and the Participant's Spouse (or where either the Participant or the Spouse has died, the survivor) must consent to any distribution of such Accrued Benefit. The consent of the Participant and the Participant's Spouse shall be obtained in writing within the 90-day period ending on the Annuity Starting Date. The Board of Managers shall notify the Participant and the Participant's Spouse of the right to defer any distribution until the Participant's Accrued Benefit is no longer immediately distributable. Such notification shall include a general description of

the material features, and an explanation of the relative values of, the optional forms of benefit available under Section 15.7, and shall be provided no less than thirty (30) days and no more than ninety (90) days prior to the Annuity Starting Date. However, distribution may commence less than thirty (30) days after the notice described in the preceding sentence is given, provided the distribution is one to which Code Sections 401(a)(11) and 417 do not apply, the Board of Managers clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution, and the Participant after receiving the notice, affirmatively elects a distribution.

Notwithstanding the foregoing, only the Participant need consent to the commencement of a distribution in the form of an Automatic Joint and Survivor Annuity, described in Section 15.6.01 of this Article 15, while the Accrued Benefit is immediately distributable. Neither the consent of the Participant nor the Participant's Spouse shall be required to the extent that a distribution is required to satisfy Code Sections 401(a)(9) or 415. An Accrued Benefit is "immediately distributable" if any part of the Accrued Benefit could be distributed to the Participant (or surviving Spouse) before the Participant attains (or would have attained if not deceased) the later of Normal Retirement Age or age sixty-two (62).

15.9.06     Disability Termination.

(a)    A Participant shall be eligible for a Disability Retirement as defined in Section 15.4.04 if he has incurred, through some unavoidable cause, a total and permanent Disability as defined in Section 15.1.10.  Disability shall be deemed to have resulted from an unavoidable cause unless it was contracted, suffered, or incurred while the Participant was engaged in a willful criminal enterprise or resulted from a deliberate self-inflicted injury.

(b)    Upon a Participant's retirement under this Section 15.9.06, the Participant shall be automatically entitled to receive a monthly retirement benefit, commencing on the first day of the seventh month following his date of Disability, and continuing on the first day of each month thereafter during his lifetime.  Such monthly retirement benefit shall be determined in the same manner as the monthly retirement benefit payable upon retirement at the Normal Retirement Date of the Participant, determined as of the date of his Disability retirement.

(c)    Benefits payable under this Section 15.9.06 shall be in lieu of any benefits payable under any other Section of this Article 15; provided however, any loss of rights to benefits under this Section 15.9.06 shall not deprive a Participant of any benefits that he might otherwise be entitled to receive under this Article 15.

(d)    If a Participant loses all rights to any benefits under this Section 15.9.06 because, prior to his Normal Retirement Date, his total and permanent Disability has ceased, and if such Participant resumes Covered Employment immediately after the cessation of such Disability, then automatically after such resumption of employment he shall resume participation in this Article 15 provided he agrees to make mandatory Employee Contributions pursuant to Section 15.2.01.  The benefits to which such Participant will

subsequently be entitled, however, will be calculated in accordance with the provisions of Section 15.9.08 hereof.

15.9.07        Disability Retirement.

Where a Participant applies to the Board of Managers for a Disability pension and the Board of Managers, at a meeting, finds upon all the medical evidence before the Board of Managers that such Participant is totally and permanently disabled, they shall set forth in full in the minutes of the meeting their specific findings as to the nature, cause and extent of the Disability.

15.9.08        Review of Disability Pension Payments.

The continued payment of a Disability pension shall be subject to review by the Board of Managers at any time upon the motion of any member of the Board of Managers. If at any time before the Normal Retirement Date of a Participant who is the recipient of a Disability retirement pension, the Board of Managers finds based upon all the medical evidence before them that the Participant is no longer totally and permanently disabled, the Participant's Disability retirement benefits shall cease. Upon the subsequent retirement of such Participant, whether at normal retirement, early retirement, or a subsequent Disability retirement, the Participant's pension will be calculated as the sum of (i) a benefit based on the Participant's Uninterrupted Seniority determined as of his Disability Retirement Date, and (ii) a benefit based on the Participant's Uninterrupted Seniority earned after his Disability ceases, determined on his subsequent retirement date. Continued payment of a Disability pension shall not be subject to review after the Participant shall have attained the age of sixty-five (65), or, if the Participant has

at least twenty (20) years of Uninterrupted Seniority, after he has attained the age of fifty-seven (57), nor shall he be required to establish continuing Disability after such date.

15.9.09        No Forfeiture upon Withdrawal of Employee Contribution.

If a Participant has a nonforfeitable right to at least fifty percent (50%) of his employer-derived Accrued Benefit, then no forfeitures will occur solely as a result of a Participant's withdrawal of Employee Contributions.

**15.10        FUNDING**

15.10.01       Contributions By Participants.

(a)        Each Participant shall be obligated and required to make contributions to the Plan in such amounts and at such times as shall be provided in the collective bargaining agreements or other agreements between the Employer and the Union. The rate of contribution payable by the Participant shall not exceed the amount payable by his Employer.

(b)        Each Participant shall execute a wage deduction authorization, authorizing and directing the Employer to deduct weekly from any wages, vacation benefits or sick benefits payable to him by the Employer, the amounts payable under subsection (a) above and directing the Employer to pay over to the Plan, within ten (10) days after the day on which the deduction is made, the amount so deducted. Such authorization shall not be revocable. For each week for which no such authorization is on file with the Employer because of the failure of the Participant to execute and deliver such authorization, there shall be added to the Participant's obligation to the Plan the sum of one dollar ($1.00) to cover administrative expenses, and no

monies so paid over and above the basic contribution shall be refundable under any circumstances.

(c)     When for any week or weeks other than for a period described in Section 15.3.06 no deduction is made on behalf of an Employee because neither wages, vacation benefits nor sick benefits were paid to such Employee for such week or weeks, the deduction on such Employee's behalf in each subsequent week, or weeks, shall be one hundred fifty percent (150%) of the basic contribution rate until such Employee's past obligations to the Fund are fully met.

(d)     Any Participant who transfers, or is transferred, to a position with the Employer not within the unit of Employees represented by the Union may continue as a participant and retain his eligibility for benefits hereunder by so electing in a written statement filed with the Board of Managers or its designee, provided contributions are continued in amounts aggregating the Employer's plus the Employee's Contributions required under this Section 15.10.   Such contributions may be made by the Employer, the Employee or any combination thereof approved by the Employer.  Any such Participant may elect to withdraw his contributions to the Plan by so notifying the Board of Managers or its designee in writing.  The repayment of such contributions by the Plan shall bear interest at the rate of one hundred twenty percent (120%) of the Federal mid-term rate as in effect on the first day of each Plan Year.  Upon withdrawal of such contributions, the following shall govern:

(i)     If the Participant was transferred before completing five (5) years of Uninterrupted Seniority, all his rights to benefits hereunder shall cease.

(ii)    If the Participant was transferred after completing five (5) years of Uninterrupted Seniority, he shall be entitled, upon attaining age sixty-five (65), to that part of his normal pension benefit which is attributable to Employer contributions. This election to withdraw his own contributions shall be subject to the provisions of Section 15.6.03 hereof.

(e)    Employee Contributions, plus the interest earned thereon, shall be nonforfeitable at all times.

15.10.02    Contributions by Employers.

(a)    The Employer shall make contributions to the Plan in such amounts as shall be provided in the Agreements between the Employer and the Union, or as they may be amended from time to time. Contributions by the Employer to the Plan shall be accompanied by reports containing such information as may be prescribed by the Board of Managers. All contributions shall be irrevocable and may be used only for the benefit of the Participants and their Spouses and/or Beneficiaries. The actuarial liabilities for benefits under this Article 15 that may be forfeited in the event of severance from employment, death, or for any other reason, shall be used in the determination of Employer contributions made immediately following such forfeiture to effect a reduction in such contributions and shall in no event be applied to increase any of the benefits under this Article 15.

(b)    In addition to its contributions, the Employer may elect to pay all the administrative expenses of this Article 15 and all fees and retainers of the Board of Managers, actuary, accountant, counsel, consultant, administrator, or other specialist so long as the Plan and Trust remain in effect. If the Employer does not pay all or part of such expenses directly, the Board of Managers shall pay these expenses from the Plan's Trust. All expenses

- 50 -

directly relating to the investments of the Plan's Trust, including taxes, brokerage commissions, and registration charges must be paid from the Plan's Trust.

**15.11        MISCELLANEOUS**

15.11.01        Participant's Rights; Acquittance.

Neither the establishment of this Article 15, nor any modification thereof, nor the creation of this Article 15, nor the payment of any benefits, shall be construed as giving to a Participant or other person any legal or equitable right against any Employer, or any officer or Employee thereof, or a member of the Board of Managers, or the Board of Managers, except as herein provided.  Under no circumstances shall the terms of employment of a Participant be modified or in any way affected hereby.

15.11.02        Receipt or Release.

Any payment to a Participant, Spouse or Beneficiary or to their legal representatives, in accordance with the provisions of this Article 15, shall to the extent thereof be in full satisfaction of all claims hereunder against the Board of Managers, and the Employer, any of whom may require such Participant, Spouse, Beneficiary, or legal representative, as a condition precedent to such payment, to execute a receipt and release therefor in such form as shall be determined by the Board of Managers or the Employer as the case may be.

15.11.03        Payments To Legally Incompetent.

If any Participant, Spouse or Beneficiary is a minor or is, in the judgment of the Board of Managers, otherwise legally incapable of personally receiving and giving a valid receipt for any payment due him under this Article 15, the Board of Managers may, unless and

- 51 -

until claim shall have been made by a duly appointed guardian or committee of such person, make such payment or any part thereof to such person's Spouse, child, parent, brother or sister or other person deemed by the Board of Managers to have incurred expense for or assumed responsibility for the expenses of such person.   Any payment so made shall be a complete discharge of any liability under the Plan for such payment.

15.11.04       Payment To Incapacitated Participant.

In the event that a Participant suffers from an incapacity, the nature of which prevents his making an application for benefits hereunder either individually or through an exercise of a power of attorney, and such incapacity is evidenced by a written statement to that effect by a duly licensed physician, then an irrebuttable presumption shall arise that the Participant would have made such a claim if able, and the application shall be deemed made; provided, however, that the designated Beneficiary of such Participant consents in writing to the making of such claim and acknowledges that the making of payments thereunder could result in a possible loss to such Beneficiary.

15.11.05       Divestment of Benefits.

No payment of benefits provided under this Article 15 shall be forfeited, when due, because of any action of a Participant or his Spouse or Beneficiary, except for the lack of fulfillment of any requirement under any of the terms of this Article 15 for the completion of any specified period of Uninterrupted Seniority or the attainment of any specified age, for qualification for such benefits.

15.11.06       Lost Beneficiary or Participant.

If a benefit is forfeited because the Participant, Spouse, or Beneficiary cannot be found, such benefit will be reinstated if a claim is made by the Participant, Spouse, or Beneficiary.

15.11.07    Duplication of Benefits.

If a Participant is entitle to any retirement income or other benefits attributable to Employer Contributions from any other qualified defined benefit retirement or annuity maintained by the Employer, the benefits to which such Participant may be entitled under this Article 15 shall be reduced by an amount equal to such other retirement income or benefits, to the extent such benefits are attributable to concurrent periods of employment.    In the determination of any benefit to which a Participant or Beneficiary will be entitled under the Plan, adjustments shall be made to reflect any amounts previously distributed under this Article 15 and to reflect any amounts required to be paid to the Participant's Spouse or former Spouse under any law or qualified domestic relations order as described in Code Section 414(p).

15.11.08    Amendment.

No amendment to this Article 15 shall reduce the Accrued Benefit of any Participant and no amendment shall be made to the vesting provisions of this Article 15 which has the effect of reducing the nonforfeitable benefit to which the Participant would have been entitled to in accordance with the provisions of this Article 15 if he had terminated his employment with the Employer on the date on which such amendment is to be effective, nor shall any amendment affecting the vesting provisions in this Article 15 be made unless any Participant who has completed three (3) Years of Service on the date on which such amendment

is to be effective, is allowed to elect to have his nonforfeitable benefit computed under the prior vesting schedule.

## 15.12 CERTAIN PARTICIPANTS IN THE TWU-NYC PLAN OTHER THAN FORMER QJT EMPLOYEES

Each individual who was receiving benefits or entitled to receive benefits under the terms of the TWU-NYC Plan immediately prior to the Effective Date and who is not a Former QJT Employee (including any retiree receiving benefits under the TWU-NYC Plan as of the Effective Date and any deferred vested participant under the TWU-NYC Plan as of the Effective Date) shall be entitled to receive benefits from this Plan on and after the Effective Date in accordance with the terms of the TWU-NYC Plan, as applicable, in effect immediately prior to the Effective Date. Any individual who shall become a Participant in accordance with the terms of this Article 15 after the Effective Date shall not be subject to this Section 15.12 but shall be subject to the remaining provisions of this Article 15.

# **EXHIBIT G**

**RESOLUTIONS**
**OF**
**THE TRANSPORT WORKERS UNION-NEW YORK CITY PRIVATE BUS LINES**
**PENSION TRUST**

**WHEREAS**, the Board of Trustees (the "Trustees") of the T.W.U.- New York City Private Bus Lines Pension Trust (the "Trust") sponsors the T.W.U. - NYC Private Bus Lines 401(k) Savings Plan (the "Savings Plan"), which is intended to be qualified under section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"); and

**WHEREAS**, pursuant to Section 11.2.1 of the Savings Plan, the Trustees may terminate the Savings Plan at any time; and

**WHEREAS**, Section 11.3.2 sets forth the terms and conditions of any termination of the Savings Plan; and

**WHEREAS**, pursuant to the Agreement, dated as of February 23, 2005, by and between Queens Surface Corporation ("Queens Surface") and the City of New York (the "City"), the City acquired substantially all of the assets of Queens Surface (the "Queens Surface Acquisition"); and

**WHEREAS**, pursuant to the Agreement, dated as of November 29, 2005, by and among Jamaica Buses, Inc. ("Jamaica"), Triboro Coach Corp. ("Triboro"), the City and other parties thereto, the City acquired substantially all of the assets of Jamaica and Triboro (the "Transit Alliance Acquisition"); and

**WHEREAS**, as a result of the Queens Surface Acquisition and the Transit Alliance Acquisition, the Trustees desire to terminate the Savings Plan.

**NOW, THEREFORE, IT IS**

**RESOLVED**, that the Savings Plan be, and hereby is, terminated effective as soon as practicable (the "Termination Date"), pursuant to Section 11.2.1 of the Savings Plan and in accordance with Section 11.3.2 of the Savings Plan, including the requirements that the rights of each affected participant to benefits with respect to assets remaining in the Savings Plan on the Termination Date shall be nonforfeitable and that the assets shall be distributed to participants as soon as administratively practicable but in no event later than one year after the Termination Date; and it is further

**RESOLVED**, that following the Termination Date, the Savings Plan shall continue to be administered in accordance with the terms thereof until all Savings Plan assets have been distributed, except that no further contributions shall be made to the Savings Plan after the Termination Date; and it is further

**RESOLVED**, that the Trustees and proper individuals acting on behalf of the Savings Plan and the Trust (including the Fund Director) be, and each of them hereby is, authorized, empowered and directed to execute such documents, enter into such agreements and take such

steps and actions as they, together with and upon the advice of counsel, shall deem necessary, appropriate or advisable to carry out the intent and purposes of all the foregoing, including, but not limited to, preparing and filing with the Internal Revenue Service an annual report on Form 5500 for the final year of the Savings Plan, such determination to be conclusively evidenced by the execution of such documents, the entry into such agreements and the taking of such steps and actions.

**RESOLVED**, that these resolutions may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the undersigned Trustees have duly executed the foregoing resolutions this _2rd_ day of _March_, 2006.

**UNION TRUSTEES**

Roderick Bailey

Kevin Cadigan

Hector Comrie

Jerry Greenhaus

Neil Winberry

**EMPLOYER TRUSTEES**

Margaret Connor

Marjorie E. Henning

Susan Kupferman

Mark Page

Bernard Rosen

10081214.2                                    2

# EXHIBIT H

**RESOLUTIONS**
**OF**
**THE T.W.U.-NEW YORK CITY PRIVATE BUS LINES HEALTH BENEFIT TRUST**

**WHEREAS**, the Board of Trustees (the "Trustees") of the T.W.U.-New York City Private Bus Lines Health Benefit Trust (the "Trust") sponsors the T.W.U.-NYC Private Bus Lines Health Benefit Plan (the "Plan"); and

**WHEREAS**, pursuant to Section 10 of the Trust, the Trustees may terminate the Trust and the Plan at any time; and

**WHEREAS**, pursuant to the Agreement, dated as of February 23, 2005, by and between Queens Surface Corporation ("Queens Surface") and the City of New York (the "City"), the City acquired substantially all of the assets of Queens Surface (the "Queens Surface Acquisition"); and

**WHEREAS**, pursuant to the Agreement, dated as of November 29, 2005, by and among Jamaica Buses, Inc. ("Jamaica"), Triboro Coach Corp. ("Triboro"), the City and other parties thereto, the City acquired substantially all of the assets of Jamaica and Triboro (the "Transit Alliance Acquisition"); and

**WHEREAS**, as a result of the Queens Surface Acquisition and the Transit Alliance Acquisition, the Trustees desire to terminate the Trust and the Plan.

**NOW, THEREFORE, IT IS**

**RESOLVED**, that the Trust and the Plan be, and hereby are, terminated effective March 31, 2006 (the "Termination Date"); and it is further

**RESOLVED**, that following the Termination Date, the Fund and the Plan shall continue to be administered in accordance with the terms thereof until the affairs of the Fund and the Plan are wound up; and it is further

**RESOLVED**, that the Trustees and proper individuals acting on behalf of the Plan and the Trust (including the Fund Director) be, and each of them hereby is, authorized, empowered and directed to execute such documents, enter into such agreements and take such steps and actions as they, together with and upon the advice of counsel, shall deem necessary, appropriate or advisable to carry out the intent and purposes of all the foregoing, such determination to be conclusively evidenced by the execution of such documents, the entry into such agreements and the taking of such steps and actions.

**RESOLVED**, that these resolutions may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the undersigned Trustees have duly executed the foregoing resolutions this 2nd day of March, 2006.

**UNION TRUSTEES**

_____
Roderick Bailey

_____
Kevin Cadigan

_____
Hector Comrie

_____
Jerry Greenhaus

_____
Neil Winberry

**EMPLOYER TRUSTEES**

_____
Jerome Cooper

_____
Stephen Eagar

_____
Thomas Eagar

_____
Thomas Elkins

_____
Doris Drantch

10083953.1                                        2